## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| PRADEEP TRIPATHI, an individual; NEXUS ENVIRONMENTAL, LLC, a Florida limited liability company, | ) ) ) | |
| | ) | No. |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OPUS GROUP AB, f.k.a. OPUS PRODOX AB, a company organized under the laws of the Kingdom of Sweden; OPUS INSPECTION, INC., a Delaware corporation, | ) ) ) | |
| | | |
| Defendants. | | |

## COMPLAINT
## AND JURY DEMAND

Plaintiffs Pradeep Tripathi ("Tripathi") and Nexus Environmental, LLC ("Nexus"), by their undersigned attorneys, as and for their Complaint against defendant Opus Group AB, f.k.a. Opus Prodox AB ("Opus Group") and Opus Inspection, Inc. ("Opus Inspection") (together, "Opus"), state as follows:

## Introduction

1.      This case arises out of Opus's failure to pay Tripathi approximately $15,000,000 in earn-out payments that are due under a sale and purchase agreement, as well as Opus's anticompetitive efforts to keep Tripathi out of the vehicle safety and environmental inspection/maintenance ("I/M") systems and services marketplace, which have caused additional millions of dollars in damages.

**The Parties**

2.      Plaintiff, Pradeep Tripathi, is an individual residing in Florida.  Tripathi is an industrial engineer and entrepreneur who founded Systech International LLC, a vehicle I/M systems and services company that was sold to Opus in 2008.

3.      Plaintiff, Nexus Environmental, LLC, is a Florida limited liability company that was formed by Tripathi in July 2011.  Nexus was intended to be a vehicle I/M systems and services company, but Opus, through its wrongful conduct, successfully prevented Nexus from entering that market.

4.      Defendant, Opus Group AB, f.k.a. Opus Prodox AB is a public company organized under the laws of the Kingdom of Sweden and listed on the Swedish Nasdaq (Nasdaq OMX First North Premier) under the ticker OPUS.  Opus is engaged in the development, manufacture and marketing of products and services within automotive test systems and vehicle inspection services for the global market.  Opus's 2016 revenues were approximately $190 million.

5.      Defendant Opus Inspection, Inc. is a Delaware corporation and a wholly owned subsidiary of Opus Group.

**Jurisdiction and Venue**

6.      Opus Group and Tripathi agreed to the jurisdiction and venue of this Court.  In their contract which is the subject of this action, they agreed that "each of the parties hereby irrevocably submits to the jurisdiction of the United States District Court of the Southern District of New York . . . in any action, suit or proceeding brought against it by the other party under this Agreement."

7.      Further: (a) jurisdiction is proper pursuant to 28 U.S.C.A. § 1332(a) because Tripathi is a citizen of Florida and is the sole member of Nexus, Opus Group is a citizen of a

foreign state, Sweden, Opus Inspection is a citizen of a foreign state, and the matter in

controversy exceeds the sum of $75,000; (b) jurisdiction is proper under 28 U.S.C.A. § 1331 for

those claims arising under the laws of the United States.   This Court has supplemental

jurisdiction over all related claims pursuant to 28 U.S.C.A. 1367.

## Factual Background

8.      In 1999, Tripathi, an engineer and entrepreneur, founded Systech International,

LLC ("Systech"), a vehicle safety and environmental inspection / maintenance  systems and

services company.  Mr. Lothar Geilen joined Systech in 2000 as President and became a member

of Systech by 2001.

9.      Systech was an innovative company in the field of vehicle I/M, producing many

first-in-industry technologies, including web technology based inspection systems, handheld

testing using Palm OS, biometric inspector authentication, on-demand video auditing and

wireless remote on-board diagnostic testing.

10.     In the decade after its founding, Systech grew to become a leading operator in the

vehicle I/M industry, winning dozens of contracts to provide I/M systems and services

throughout the United States and worldwide

11.     Systech acquired the bulk of its business by: 1) submitting bids in response to

request for proposals ("RFP") for exclusive contracts to provide vehicle I/M systems and

services for countries, states, counties and various jurisdictions across the world, and

2) qualifying and competing in open-markets that were not awarded on an exclusive basis.  For

RFP bid-based programs, contracts are typically awarded for two-to-five-year duration to the

winning bidder, which may then be the exclusive supplier of vehicle I/M systems and/or services

during the contract period.  Systech developed an excellent success rate in RFP bids and open

market competition, making it an attractive company to prospective purchasers.

### A. Opus purchases Systech

12.     One such purchaser that approached Systech was Opus.  On March 2, 2008, Opus,

Tripathi and Geilen signed a Sale and Purchase Agreement Relating to 100% of the Membership

Interest in Systech International, LLC and Trilen LLC, under which Opus agreed to purchase

Tripathi's and Geilen's interests in Systech.

13.     The agreement was amended on April 8, 2008.  (A true and correct copy of the

agreement, as amended (the "SPA"), is attached hereto as Exhibit A.)  Unless otherwise defined,

capitalized terms used herein have the same meaning as set forth in the SPA.

14.     Opus intended for its purchase of Systech to enable it to compete as a fully

integrated provider of technologies and services in the business of vehicle inspection and

maintenance, a sector in which it had very limited modern technologies and expertise, resulting

in lack of market penetration.

15.     Opus announced that its purchase of Systech enabled Opus to become "a leading

supplier of complete solution[s] for automotive emission and safety inspection programs."

16.     In exchange for the membership interests of Tripathi and Geilen, Opus agreed to

provide certain compensation at the closing plus Earn-Out Payments not to exceed $25 million

(of which 75%, or $18,750,000, would be paid to Tripathi) (the "Maximum Earn Out").

17.     After the sale, Geilen continued with Opus as the head of its Vehicle Inspection

Division.  In 2017, Opus announced that Geilen had been appointed as its Chief Executive

Officer.

18.     As part of the SPA, Tripathi agreed not to compete against Opus for a period of thirty months.

**(i)     Opus agrees to make Earn Out Payments on profits from New Business**

19.     The terms under which Earn Out Payments should be made are set forth in Appendix 2.02(c) to the SPA.

20.     Opus agreed to make Earn Out Payments calculated as a percentage of profits earned "based on all New Business, generated by Systech, [Opus], any affiliate of either, or any successor or assign of either" during the fifteen-year period after April 20, 2008.

21.     In the SPA, "New Business" is defined as "all new projects (excluding extensions of existing projects) on a worldwide basis (except as herein provided) based on the business concepts or technologies that were developed or contemplated by Systech as of December 31, 2007."  (Exhibit A at Appendix 2.02(c)(1).)

22.     Such business concepts include, but are not limited to, performing decentralized vehicle inspection services or centralized vehicle inspection services.

23.     Such technologies include, but are not limited to, vehicle inspection database systems ("VID") and emission and safety test systems.

24.     Opus also agreed that it could not reduce, limit or avoid Earn Out Payments by changing the Systech business or shifting sales away from Systech in favor of Opus or its affiliates.

25.     If Opus acquires an active contract through the purchase of another business, then that acquired contract is exempt from Earn Out Payments, but any new contracts entered after the purchase that utilize the business concepts or technologies developed or contemplated by Systech would be subject to Earn Out Payments.

26.     In other words, Opus cannot refuse to make Earn Out Payments on new contracts or projects that utilize the business concepts or technologies developed or contemplated by Systech on the basis that the same business concepts or technologies were also contemplated by Opus or other entities it acquired.

27.     Further, Opus cannot avoid its Earn Out obligations to Tripathi by pursuing vehicle I/M business using an acquired and/or affiliated organization, when it could have pursued the same business using Systech's technology or business concepts.

**(ii)     Opus agrees to adjust revenues if necessary to ensure that annual Earn Out Payments are based upon a minimum profitability threshold**

28.     The parties included certain terms in the SPA that would ensure that Opus was unable to manipulate the profit generated by New Business in order to deny Tripathi his Earn Out Payments.

29.     Under the SPA, Opus effectively guaranteed that Tripathi would receive Earn Out Payments based upon a minimum profitability threshold for all New Business.

30.     Under the SPA, Opus is obligated to prepare annual financial reports based upon the actual performance for the year.  The relevant term states:

> Within forty-five (45) days after the end of each calendar year, Purchase shall develop in good faith actual project financials (the "Project Financials") for each project constituting New Business that will include the actual revenues ("Actual Revenues"), the actual costs (as defined in Section 8 Below) and the "Actual Net Profit" (defined as the Actual Revenues less the Actual Costs before income taxes) (all determined in accordance with GAAP).

(Exhibit A Appendix 2.02(c)(2).)

31.     These annual actual project financials for New Business were to be used to calculate annual Earn-Out Payments.

32.     The SPA provides that if the annual Actual Net Profit Margin with respect to a New Business project equals or exceeds 30%, then the annual Earn Out Payment for that project shall be 35% of the Actual Net Profit it generated (except that the Earn Out Payments are 25% of the Actual Net Profit for Centralized Business).  (*Id.*)

33.     However, in any given year in which the Actual Net Profit Margin for a New Business project falls below the triggering thresholds of 30% for non-Centralized Business or 25% with respect to Centralized Business, the Actual Revenues must be adjusted so that the Actual Net Profit Margin reaches those thresholds.  (*Id.*)  The annual Earn Out Payment must then be based upon those Modified Revenues.  (*Id.*)

34.     There is one situation in which an annual Earn Out Payment for a project may be based upon Actual Revenues (as opposed to Modified Revenues) notwithstanding the fact that the annual Actual Profit Margin for the project is below the triggering thresholds.  That exception is where, at the inception of a project, Tripathi is notified of, and pre-approves, the anticipated lower Earn Out Payment.  (Exhibit A Appendix 2.02(c)(3).)

35.     Absent Tripathi's pre-approval, Opus is never entitled to make an annual Earn Out Payment that is based upon a profit margin less than the triggering thresholds.  (*Id.*)

**B.  Opus struggles and Tripathi helps**

36.     Under Tripathi's leadership, prior to the sale to Opus, Systech was very successful in winning bids to provide vehicle I/M systems and services.

37.     Prior to the sale, Systech had been the successful bidder in at least six of eight straight major bids to provide I/M services.

38.     After Opus took control of Systech, it lost six straight major bids.  By 2011, the Opus stock had lost approximately 75% of its value as of the date it purchased Systech.

39.     After observing Opus's failures, Opus asked Tripathi to help update its technology and business strategies in order to improve its performance in the marketplace.

40.     Tripathi accepted and Opus in return promised that it would compensate Tripathi by releasing him from any indemnification that he may otherwise have owed relating to a lawsuit in which Systech was a defendant when it was purchased by Opus (the "Hickok Claim").

41.     Tripathi's indemnification obligation for the Hickock claim had previously been capped at $450,000, by agreement.

42.     Tripathi went to work fixing and improving the technology and bid proposal strategies that Opus had been employing, and Opus happily accepted Tripathi's expertise and ideas to improve its proposal and offering.

43.     Tripathi's work materially improved Opus's business.  Indeed, after Tripathi intervened to help Opus, Opus won four straight bids and its stock soon increased in value tenfold.

44.     In December 2011, the CEO of Opus wrote a letter to Tripathi, stating "please let me express our sincere gratitude for your assistance in improving Systech's technology offering over the past few years."

45.     However, despite its promises, Opus did not expunge or reduce Tripathi's potential liability for the Hickok claim - and provided Tripathi no other compensation whatsoever for his work improving Opus's business and technology.

**C.  Tripathi's non-competition term expires and Opus threatens to punish Tripathi if he competes**

46.     Tripathi's agreement not to compete with Opus expired in 2010, around the time he completed his work helping Opus improve its business and technology.

47.     Approximately six months later, Tripathi established Nexus Environmental, LLC ("Nexus") in order to re-enter the vehicle I/M marketplace.

48.     Initially, Tripathi hoped Nexus would partner with Opus in order to continue enhancing Opus's vehicle inspection business.  Indeed, Tripathi rejected overtures from a number of Opus's competitors because he hoped to work with Opus.

49.     However, certain of Opus's conduct caused Tripathi concern about entering into an ongoing partnership with the company.  This conduct included Opus's failure to fulfill its promise to compensate him for his post-closing work improving Opus's technology and market strategy.

50.     This conduct also included a malicious effort by the CEO of Opus to attempt to rush Tripathi to sell back the Opus shares that he acquired as part of the Systech closing.  Just after this effort by the CEO, a major project bid award was announced that caused the Opus shares to significantly increase in value.

51.     In May 2013, the CEO of Opus asked Tripathi if he would ever compete directly against Opus - which Tripathi is and was most certainly entitled to do.  Tripathi responded that he may, depending on the circumstances.

52.     The CEO responded that if Tripathi competed against Opus, he would settle the Hickok Claim for an unreasonably high amount in order to punish Tripathi.

53.     In other words, after Opus reneged on its promise to effectively release Tripathi from any liability for the Hickok Claim in exchange for Tripathi's help, Opus turned around and threatened to abuse Tripathi with the same claim if he entered the market.

**D.  In breach of the SPA, Opus refuses to make Earn-Out Payments on New Business**

54.     Prior to Tripathi informing Opus that he intended to re-enter the vehicle inspections market, Opus had shared with Tripathi the project financials associated with New Business at the inception of the new projects.  However, once Tripathi's non-competition agreement expired, Opus stopped sharing any detailed financial information relating to New Business with Tripathi.

55.     Further, in the year after Opus learned that Tripathi intended to re-enter the market (2014), the Earn Out Payment made to Tripathi dropped by more than 30% as compared with the prior year (2013).

56.     The payment declined again the following year despite the fact that Opus gained new business and increased revenues.

57.     Most critically, despite having begun more than twenty new projects based on Systech's pre-2008 business concepts or technologies, Opus has paid Tripathi Earn Out Payments on only five such projects.

58.     For the remainder of the new projects, Opus has refused to make Earn Out Payments at all, or even to provide Tripathi with basic information relating to those projects.

59.     As only one example, in 2012, Opus (via an affiliate) began a project in Sweden in which it operates at least 70 inspection stations, utilizing the SysTech business concepts and technologies (the "Sweden Project").

60.     The Sweden Project is a "new project" and is "[b]ased on the business concepts or technologies that were developed or contemplated by SysTech as of December 31, 2007."

61.     Therefore, the Sweden Project meets the definition of New Business under the SPA and qualifies for Earn Out Payments.

62.     Based upon the reported revenue from the Sweden Project, Opus should have paid Tripathi the remainder of the Earn Out Payments due him under the SPA.  In other words, if Opus had properly made Earn Out Payments on the Sweden Project alone, then Tripathi would have been fully paid his portion of the Maximum Earn Out by now.

63.     While Earn Out Payments due from the Sweden Project alone far exceed the Maximum Earn Out, there are additional projects that constitute New Business, but for which Earn Out Payments have not been made.  As mere examples, it appears that new Opus programs in California, Utah, Ohio and Indiana have been wrongly excluded.

64.     Tripathi has requested information from Opus regarding the Sweden Project and other projects which appear to have been wrongly excluded from the calculation of annual Earn Out Payments.  Opus has failed to provide the requested information.

**E.  In breach of the SPA, Opus has failed to calculate Earn Out Payments based upon Modified Revenues**

65.     For the few projects that Opus has conceded constitute New Business, it has refused to make Earn Out Payments in accordance with the terms of the SPA.

66.     Opus has refused to pay Earn Out Payments based upon Modified Net Profits for years in which the Actual Profit Margin falls below the minimum threshold.

67.     In other words, without Tripathi's consent, Opus has refused to comply with the terms of the SPA that guarantee that Earn Out Payments will be based upon a specified minimum profitability for all New Business.

68.     Not only has Opus failed to base Earn Out Payments on affirmatively modified revenues, it has actually offset Earn Out Payments due in profitable years by deducting negative earnings from other years.  This is a further breach of the SPA.

69.     Opus's failure to pay Earn Out Payments based upon Modified Net Profits has resulted in an underpayment to Tripathi of $2,200,187.

**F. Opus engages in anticompetitive conduct to keep Tripathi out of the California vehicle inspection market**

70.     In early 2013, around the time that Opus's CEO was threatening to punish him by settling the Hickok claim for an unreasonable amount, Tripathi realized that he would not be able to partner with Opus.

71.     Tripathi became interested in developing a modernized vehicle inspection system, and set his sights on qualifying to participate in the California vehicle I/M market for 2014, through Nexus.

### 1. The California Smog Check Program

72.     California's Smog Check Program is administered by its Bureau of Automotive Repair ("BAR"), a division of the California Department of Consumer Affairs.  Under the Smog Check Program, privately-owned Smog Check Stations use state-certified inspection systems to perform mandatory emissions testing for consumers.

73.     California utilizes an open market for the sale of the certified inspection systems to Smog Check Stations rather than a sole source bid for a single test system supplier.

74.     California invites vendors to submit their vehicle inspection systems for certification, and any vendors who qualify can then participate in the California market for providing certified vehicle inspection systems to Smog Check Stations (the "California Market").

75.     California has historically been a pioneer in the vehicle emissions testing market. New technological requirements are typically introduced in California, after which other states follow by imposing similar requirements.

76.     Participation in the California Market can therefore provide significant upfront and ongoing profitability and provide a substantial advantage when bidding for future contracts in other states that follow the California requirements (which often require a vendor to demonstrate prior program experience).  This is particularly important for a startup company like Nexus.

77.     In early 2013, the California BAR published a specification for the Data Acquisition Device ("DAD") and On-Board-Diagnostic Inspection System ("OIS") that would be required in order to provide vehicle inspection testing as part of its Smog Check Program.

78.     The DAD is a type of on board diagnostic device that connects to a vehicle's computer to collect information regarding its emissions and other associated parameters.

79.     The OIS is the complete system used for testing vehicle emissions, which includes the DAD as well as the cart, computer terminal, operating system, DAD communication application, bar code scanner and printer.

80.     The BAR set an August 2013 application deadline for vendors who hoped to meet the new requirements and be certified to participate in the Smog Check Program.  Certified vendors were required to provide DADs that met new enhanced requirements for on-board diagnostic devices.

81.     The new DAD systems were to be deployed in California beginning in June 2014. By March 2015, all Smog Check Stations were required to have procured and employed the new inspection systems.

## 2.  Opus convinces DAD suppliers not to supply to Nexus

82.     Tripathi learned that there were four entities developing DADs for the California marketplace.

83.     Two of these companies, Applus Technologies, Inc. ("Applus") and Worldwide Environmental Products ("Worldwide") are system integrators, or companies that provide, as a part of their business model, an end-to-end solution including test systems and Vehicle Inspection Databases, to programs other than California.

84.     System integrators do not typically sell their DADs or other similar components to other system integrators, who compete with them in RFP-based programs in other jurisdictions.

85.     The other two companies, Bosch Automotive Service Solutions ("Bosch") and Drew Technologies, Inc. ("Drew"), were DAD manufacturers and vendors who would typically sell their DADs to system integrators (like Opus and Nexus).

86.     In order for Nexus to participate in the California Market, it had to find a supplier of certified DADs.  Therefore, in early 2013, Tripathi contacted Bosch about the possibility of providing DADs to Nexus for the Smog Check Program.

87.     Initially, Bosch stated that it would supply DADs and other OBD devices to Nexus for the California Market and nationwide.

88.     However, Opus then intervened and entered into discussions with Bosch.

89.     After Opus's intervention, Bosch refused to supply anything to Nexus, claiming that it was under an exclusive arrangement with Opus.

90.     After Opus ensured that Bosch would not supply Nexus with DADs or other devices, Tripathi contacted Drew, the other supplier seeking California certification for its DADs.

91.     Drew stated that it would be willing to supply DADs to Nexus, and in May 2013 provided a per-unit price quote for its wired DAD package.  At the quoted price, Nexus

determined that it could compete in the California Market, and therefore prepared a plan to do so in reliance upon Drew's commitment.

92.     On August 15, 2013, Bosch, Drew, Applus and Worldwide all submitted their applications for certification to BAR.  However, after testing began, BAR refused to certify the Bosch DAD.

93.     When Bosch began having difficulties achieving certification, Opus approached Drew, the only remaining DAD vendor that was not a system integrator.  Upon information and belief, Opus convinced Drew to increase the price at which it would supply DADs to Nexus, thus pricing Nexus out of the California OIS market.

94.     In November 2013, Drew sent Nexus a price quote for its wired DAD package-that was more than 240% higher than the price that Drew provided Nexus only seven months earlier for the same product.

95.     At the newly-quoted price, it would be impossible for a DAD re-seller or OIS vendor to compete in the California Market.

96.     This inflated price quote had the desired effect of keeping Nexus out of the California Market.

97.     If Drew had sold the DAD to Nexus at the price it had quoted before conferring with Opus, Nexus would have been able to offer its OIS at a lower price than the price ultimately charged by the system integrators who were able to participate in the California Market.

### 3.   The California Market opens, and is monopolized by Opus

98.     Three DAD vendors were ultimately certified to participate in the California Market: Worldwide, Applus and Drew.

99.     Drew was the only certified vendor that was not a system integrator (and thus was a viable supplier to potential third party OIS providers).

100.     Drew sold its DADs to Opus, and Opus Inspection began competing in the California Market by providing Drew-manufactured DADs.

101.     Upon information and belief, Opus convinced Drew to supply its DADs to Opus Inspection at a price significantly lower than the price it offered to Nexus.

102.     Indeed, upon information and belief, if Opus Inspection were paying the same prices that Drew quoted Nexus for DADs, Opus Inspection would be unable to provide DADs at the prices at which it has offered them at market.

103.     On February 13, 2015, Opus announced that it had signed an agreement to purchase Drew for $30 million, plus a contingent earn-out of $4.4 million.  The acquisition was completed in March 2015, and the Opus-owned Drew continues to provide DADs and OISs in the California Market.

104.     After it purchased Drew, Opus also purchased Bosch's vehicle I/M business unit.

105.     As a result of Opus's actions, alone and in concert with Drew (before Opus purchased Drew), Nexus has been frozen out of the California Market.  This left Nexus unable to effectively participate in future competitive bidding processes across the country in which a DAD device is a prerequisite.

106.     Upon information and belief, Opus convinced Bosch not to sell to Nexus and convinced Drew to charge Nexus an artificially inflated price for its DADs for an anticompetitive purpose: to keep Nexus from competing with Opus Inspection in the California Market.

107.    Although there are three competing vendors in the California Market, due to its anticompetitive efforts, Opus Inspection's share of the California vehicle I/M market is greater than 80% and may be as high as 90%.

108.    Opus Inspection, Worldwide and Applus offered their DADs and OISs at nearly the same price point in the California Market.

109.    The barriers to entering the California Market make it virtually impossible for a vendor to enter and compete effectively after the initial certification period and mandated implementation deadline.

110.    First, development of a new DAD for certification testing is a lengthy and expensive process.

111.    Second, certification testing consists of two time-consuming phases, Alpha Testing (involving laboratory testing of the DAD) and Beta Testing (involving testing at Smog Test Stations to collect data from in-use vehicles).

112.    Third, Smog Test Stations were required to procure and begin using the new testing equipment in 2015, and therefore there are few, if any, remaining consumers for the new equipment.  In other words, the period of competition for the vast majority of customers took place over a matter of months between vendors of the three initially-certified inspection devices.

113.    Upon information and belief, because of these barriers to entry into the California Market no vendors attempted to have a DAD certified after the first certification phase.   The time and expense of procuring certification would be wasted, given that all Smog Test Stations were required to procure their certified testing equipment more than two years ago.

114.     Had Nexus not been frozen out of the California Market by Opus's anticompetitive conduct, it would have offered a directly competitive product for a significantly lower price than the price at which Opus Inspection lists its OISs and DADs.

## COUNT I
### (Breach of Contract)
### *Tripathi v. Opus Group*

115.     Tripathi repeats and incorporates by reference the allegations contained in paragraphs 1 through 113, as though fully and completely set forth herein.

116.     The SPA is a valid and binding contract between Opus, Tripathi and Geilen.

117.     Tripathi has fully performed his obligations under the SPA.

118.     As set forth herein, Opus has breached the SPA by, *inter alia*, refusing to make Earn Out Payments on New Business and refusing to make Earn Out Payments based upon Modified Revenues.

119.     Opus's breaches of the SPA have damaged Tripathi in an amount to be determined at trial, but not less than $15,000,000.

## COUNT II
### (Violation of Federal Antitrust Laws, 15 U.S.C. § 2 (the "Sherman Act"))
### *Nexus v. Opus Group and Opus Inspection*

120.     Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 113, as though fully and completely set forth herein.

121.     Opus Inspection has attempted to monopolize, and has monopolized, the California Market.  Opus has more than an 80% share of the California Market, and there are significant barriers to entry into the California Market.

122.     As set forth herein, Opus has willfully acquired and maintained its monopoly power in the California Market.  Opus's predatory and anticompetitive conduct includes, but is not limited to:

i.   Starving Nexus of capital by refusing to pay Tripathi the Earn Out Payments contractually due him;

ii.   Interfering and causing Bosch to refuse to deal with Nexus;

iii.   Interfering with and causing Drew to refuse to fairly deal with Nexus through the use of discriminatory pricing tactics relating to Drew's DAD;

iv.   Causing Drew to rescind its offer to sell Nexus the DAD to Nexus and inflating the price by 240%, making the DAD cost-prohibitive for Nexus;

v.   Driving or starving Nexus out of the vehicle I/M business by active interference with its ability participate in the California Market;

vi.   Upon the removal of Nexus from the subject market, using the barriers to entry to the market in conjunction with its market power and influence to control the California Market;

vii.   Unfairly competing with Nexus in the vehicle I/M market of California; and

viii.   Preserving the closed market in the California for vehicle I/M and preserving market control in that industry to the exclusion of potential competition.

123.   Opus's conduct had no pro-competitive justification and was specifically intended to prevent Nexus's entry into the California Market and acquire and preserve Opus's dominant position.

124.   The dangerous probability of Opus achieving a monopoly in the California Market is evidenced by its market share, which is greater than 80%, and the barriers to entry into the California Market.

125.    Due to Opus's dominant market position and the barriers to entry into the California Market, Opus has the ability to control the market price in the California Market and charge supra-competitive prices.

126.    Opus's conduct has harmed competition in the California Market.  Had Opus not foreclosed Nexus from participating in the California Market, Nexus would have provided a superior competing product at a lower price.

127.    Opus's conduct has had, and will continue to have, the following effects, among others:

    i.   Competition between Nexus and Opus Inspection has been eliminated;

    ii.   Consumers in California have been deprived of the benefits of competition and the freedom of choice in the California Market;

    iii.   Competition in the California Market has been unreasonably restricted and eliminated; and

    iv.   Nexus has been effectively deprived of its right and ability to enter and compete in the California Market.

128.    As a direct and proximate result of the violations alleged herein, Nexus has suffered significant damages, including but not limited to lost profits and loss of substantial goodwill and a diminution of their regional reputations.

129.    Nexus is entitled to treble damages.

## COUNT III
**(Violation of Federal Antitrust Laws,  Sherman Act § 1)**
***Nexus v. Opus Group and Opus Inspection***

130.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 113, as though fully and completely set forth herein.

131.    Plaintiffs are informed and believe that Opus, Bosch and Drew (the "Conspirators") engaged in an unlawful combination and conspiracy to prevent Nexus from participating in the California Market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.4.  The Conspirators acted in restraint of trade and commerce in the California Market.

132.    Nexus is informed and believes that the combination and conspiracy consisted of an agreement, understanding and concert of action among and between the Conspirators, the substantial terms of which involved:

    i.  Interfering and causing Bosch to refuse to deal with Nexus;

    ii.  Interfering with and causing Drew to refuse to fairly deal with Nexus through the use of discriminatory pricing tactics relating to Drew's DAD;

    iii.  Causing Drew to rescind its offer to sell Nexus the DAD to Nexus and inflating the price by 240%, making the DAD cost-prohibitive for Nexus;

    iv.  Driving or starving Nexus out of the vehicle I/M business by active interference with its ability participate in the California Market;

    v.  Upon the removal of Nexus from the subject market, using the barriers to entry to the market in conjunction with their market power and influence to control the California Market;

    vi.  Unfairly competing with Nexus in the vehicle I/M market of California; and

    vii.  Preserving the closed market in the California for vehicle I/M and preserving market control in that industry to the exclusion of potential competition.

133.    Pursuant to and in effectuation of the described combination and conspiracy, the Conspirators did those things which, as above alleged, they combined and conspired to do. These unlawful contracts, combinations, or conspiracies have unreasonably restrained

competition in the California Market and are not reasonably necessary to accomplish any pro-competitive objective.

134.    Conspirators' conduct has harmed competition in the California Market.  Had Conspirators not foreclosed Nexus from participating in the California Market, Nexus would have provided a superior competing product at a lower price.

135.    The combination and conspiracy has had, and will continue to have, the following effects, among others:

      i.    Competition between Nexus and Opus Inspection has been eliminated;

      ii.    Consumers in California have been deprived of the benefits of competition and the freedom of choice in the California Market;

      iii.    Competition in the California Market has been unreasonably restricted and eliminated; and

      iv.    Nexus has been effectively deprived of its right and ability to enter and compete in the California Market.

136.    As a direct and proximate result of the violations alleged herein, Nexus has suffered significant damages, including but not limited to lost profits and loss of substantial goodwill and a diminution of their regional reputations.

137.    Nexus is entitled to treble damages.

## COUNT IV
### (Violation of Federal Antitrust Laws, 15 U.S.C. § 14 ("Clayton Act § 3")  - Unlawful Exclusive Agreement)
### *Nexus v. Opus Group and Opus Inspection*

138.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 113, as though fully and completely set forth herein.

139.    The market for vehicle-emissions technology and services in California is a line of commerce, and the DAD is a commodity within that line of commerce.

140.    Opus has induced Drew not to sell its DAD to Nexus at a commercially reasonable price.  The effect of this is to substantially lessen competition in the market for provision of vehicle I/M technologies and services in California and the United States.

141.    As a result of Opus's unlawful conduct, competitors have been and will continue to be injured because they cannot compete with Opus Inspection.  Drew is the only non-system-integrator vendor of the DAD that is approved by the BAR.  As a practical matter, no new competitor can reasonably enter the market.

142.    As a result of Defendants' unlawful conduct, consumers have been and will continue to be injured because they have fewer choices of OIS providers in the vehicle I/M market as a whole.

143.    Nexus has been and will continue to be injured as a result of Defendants' unlawful contracts, combinations and conspiracies because it is foreclosed from purchasing and distributing the DAD, including to the California Market.

**<u>COUNT V</u>**
**(Violation of California Bus. & Prof. Code § 16720 *et seq.*, (the "Cartwright Act"))**
***Nexus v. Opus Group and Opus Inspection***

144.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 113, as though fully and completely set forth herein.

145.    The violations of federal antitrust law set forth above also constitute violations of Section 16720 of California Business and Professions Code, which sets forth the antitrust laws of the State of California.

146.    During the period of time covered by this Complaint, Opus and non-parties Bosch and Drew engaged in a continuing contract, combination or conspiracy in unreasonable restraint

of trade and commerce and other anticompetitive conduct alleged above in violation of

California Business and Professions Code § 16700, *et seq.*

147.    Opus's anticompetitive acts described above were knowing and willful and

constitute violations or flagrant violations of California Business and Professions Code § 16700,

*et seq.*

148.    As a direct and proximate result of Opus's unlawful conduct, competitors have

been and will continue to be injured because they cannot compete with Opus.

149.    As a result of Opus's unlawful conduct, consumers have been and will continue to

be injured because they have fewer choices in the vehicle I/M market as a whole.

150.    As a result of Opus's violation of § 16720 of California Business and Professions

Code, Nexus seeks treble damages and its cost of suit, including reasonable attorneys' fees,

pursuant to § 16750(a) of California Business and Professions Code.

## <u>COUNT VI</u>
### (Tortious Interference with Prospective Economic Advantages)
### *Nexus v. Opus Group and Opus Inspection*

151.    Plaintiffs repeat and incorporate by reference the allegations contained in

paragraphs 1 through 113, as though fully and completely set forth herein.

152.    Nexus had, during the period of time covered by this Complaint, a reasonable

valuable expectation of existing and prospective business relationship with Drew to purchase

DADs at a commercially reasonable price.

153.    Nexus is informed and believes and therefore alleges that Opus had actual or

constructive knowledge of the fact that Nexus had been engaged in negotiations with Drew

regarding the purchase of Drew's DAD.

154.    Nexus also had, during the period of time covered by this Complaint, a reasonable

valuable expectation of prospective business relationship with Smog Test Stations in the State of

California to obtain the right to provide vehicle I/M products and services in California based on its experience and reputation in the vehicle I/M community.  As a result of those relationships, there was a high probability of future economic benefit to Nexus.

155.    Nexus is informed and believes and therefore alleges that Opus had actual or constructive knowledge of the existence of that relationship.

156.    Defendant has intentionally disrupted and interfered with Nexus's existing and prospective business relationships with the consumers in the State of California and Drew through its efforts to convince Drew not to sell DADs to Nexus at a commercially reasonable price.

157.    The conduct of Opus was wrongful separate and apart from the fact that the conduct interfered with or disrupted the economic relationship between Nexus and Drew and Nexus and the Smog Check Stations in that it also violated a statute (namely the Sherman Act), recognized rules of common law (prohibiting conspiracies to restrain trade and the use of economic duress), was intended to prevent Nexus from participating in a competitive marketplace and was out of the realm of legitimate business transactions.

158.    As a proximate result of that conduct, Nexus has been prevented from consummating prospective business transactions with Drew and the Smog Check Stations, resulting in Nexus's bar from entry into the California Market and a substantial loss of revenue and profit for Nexus.  Nexus has suffered significant lost profit damages.

159.    Through Opus's intentional disruption of Nexus's existing and prospective business relationship, Opus is guilty of oppression, malice and despicable conduct such that Nexus is therefore entitled to exemplary and punitive damages according to proof.

## **Relief Requested**

160.    Wherefore, Plaintiffs request that the Court enter judgment on their behalf and against the Defendants and awarding the following relief:

i.    Damages for the Earn Out Payments due Tripathi, plus interest and attorneys' fees, an amount exceeding $15,000,000;

ii.    Damages in the amount of the lost profits Nexus would have achieved had it participated in the California Market, as well as profits Nexus would have gained from participating in other markets for which participation in the California Market was a practical prerequisite; which damages exceed $3,500,000 (before trebling) and shall be proven at trial;

iii.    Damages sufficient to compensate Nexus and Tripathi for the loss of value of the Nexus business, loss of value of substantial goodwill and diminution of their regional reputations caused by Opus's misconduct;

iv.    Treble damages, prejudgment interest and attorneys' fees for all damages incurred as a result of Opus's anticompetitive conduct.

## **Demand for a Jury Trial**

161.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a

trial by jury in this action for all issues so triable.

Dated:  June 21, 2017

PRADEEP TRIPATHI, Nexus

By:  /s/ Michael E. Waller
        One of his attorneys

Michael E. Waller (MW2155)
K&L Gates, LLP
One Newark Center, Tenth Floor
Newark, New Jersey  07102-5285
(973) 848-4000

*Pro hac vice pending:*

Abram Moore
Scott Mendel
K&L Gates, LLP
Three First National Plaza
70 West Madison Street, Suite 3300
Chicago, Illinois  60602-4207
(312) 372-1121

# EXHIBIT A

EXECUTION VERSION

SALE AND PURCHASE AGREEMENT

RELATING TO 100% OF

THE MEMBERSHIP INTERESTS

IN

SYSTECH INTERNATIONAL, LLC

AND

TRILEN LLC

BY AND AMONG

OPUS PRODOX AB,

PRADEEP TRIPATHI

AND

LOTHAR GEILEN

Dated as of March 2, 2008



## SALE AND PURCHASE AGREEMENT

**THIS SALE AND PURCHASE AGREEMENT** (this "Agreement"), dated as of March 2, 2008, by and among **OPUS PRODOX AB (publ)**, a company organized under the laws of the Kingdom of Sweden ("Purchaser"), **PRADEEP TRIPATHI** ("Tripathi") and **LOTHAR GEILEN** ("Geilen")(Tripathi and Geilen are collectively referred to herein as "Sellers" and each is referred to herein as a "Seller"), and **SYSTECH INTERNATIONAL, LLC**, a Florida limited liability company ("SysTech") and **TRILEN LLC**, a Florida limited liability company ("TriLen") (SysTech and TriLen are collectively referred to herein as the "Companies" and each is referred to herein as a "Company").

### RECITALS

**WHEREAS**, Sellers own 100% of the membership interests (the "Membership Interests") of Systech and TriLen;

**WHEREAS**, Purchaser and Sellers mutually desire that Purchaser acquire all of the Membership Interests from Sellers, upon the terms and subject to the conditions set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants, and promises set forth in this Agreement, and intending hereby to be legally bound subject to the terms and conditions set forth in this Agreement, Purchaser, Sellers, and the Companies hereby agree as follows:

### ARTICLE I

### DEFINITIONS

Capitalized words and phrases used and not otherwise defined in this Agreement shall have the following meanings:

**Additional Purchase Price Payments**: shall have the meaning set forth in Section 2.02(d).

**Affiliate**: means any Person that directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

**Agreement**: shall have the meaning set forth in the introductory paragraph.

**Audited 2006 and 2005 Statements**: shall have the meaning set forth in Section 3.05(a).

**Audited 2007 Statements**: shall have the meaning set forth in Section 2.04(b).

Backlog Report:  shall have the meaning set forth in Section 3.24.

Backlog Report Contracts:  shall have the meaning set forth in Section 3.24.

Business:  means the business of designing, developing, manufacturing, assembling, marketing, selling, servicing and providing (i) emission, diagnostic, fleet management and test line equipment, in each and all of the foregoing cases, solely with respect to vehicles, (ii) vehicle inspection database systems, (iii) vehicle safety and emissions testing programs, and (iv) vehicle diagnostic systems.  For the avoidance of doubt and notwithstanding the foregoing, the following activities are hereby agreed to be specifically excluded from, and to not in any way constitute, the "Business": Raman spectroscopy applications, bomb detection technology, security surveillance systems, personal medical assistance, personal emergency response systems, motor vehicle registration and licensing systems, government management systems, non-mobile source pollution measurement and management systems, and any and all similar or related activities.

Business Day:  means any other day than Saturday, Sunday or any day on which commercial banks in New York are authorized or required to close.

Cap:  shall have the meaning set forth in Section 11.03(c)(i).

Claim:  means a claim for indemnification asserted under any provision of Article X or XI.

Claim Notice:  means written notification pursuant to Section 11.04(a) of a Third Party Claim as to which indemnity under Section 11.03(a) or 11.03(b) is sought by an Indemnified Party, enclosing a copy of all papers served, if any, and specifying the nature of and basis for such Third Party Claim and for the Indemnified Party's claim against the Indemnifying Party under Section 11.03(a) or 11.03(b), together with the amount or, if not then reasonably ascertainable, the estimated amount, determined in good faith, of such Third Party Claim.

Cleanup:  means all actions required by Environmental Laws to:  (i) remove, treat or remediate Hazardous Substances in the indoor or outdoor environment; (ii) prevent the release of Hazardous Substances so that they do not migrate, endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations and post-remedial monitoring and care with respect to Hazardous Substances; or (iv) respond to any government requests for information or documents with respect to cleanup, removal, treatment or remediation or potential cleanup, removal, treatment or remediation of Hazardous Substances in the indoor or outdoor environment.

Closing:  shall have the meaning set forth in Section 2.03.

Closing Date:  shall have the meaning set forth in Section 2.03.

Closing Payment:  shall have the meaning set forth in Section 2.02(b).

2

COBRA:  means the Consolidated Omnibus Budget Reconciliation Act of 1986, codified at Part 6 of Title I of ERISA and section 4980B of the Code, and similar applicable state Laws.

Code:  means the Internal Revenue Code of 1986, as amended.

Commission:  means, collectively, any and all Governmental or Regulatory Authorities, including any and all exchanges (including the First North (Stockholm Stock Exchange)), markets, self regulatory organizations (SROs), regulatory, administrative governmental and/or quasi-governmental departments, commissions and/or agencies, in each case, having jurisdiction over securities Laws with respect to Purchaser (including the enactment, promulgation, enforcement, regulation and/or adjudication thereof).

Company:  shall have the meaning set forth in the introductory paragraph.

Company Employee:  means any current employee, director or officer of either of the Companies.

Company Financial Statements:  shall have the meaning set forth in Section 3.05(a).

Confidentiality Agreement:  shall have the meaning set forth in Section 7.02(b).

Continuing Employee:  shall have the meaning set forth in Section 12.01.

Contract:  means any agreement, license, sublicense, sales order, purchase order, commitment, lease, evidence of Indebtedness, mortgage, indenture, security agreement or other contract, instrument, understanding or arrangement, oral or written, that is binding on any Person or any of its property under applicable Laws.

Deductible:  shall have the meaning set forth in Section 11.03(c)(ii).

Dispute Period:  means (i) with respect to a Claim Notice, the period ending 30 days following receipt by an Indemnifying Party of such Claim Notice, or (ii) with respect to an Indemnity Notice, the period ending 90 days following receipt by an Indemnifying Party of such Indemnity Notice.

Due Diligence Condition Notice:  shall have the meaning set forth in Section 6.03

Due Diligence Review:  shall have the meaning set forth in Section 5.02.

Due Diligence Review Period:  shall have the meaning set forth in Section 5.02.

Earn-Out Payments:  shall have the meaning set forth in Section 2.02(c).

3

Environment: means any and all environmental media, including ambient and indoor air, land, soil, surface or subsurface strata, surface water, drinking water, ground water, wetlands and sediment.

Environmental Claim: means any claim, action, cause of action, administrative proceeding, investigation or notice by any Person alleging potential liability (including, without limitation, potential liability for investigatory costs, Cleanup costs, governmental response costs, natural resource damages, property damages, personal injuries or penalties) arising out of, based on or resulting from (i) the presence, or release into the environment, of a Hazardous Substance at any location, whether or not owned or operated by either of the Companies, or (ii) circumstances forming the basis of any violation or alleged violation of, or any liability under, any Environmental Law.

Environmental Laws: means all federal, state and local Laws of the United States of America (including common law) and all applicable foreign Laws, in either case, relating to the Environment, pollution, protection or restoration of the Environment, or human health and safety, including without limitation, laws relating to the exposure to, or Releases or threatened Releases of, Hazardous Substances or otherwise relating to the manufacture, generation, processing, distribution, use, treatment, storage, Release, transport or handling of Hazardous Substances and such Laws with regard to recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Substances.

ERISA: means the Employee Retirement Income Security Act of 1974, as amended.

ERISA Affiliate: means any Person which is (or at any relevant time was or will be) a member of a "controlled group of corporations" with, under "common control" with, or a member of an "affiliate service group" with the Company as such terms are defined in Section 414(b), (c), (m) or (o) of the Code.

Escrow Agreement: shall have the meaning set forth in Section 11.06(a).

Escrow Payment(s): shall have the meaning set forth in Section 11.06(a).

Final Determination: means (i) with respect to Federal Income Taxes, a "determination" as defined in Section 1313(a) of the Code or execution of an IRS Form 870-AD, or receipt of a Notice of Deficiency (commonly referred to as a 90-day letter) unless a Tax Court Petition is timely filed within the period allowed by such Notice of Deficiency and (ii) with respect to Taxes other than Federal Income Taxes, any final determination of liability in respect of a Tax that, under applicable Law, is not subject to further appeal, review or modification through proceedings or otherwise (including the expiration of a statute of limitations or a period for the filing of claims for refunds, amended Tax Returns or appeals from adverse determinations) or requires the payment of Taxes in order to contest the imposition of Taxes.

Financing: shall have the meaning set forth in Section 6.11.

Financial Guarantees: shall have the meaning set forth in Section 7.07.

4

GAAP: means United States generally accepted accounting principles, consistently applied.

Geilen: shall have the meaning set forth in the introductory paragraph.

Governmental or Regulatory Authority: means any federal, state or local government or quasi-governmental authority of the United States of America or any foreign government, including any domestic court, tribunal, arbitrator, authority, regulatory body, agency, commission, official or other instrumentality of such government or authority.

Hazardous Substances: means, whether naturally occurring and whether alone or in combination, (i) any petrochemical or petroleum products, radioactive materials, asbestos or asbestos-containing materials, lead-based paint, urea formaldehyde foam insulation, polychlorinated biphenyls, or radon gas; (ii) any chemicals, materials or substances defined by any Environmental Law as, or included in the definition of, "hazardous substances," "hazardous wastes," "hazardous materials," "restricted hazardous materials," "extremely hazardous substances," "toxic substances," "contaminants" or "pollutants" or words of similar meaning and regulatory effect; or (iii) any other chemical, material or substance, exposure to which is prohibited, limited, or regulated by any applicable Environmental Law. For the avoidance of doubt, any and all references in this Agreement to Hazardous Substances, Environment, Environmental Laws, Environmental Claims and/or other environmental matters, in each case, to the extent relating to asbestos, shall be deemed to refer and relate exclusively to "friable asbestos."

Hickok Claim: means that certain claim filed on November 16, 2007 by Hickok Incorporated against SysTech in the USDC Northern District of Ohio, Eastern Division, Case No. 1:07 cv 03565.

Hickok Deductible: shall have the meaning set forth in Section 11.03(c)(iii).

Indebtedness: of any Person means all outstanding obligations (i) of such Person (A) for borrowed money, (B) evidenced by notes, bonds, debentures, letters of credit, drafts or similar instruments, (C) for the deferred purchase price of goods or services, and (D) accrued interest with respect to any of the items described in clauses (A) through (C) above, or (E) in the nature of guarantees of the obligations described in clauses (A) through (D) above of any other Person, or (ii) of any Person secured by a Lien on the property or assets of such first Person; provided, however, that Indebtedness shall not be deemed to include accrued expenses, accounts payable and/or trade payables incurred in the ordinary course of the Business consistent with past practice since January 1, 2008.

Indemnified Party: means any Person claiming indemnification under any provision of Article X or XI.

Indemnifying Party: means any Person against whom a claim for indemnification is being asserted under any provision of Article X or XI.

5

Indemnity Notice:  means written notification pursuant to Section 11.04(b) of a Claim for indemnity under Article XI, or written notification of a Claim for indemnity under Article X, by an Indemnified Party, specifying the nature of and basis for such claim, together with the amount or, if not then reasonably ascertainable, the estimated amount, determined in good faith, of such claim.

Intellectual Property  means all of the following:  (i) all copyrights, including without limitation all registrations and applications therefor; (ii) all patents and industrial designs, including without limitation any continuations, divisionals, continuations-in-part, renewals, reissues and applications therefor; (iii) all computer programs (whether in source code or object code form but specifically excluding packaged "off the shelf" software and generally available software subject to shrinkwrap, clickwrap and similar license arrangements), databases, compilations and data, and all documentation related to any of the foregoing; (iv) all trademarks, service marks, trade names and domain names, and all registrations and applications relating to any of the foregoing; and (v) all trade secrets (as defined under applicable Law), know-how, inventions, and other proprietary processes and intellectual property rights.

IRS:  means the Internal Revenue Service.

Knowledge:  means the actual conscious (and not constructive) knowledge, without duty of inquiry, of a Person.  With respect to Sellers or the Companies, Knowledge shall mean the Knowledge of any of Geilen, Tripathi, Bruce Kohn and/or Karen Boone. With respect to Purchaser, Knowledge shall mean the Knowledge of Magnus Greko, Göran Nordlund and Bertial Engman.

Laws:  means all laws, common law, statutes, rules, regulations, ordinances, constitutions, treaties, compacts, directives, codes, Orders, Permits, authorizations, variances, rules, judicial decisions, applicable governmental agreements (specifically excluding agreements entered into with Governmental or Regulatory Authorities with respect to the engagement by the Company(ies) in the Business) and other pronouncements having the effect of law of the United States of America or any foreign country or of any of their respective states, counties, cities or other political subdivisions or of any Governmental or Regulatory Authority.

Lease:  shall have the meaning set forth in Section 3.15(b).

Legal Proceeding:  means any civil, criminal, judicial, administrative or arbitral actions, suits, audits, hearings, litigation, proceedings (public or private), claims, investigations or governmental proceedings.

Liens:  means any mortgage, pledge, assessment, security interest, lien, levy, charge, or other encumbrance, of every kind and character.

Loss:  means damages which constitute actual and direct damages, and no other damages whatsoever, together with fines, assessments, penalties, Taxes, interest, court costs, reasonable fees and expenses of attorneys (including at trial and at all appellate

6

levels), accountants and other experts or other actual and direct expenses relating to such Claim.

Material Adverse Effect: means, when used in connection with an entity, any change, effect, event, circumstance, occurrence, state of facts or development that, on or prior to the Closing, (i) is materially adverse to the combined businesses, assets, liabilities, results of operation, financial condition, properties or prospects of such entity in an amount of at least Three Million Dollars (US $3,000,000), or (ii) has a material and adverse impact on the ability of such entity (if a party hereto) to perform its obligations hereunder and consummate the transactions contemplated hereby; provided, however, that none of the following, alone or in combination, shall be deemed to constitute a Material Adverse Effect for any purpose: (i) changes, events or effects to the extent attributable to the public announcement or pendency of the transactions contemplated hereby, (ii) changes, events or effects attributable to natural disaster, (iii) changes, events or effects attributable to general global, national or regional economic, business and/or political conditions (including arising in connection with any hostilities, acts of war, sabotage or terrorism or military actions, or any escalation or worsening of any hostilities, acts of war, sabotage or terrorism or military actions) or which affect the market area or industry of such entity (including fluctuations of any magnitude in interest rates, currency rates, Taxes and/or changes in any Laws applicable to such entity), (iv) with respect to either party hereto (Sellers and/or the Company on the one hand and Purchaser on the other hand), changes, events or effects attributable to actions or omissions of the other party or any Affiliate thereof, (v) changes, events or effects attributable to changes in GAAP, (vi) with respect to either party hereto (Sellers and/or the Company on the one hand and Purchaser on the other hand), changes, events or effects attributable to actions or omissions of such party taken with the prior written consent of the other party hereto, and/or (vii) changes, events or effects attributable to the transactions contemplated hereby or resulting from a party's compliance with the terms or conditions of this Agreement.

Membership Interests: shall have the meaning set forth in the Recitals.

Net Equity: means, as of any particular date, the difference between (i) the combined book assets of a Person (net of any appropriate inter-company eliminations) and (ii) the combined book liabilities of the Person (net of any appropriate inter-company eliminations), in each case, determined in accordance with GAAP as consistently applied.

Net Equity Target: means, with respect to SysTech, Net Equity as of December 31, 2007 (as reflected on a book basis in the Audited 2007 Statements) equal to One Million Nine Hundred Fifteen Thousand Two Hundred Fourteen Dollars ($1,915,214) and, with respect to TriLen, Net Equity as of December 31, 2007 (as reflected on a book basis in the Audited 2007 Statements) equal to One Million One Hundred Seventy Three Thousand Eight Hundred Forty Seven Dollars and Seventy Five Cents ($1,173,847.75).

Order: means any writ, judgment, decree, injunction, award, settlement or stipulation, decision, determination, ruling, subpoena or verdict or similar order entered, issued, made or rendered by any Governmental or Regulatory Authority (in each such case whether preliminary or final).

7

Owned Real Property:  shall have the meaning set forth in Section 3.15(a).

Permit:  means all licenses, permits, orders, consents, approvals, registrations, authorizations, qualifications and filings with and under all Laws and Governmental or Regulatory Authorities.

Permitted Liens:  means (i) Liens securing the liens of materialmen, mechanics, carriers, workmen, repairmen, landlords and like persons, all of which are for amounts not yet due and payable or which are being contested in good faith by appropriate proceedings, (ii) Liens for Taxes not yet due and payable, (iii) Liens for Taxes being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP, (iv) Liens that do not materially adversely affect the use or value of the asset(s) to which they attach, (v) the Liens, claims or other encumbrances reflected in the Interim Financial Statements, (vi) Liens with respect to assets and properties disposed of, or subject to purchase or sales orders, in the ordinary course of business, and (vii) Liens securing rental payments under capital or equipment lease arrangements.

Person:  means any natural person, corporation, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, limited liability company, proprietorship, other business organization, trust, union, association or any Governmental or Regulatory Authority.

Plan:  means any pension, profit-sharing or other retirement, bonus, deferred compensation, incentive compensation, equity purchase, equity appreciation, restricted equity, equity option or other equity-based (whether real or phantom), vacation pay, sick pay, severance or termination pay, retention, disability, death benefit, employment, consulting, independent contractor, director, retention, hospitalization, fringe benefit, medical, dental, vision, life or other insurance or other plan, program, policy, agreement, arrangement or Contract established, maintained, contributed to or required to be established, maintained or contributed to by either Company or any ERISA Affiliate, in each case, providing or intended to provide benefits to any Company Employee, and in each case whether written or oral, informal or formal, and subject to ERISA or not.

Post-December Tax Period:  means all taxable periods (or portions thereof) beginning after December 31, 2007.

Pre-Closing Tax Period:  means (i) all taxable periods ending on or before the Closing Date and (ii) that portion of any tax period beginning before the Closing Date and ending after the Closing Date which occurs on or before the Closing Date.

Pre-January Tax Period:  means all taxable periods (or portions thereof) beginning on or before December 31, 2007.

Previously Disclosed:  shall have the meaning set forth in the definition of Schedules below.

Purchase Price:  shall have the meaning set forth in Section 2.02(a).

8

Purchaser:  shall have the meaning set forth in the introductory paragraph.

Purchaser Indemnified Parties:  shall have the meaning set forth in Section 11.03(a).

Purchaser Indemnitees:  shall have the meaning set forth in Section 10.02(a).

Purchaser Plan:  shall have the meaning set forth in Section 12.01.

Purchaser Required Consents: shall have the meaning set forth in Section 4.11.

Purchaser Taxes:  shall have the meaning set forth in Section 10.01(b).

RI Test Equipment: shall have the meaning set forth in Section 8.07.

Release:  means any accidental or intentional releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing or dumping into the Environment.

Representatives:  means any officer, director, principal, agent, stockholder, source of financing, investment banker, employee, counsel, consultant, independent auditor or other representative of a Person.

Schedules:  means the disclosure schedules and related exhibits attached thereto, of Purchaser, on the one hand, or Sellers or the Companies, on the other hand, executed and delivered jointly by the parties as promptly as practicable following the date of this Agreement, as the same may be subsequently updated by such parties (including any and all updates made pursuant to Section 5.04). Such Schedules set forth, among other things, items the disclosure of which is necessary or appropriate either (i) in response to an express informational requirement contained in or requested by a provision hereof, or (ii) as an exception, qualification or limitation to one or more representations or warranties or covenants contained in this Agreement; provided, however, that the inclusion of a disclosure, statement or item in the Schedules as an exception to a representation or warranty shall not be deemed to be an admission by the disclosing party that such item (or any undisclosed item or information of comparable or greater significance) represents a material exception or fact, event or circumstance with respect to any Seller or Company (on the one hand) or Purchaser (on the other hand).  Any matter disclosed on a Schedule, including by cross-reference to one or more other Schedules (but without the necessity of review of any documents listed in such Schedule(s) that are not appended as exhibit(s) to such Schedule(s)) shall be deemed to be disclosed for purposes of such Schedule and shall be considered exceptions to the representations and warranties set forth in the Section of the Agreement corresponding to the enumerated heading reference of such Schedule.  In addition, any matter disclosed on a Schedule, including by cross-reference to one or more other Schedules (but without the necessity of review of any documents listed in such Schedule that are not appended as exhibit(s) to such Schedule(s)), shall be deemed to be disclosed for purposes of all other Schedules, regardless of the enumerated Section reference of such Schedule and regardless of whether a specific representation or warranty contained

9

in this Agreement specifically provides for exceptions to be listed on a Schedule, and shall be considered exceptions to all representations and warranties to which such disclosure relates, in each case, to the extent that Purchaser has Knowledge of the disclosure made on such Schedule, it being acknowledged and agreed that Purchaser (i) shall review each and all of the Schedules and (ii) shall be deemed to have Knowledge of all statements contained in the Schedules.  Information set forth or described in or provided pursuant to this Agreement, in an Exhibit or Appendix hereto or in the Schedules is referred to herein as "Previously Disclosed."

Seller Indemnified Parties:  shall have the meaning set forth in Section 11.03(b).

Seller Indemnitees:  shall have the meaning set forth in Section 10.02(b).

Seller Required Consents:  shall have the meaning set forth in Section 3.11.

Seller Taxes:  shall have the meaning set forth in Section 10.01(c).

Sellers:  shall have the meaning set forth in the introductory paragraph.

Tax or Taxes:  means all foreign or U.S. federal, state, county, local, municipal, and other taxes, assessments, duties or similar charges of any kind whatsoever, including all corporate franchise, income, sales, use, ad valorem, receipts, value added, profits, license, withholding, payroll, employment, excise, premium, property, customs, net worth, capital gains, transfer, stamp, documentary, social security, environmental, alternative minimum, occupation, recapture and other taxes, and including all interest, penalties and additions imposed with respect to such amounts.

Tax Claim:  shall have the meaning set forth in Section 10.07(a).

Tax Returns:  means all returns, declarations of estimated tax payments, reports, information returns and statements filed or to be filed with any Taxing Authority in connection with the determination, assessment, collection or administration of any Taxes.

Taxing Authority:  means the IRS and any other U.S. or foreign national, state, county or municipal or other local government thereof, any subdivision, agency, commission or authority thereof, or any U.S. or foreign quasi-governmental body exercising tax regulatory authority.

Tennessee Facility:  shall have the meaning set forth in Section 2.02(b)(v).

Third Party Claim:  shall have the meaning set forth in Section 11.04(a).

Third Party Transaction:  shall have the meaning set forth in Section 7.03.

Transfer Tax:  shall have the meaning set forth in Section 10.06.

Tripathi:  shall have the meaning set forth in the introductory paragraph.

10

Tripathi Technology: means any and all Intellectual Property rights (including all patents and all applications therefor) in, to and/or with respect to any of the following: (i) Raman spectroscopy applications, (ii) bomb detection technology, (iii) audio/video security surveillance systems (not associated with vehicle inspection), and/or (iv) personal medical assistance or personal emergency response systems, none of which is used or held for use or contemplated by Sellers for use in the Business.

Unaudited 2007 Statements: shall have the meaning set forth in Section 3.05(a).

## ARTICLE II

## SALE AND PURCHASE OF MEMBERSHIP INTERESTS; CLOSING

2.01    Sale and Purchase of Membership Interests.  Subject to the terms and conditions of this Agreement, at the Closing, Sellers shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Sellers, all of the right, title and interest of Sellers in and to the Membership Interests free and clear of any and all Liens and restrictions on transfer of any kind, except for any restrictions on transfer provided for in the respective Operating Agreement of each Company (which may be amended or deleted by Purchaser on or after the Closing).  Purchaser may, by way of an assignment pursuant to and in accordance with Section 14.10 hereof, elect to acquire certain assets of the Companies in one or more separate legal entities for future tax planning purposes.

2.02    Purchase Price and Payment.

(a)    The Purchase Price to be paid to Sellers for the Membership Interests shall be the sum of (i) the Closing Payment, plus (ii) the Earn-Out Payments, plus (iii) the Additional Purchase Price (collectively, the "Purchase Price").

(b)    In consideration for the sale and transfer of the Membership Interests to Purchaser by Sellers, at the Closing, Purchaser shall pay an aggregate amount of Thirty-Seven Million Seven Hundred Forty-Nine Thousand Four Hundred Sixty-Eight Dollars ($37,749,468) (the "Closing Payment") as follows:

(i)    to Tripathi and/or to one or more trusts designated by Tripathi, by wire transfer of immediately available funds to such account(s) as is/are designated by Tripathi in writing not less than Two Business Days prior to the Closing Date, the difference between (A) Twenty-Seven Million Seven Hundred Twenty-Four Thousand Six Hundred One Dollars ($27,724,601) and (B) 75% of the amount paid by Purchaser pursuant to subsection (v) below, if any;

(ii)    to Geilen and/or to one or more trusts designated by Geilen, by wire transfer of immediately available funds to such account(s) as is/are designated by Geilen in writing not less than Two Business Days prior to the Closing

11

Date, the difference between (A) Six Million One Hundred Twenty-Four Thousand Eight Hundred and Sixty-Seven Dollars ($6,124,867) and (B) 25% of the amount paid by Purchaser pursuant to subsection (v) below, if any;

        (iii)    A convertible promissory note of Purchaser in the original principal amount of One Million Nine Hundred Fifty Thousand Dollars ($1,950,000) payable to Geilen or to a trust designated by Geilen in writing not less than Two Business Days prior to the Closing Date in the form attached as Exhibit B;

        (iv)    A convertible promissory note of Purchaser in the original principal amount of One Million Nine Hundred Fifty Thousand Dollars ($1,950,000) payable to Tripathi or to a trust designated by Tripathi in writing not less than Two Business Days prior to the Closing Date in the form attached as Exhibit C; and

        (v)    all Indebtedness of the Company outstanding as of the Closing Date, if any, under that certain loan made on or about August 2007 by Tennessee Bank & Trust to SysTech in the original aggregate principal amount of $500,000 (the "Tennessee Facility"), in accordance with the payoff letter described in Section 8.13, unless Sellers shall have delivered to Purchaser evidence that all such Indebtedness has been paid in full prior to Closing.

        (c)   Earn-Out Payments.  In addition to the amounts provided for in Section 2.02(b), Purchaser shall also pay to Sellers, as part of the Purchase Price, earn out payments not to exceed, in the aggregate, Twenty-Five Million Dollars ($25,000,000) calculated and paid in the manner set forth on Appendix 2.02(c) attached hereto (the "Earn-Out Payments").

        (d)   Additional Purchase Price.  In addition to the amounts provided for in Sections 2.02(b) and 2.02(c), Purchaser shall also pay to Sellers, as part of the Purchase Price, payments calculated and paid in the manner set forth on Appendix 2.02(d) attached hereto (the "Additional Purchase Price Payments").

        (e)   Capitalization.  Promptly following the Closing, Purchaser shall make a cash capital contribution to SysTech in the amount of no less than $1,250,532 in respect of the portion of the purchase price for the RI Test Equipment being expensed in the first quarter of 2008.

        2.03   Closing.  The closing of the sale and purchase of the Membership Interests hereunder (the "Closing") shall take place at the offices of Squire, Sanders & Dempsey L.L.P. in Miami, Florida (or such other place as the parties may agree), at a time and date to be jointly determined by the parties, which shall be no later than (A) the second Business Day after the waiver or satisfaction of the conditions specified in Articles VIII and IX of this Agreement as provided in such Articles, or (B) April 30, 2008 or such later date as shall be agreed upon jointly in writing by the parties.  The date on which the Closing shall occur is referred to in this Agreement as the "Closing Date."  The Closing shall be

deemed to have occurred at 12:01 a.m. on the Closing Date, such that Purchaser shall be deemed the owner of the Membership Interests on and after the Closing Date.

2.04    Purchase Price Adjustment.

(a)    Sellers shall not be entitled from the Companies to any salaries, draws or compensation for the period between January 1, 2008 and the Closing; provided, however, the Companies may at any time or from time to time on or prior to the Closing Date make(i) distributions for net profits generated in calendar year 2007 as long as, after giving effect to such distributions, the Companies continue to achieve their minimum Net Equity Targets; and/or (ii) an assignment, transfer and distribution to the Sellers of all of the equity and/or other interests held by the Companies (or either of them) in SysTech International Pvt. Ltd.

(b)    Sellers shall deliver to Purchaser by February 22, 2008, or as soon as practicable thereafter, for each of the Companies the audited financial statements (balance sheet, statement of operations and statement of cash flows) for the fiscal year ended December 31, 2007 and the notes thereto (the "Audited 2007 Statements"). Sellers shall cause the Companies and the Companies' independent accountants, Haynie & Co., to make available to Purchaser, all books, records and workpapers relating to the Audited 2007 Statements and the Audited 2006 and 2005 Statements for purposes of reviewing the Audited 2007 Statements. The Audited 2007 Statements shall be used to determine whether any pre-closing adjustment shall be made to the Purchase Price, as hereinafter provided, due to the failure of either Company to attain its respective Net Equity Target. If and to the extent that (i) the Audited 2007 Statements reflects that either Company has failed to meet its Net Equity Target or (ii) either Seller takes any salary, draw or compensation from the Companies for the period between January 1, 2008 and the Closing, or (iii) either Seller takes any draws from either Company for net profits generated in calendar year 2007 that results, after giving effect to such draws, in such Company failing to have achieved (based solely on the results set forth in the Audited 2007 Statements) its respective minimum Net Equity Target, then the Purchase Price shall be reduced, on a dollar-for-dollar basis by an amount equal to the aggregate dollar amount of such failure and/or such excess salary, draw or compensation.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLERS AND THE COMPANIES

Except as Previously Disclosed, each Seller and the Company, jointly and severally, represent and warrant to Purchaser as of the date hereof and as of the Closing Date, as set forth below.

3.01    Organization and Qualification.

(a)    Each of Sellers is married individuals resident in the State of Florida. Each of the Companies is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Florida, with full limited liability

13

company power and authority to own, lease and operate its assets and properties and to carry on its business as now being and as heretofore conducted. Each Company is duly qualified or licensed to transact business as a foreign entity and is in good standing in each jurisdiction in which such qualification is required by Law, except where the failure to so be qualified or licensed would not be material to the Companies taken as a whole.

(b)   Each Company has previously provided to Purchaser true and complete copies of its Articles of Organization, Operating Agreement and any other governing instruments of the Company as presently in effect. The Company is not in default in the performance, observation or fulfillment of any of its governing instruments, and no amendments to such governing instruments are currently pending. Sellers and the Companies have timely filed all annual reports and all other material reports and filings required to be filed with the Florida Department of State relating to the Companies.

3.02   Authority to Execute and Perform Agreements.

(a)   Each Seller has the individual power and authority and full legal capacity to, and is competent to, enter into, execute and deliver this Agreement, to perform fully his obligations hereunder and to consummate the transactions contemplated hereby.

(b)   Each Company has the requisite corporate power and authority and full legal capacity to enter into, execute and deliver this Agreement, to perform fully its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement by the Companies and the consummation of the transactions contemplated hereby have been duly and validly authorized by Sellers as the sole members of the Companies and by all requisite limited liability company actions or proceedings required to be taken by each Company.

(c)   This Agreement has been duly executed and delivered by Sellers and each Company and constitutes a valid and binding obligation of Sellers and the Companies, enforceable against Sellers and the Companies in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or similar laws of general application now or hereafter in effect affecting the rights and remedies of creditors and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

3.03   Capitalization and Title to Membership Interests.

(a)   Sellers own 100% of the membership interests of each Company in the proportions set forth in Schedule 3.03. The Membership Interests are not certificated. The Membership Interests are owned directly, beneficially and of record free and clear of any and all Liens. The Membership Interests are not subject to any rights of dower, life interest, community property or other ownership interest of any Person, other than Sellers, including any spouse, former spouse or civil partner. All Membership Interests

14

have been duly authorized and are validly issued, fully paid, and, except as provided in the respective Operating Agreement of each Company, nonassessable, and were not issued in violation of the preemptive rights of any Person. Other than the Membership Interests, no capital or profits interests in or equity interests of either Company is authorized or outstanding.

(b) Except for this Agreement and the respective Operating Agreement of each Company, there are no outstanding rights, subscriptions, warrants, calls, preemptive rights, options, claims, subscriptions, convertible or exchangeable securities or other arrangements or agreements of any kind (contingent or otherwise) pursuant to which Sellers or either Company is or may become obligated to issue, sell, transfer, otherwise dispose of, register, purchase, return or redeem any equity interest in or other securities of the Companies or other securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase any equity interest in or other securities of the Companies and no equity interests of the Companies is reserved for issuance for any purpose. Except for this Agreement and the respective Operating Agreement of each Company, there are no agreements, voting trusts, proxies or other agreements, instruments or understandings with respect to the Membership Interests. Except for this Agreement and the respective Operating Agreement of each Company, neither Sellers nor either Company is a party to any agreement relating to the issuance, sale, redemption, transfer, acquisition or other disposition of the Membership Interests.

3.04   Subsidiaries.

(a) Neither of the Companies has any subsidiaries nor do they own beneficially or of record any equity interest in any other entity or any outstanding rights, subscriptions, warrants, calls, preemptive rights, options, claims, subscriptions, convertible or exchangeable securities or other arrangements or agreements of any kind (contingent or otherwise) with respect thereto. Neither Sellers nor either Company is party to an arrangement pursuant to which either Company is or may become obligated to issue, sell, transfer, otherwise dispose of, register, purchase, return or redeem any equity interest.

(b) Except for the respective Operating Agreement of each Company, neither Company is a party to any partnership, limited liability company, joint venture, trust or similar agreement.

3.05   Financial Statements.

(a) Sellers have previously delivered to Purchaser (i) the audited financial statements (balance sheet, statement of operations and statement of cash flows) of the Companies for the fiscal years ended December 31, 2006 and December 31, 2005 and the notes thereto (the "Audited 2006 and 2005 Statements"), and (ii) the unaudited financial statements (balance sheet and statement of operations) of each Company for the fiscal year ended December 31, 2007 (the "Unaudited 2007 Statements"). Other than the absence of notes and other immaterial end-of-period adjustments, the Unaudited 2007 Statements and the Audited 2007 Statements shall not differ from each other in any

15

material respect. The Audited 2006 and 2005 Statements, the Audited Financial
Statements and the Unaudited 2007 Statements shall be referred to collectively herein as
the "Company Financial Statements."

(b)   Except as set forth in the Independent Auditors' Report
accompanying the Audited 2006 and 2005 Statements and the Audited 2007 Statements,
all Company Financial Statements (i) have been prepared, in all material respects, in
accordance with GAAP applied on a consistent basis throughout the periods covered
thereby, (ii) have been prepared based upon the books and records of the Companies, and
(iii) present fairly, in all material respects, the financial position and the results of
operations of the Companies as of the dates thereof and for the periods covered thereby,
except, in each case, with respect to the Unaudited 2007 Statements, (A) to the extent
notes to such Unaudited 2007 Statements or statements of shareholder's equity and/or
cash flows would be required for such conformity to GAAP, would disclose deviations
from GAAP or would reflect matters that would impact such financial position or results
of operations, and (B) that such Unaudited 2007 Statements are subject to normal
adjustments that, if made as a result of an audit, would not have been material to the
Companies, taken as a whole.

(c)   Schedule 3.05(c) contains a true and complete list of all capitalized
lease obligations and any outstanding Indebtedness of the Companies and the
outstanding balances thereof as of no earlier than five (5) Business Days preceding the
date hereof.

3.06   Absence of Undisclosed Liabilities.  Except as set forth in
Independent Auditors' Report accompanying the Audited 2007 Statements and the balance
sheet that is part of the Audited 2007 Statements, neither Company has any liabilities that
would be required to be reflected on a balance sheet prepared in accordance with GAAP,
other than liabilities (i) adequately reflected or reserved against on the Company Financial
Statements that have not been paid or discharged since the date thereof, (ii) ordinary course
performance liabilities arising under Contracts listed in Schedule 3.13 or not so required to
be listed in accordance with their terms, (iii) disclosed in this Agreement (including any
Schedule hereto), (iv) arising in connection with the preparation, negotiation, consummation
and/or performance of this Agreement and/or any other agreements, documents and/or
instruments executed and/or delivered pursuant hereto (collectively with the Agreement, the
"Transaction Documents") and/or the transactions contemplated hereby and thereby, and/or
(v) arising in the ordinary course of the Companies' business (including accounts payable,
deferred revenue, accrued Taxes, accrued expenses, bonuses and payroll expenses and other
costs, expenses and other ordinary course liabilities) incurred since the date of latest
Company Financial Statements, none of which is a material liability for breach of contract,
breach of warranty, tort, infringement, violation of Law, claim or lawsuit.

3.07   No Material Changes.  Except (a) as set forth in Schedule 3.07, (b) as
required, contemplated or permitted by this Agreement (including Schedule 5.03) and/or any
other agreements, documents and/or instruments executed and/or delivered pursuant hereto
and/or the transactions contemplated hereby and thereby (including in connection with the



16

preparation, negotiation, consummation and/or performance hereof and thereof), and/or (c) as consented to in writing by Purchaser, since January 1, 2008:

(a)   there has not been, with respect to both Companies taken as a whole, any Material Adverse Effect.

(b)   Neither Sellers nor the Companies have received any notice of termination of any contract, lease or other agreement, the termination of which has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Companies taken as a whole, or suffered any damage, destruction or casualty loss, whether or not covered by insurance, that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Companies taken as a whole.

(c)   neither Company has:

(i)   entered into, relinquished, terminated or effected a material modification of, any Contract or other right having a value of or involving aggregate payments in excess of $100,000;

(ii)   redeemed or acquired any of its capital stock or equity interests or declared, set aside, or paid any dividend or distribution of any kind with respect to any of its Membership Interests or equity interests;

(iii)   amended the Company's Articles of Organization, Operating Agreement or other governing instruments;

(iv)   made any increase in compensation, bonus or other benefits payable or to become payable to any Company Employee, other than increases in compensation, bonus or other benefits in the ordinary course of business consistent with past practice or as required by existing Contracts, or made any grants of any equity or equity-based awards, including with respect to any capital stock, phantom equity interests, or rights to acquire capital stock or other equity interests of the Company;

(v)   granted any severance or termination pay or rights to any Company Employee or increased the benefits payable under existing severance or termination pay policies or employment agreements;

(vi)   established, adopted, entered into, amended or terminated any Plan (other than as may be required by the terms of an existing Plan or as may be required by applicable law or in order to qualify under Sections 401 and 501 of the Code), or any new employment or consulting arrangement providing for annual compensation over $100,000;

(vii)   adopted or changed any accounting method, policy or practice, or any depreciation or amortization policy or rate, except as required by GAAP;

17

(viii)    made any loan or advance of money or other property to any Person, in the aggregate with a value in excess of $10,000;

(ix)    made any capital expenditure or commitments therefore, in the aggregate, in excess of $250,000, except in the ordinary course of business consistent with past practice;

(x)    acquired, sold, abandoned, leased, assigned or otherwise disposed of any assets, rights or properties, in the aggregate, involving greater than $250,000, except in the ordinary course of business consistent with past practice;

(xi)    made any material changes in its selling, distribution, advertising, promotion, terms of sale or collection, purchase or payment practices;

(xii)    incurred, assumed or become subject to, or paid or discharged any Indebtedness, except for Indebtedness incurred, paid or discharged in the ordinary course of business consistent with past practice;

(xiii)    mortgaged, pledged or subjected to any Lien, any portion of its assets, rights or properties (except for Permitted Liens);

(xiv)    entered into any partnership, joint venture or similar agreement;

(xv)    written down the value of any work in progress, or written off as uncollectible any notes or accounts receivable, except write-downs and write-offs in the ordinary course of business consistent with past practice;

(xvi)    received any written notice of any new labor union organizing activity, any actual or threatened employee strikes, work stoppages, slowdowns or lockouts, or any material adverse change with respect to its relations with any of its employees, agents, partners or other co-owners in any venture, customers, suppliers, consultants, subcontractors or independent contractors;

(xvii)    extended or granted any warranties, except in the ordinary course of business consistent with past practice;

(xviii)    waived any material rights or settled or compromised any litigation;

(xix)    issued, sold or transferred any of its (i) capital stock, other equity securities or securities containing equity features, or (ii) securities, options or other rights to acquire its capital stock, other equity securities or securities containing equity features;

(xx)    entered into any agreement, arrangement or understanding to do any of the foregoing; or

18

(xxi)  made, changed, or revoked any Tax election, filed any amended Tax Return, entered into any Tax closing agreement or settlement, consented to any Tax Claim or assessment, incurred any obligation to make any payment of, or in respect of, any Taxes, except in the ordinary course of business, or agreed to extend or waive the statutory period of limitations for the assessment or collection of Taxes.

3.08   Tax Matters.

(a)  All Tax Returns required to have been filed by or with respect to the Companies have been, and with respect to Tax Returns due between the date of this Agreement and the Closing Date will be, duly and timely filed (taking into account any extensions validly obtained).  All such Tax Returns are, and with respect to Tax Returns due between the date of this Agreement and the Closing Date will be, true, complete and accurate in all material respects.  All Taxes required to be paid by the Companies have been timely paid.  The Companies are both calendar year taxpayers for income tax purposes in all jurisdictions for which they file income tax returns.  Neither of the Companies has filed any election to be treated as a corporation for US federal or state income tax purposes, and both Companies are treated as partnership flow through entities in all domestic and foreign jurisdictions in which they have an obligation to pay income taxes.

(b)  Neither Company is a party to any agreement extending the time within which to file any Tax Return, or extending or having the effect of extending the period for the assessment or collection of any Tax.

(c)  The Companies have each withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, creditor or independent contractor.

(d)  Except as set forth in Schedule 3.08(d), there is no assessment or, to the Knowledge of Sellers, proposed assessment by any Taxing Authority for additional Taxes against or in respect of either of the Companies for any past period and neither of the Companies has received any written notice regarding such assessments or proposed assessments.  There is no dispute or claim concerning any Tax liability of either of the Companies pending, or to the Knowledge of Sellers, threatened by any Taxing Authority, and since 2002, no Governmental or Regulatory Authority has inquired why either of the Companies is not filing Tax returns or paying Taxes in any jurisdiction.  There are no liens for Taxes upon the assets or properties of either of the Companies other than liens for Taxes not yet due other than Permitted Liens.  No audit or other proceedings by any Taxing Authority is pending or, to the Knowledge of Sellers, threatened with respect to any Taxes due from or with respect to either of the Companies.  Each deficiency resulting from any audit or examination by any Taxing Authority with respect to any Taxes owed by either of the Companies has been timely paid.  No issues with respect to any audit or examination of Sellers (to the extent related to either of the Companies), or either of the Companies, as the case may be, were raised by the relevant Taxing Authority in any completed audit or examination that can reasonably be expected to

19

recur in a later taxable period. The Sellers have delivered or made available to Purchaser all Tax Returns filed by, and all Tax examination reports and statements of deficiencies assessed against or agreed to by, either of the Companies with respect to any taxable period for the past three calendar years or any period for which such period remains open for audit and all private letter rulings, technical advice memorandums or closing agreements with respect to the Companies obtained or entered into since formation of the Companies.

(e)   There are no outstanding agreements or waivers extending the statutory period of limitation applicable to any Tax Returns required to be filed by, or with respect to, any Tax assessment or deficiency affecting either of the Companies.

(f)   Neither of the Companies has any liability for the Taxes of any other Person or entity (i) under Section 1.1502-6 of the Treasury regulations or similar rules of other Governmental or Regulatory Authorities, (ii) as a transferee or successor, or (iii) by contract or otherwise.

(g)   Except as set forth in Schedule 3.08(g) and except as contemplated hereunder, neither of the Companies is a party to or bound by any obligations under any Tax sharing, Tax allocation, Tax indemnity or similar agreement or arrangement.

(h)   Neither of the Companies was ever included or is includable in the Tax Return of any affiliated, consolidated, combined, unitary or similar group of corporations.

(i)   Neither of the Companies will be required to include any item of income in, or exclude any item of deduction from, taxable income for any Post-December Tax Period as a result of any (i) change in method of accounting for any period commencing prior to the Closing under Section 481(c) of the Code or (ii) "closing agreement" described in Section 7121 of the Code entered into by the Companies prior to the Closing.

(j)   Except as set forth in Schedule 3.08(j), no power of attorney with respect to any Taxes has been executed or filed with any Taxing Authority by or on behalf of either of the Companies.

(k)   Neither of the Companies is a party to any "reportable transaction" as defined in Treasury Regulation Section 1.6011-4.

(l)   Schedule 3.08(l) sets forth each U.S. federal, foreign, state, county, local, municipal or other domestic jurisdiction in which either of the Companies files a Tax Return relating to state and local income, franchise, license, excise, net worth, property or sales and use Taxes or is or has been liable for any Taxes on a "nexus" basis at any time for a taxable period for which the applicable statutes of limitation have not expired.

(m)  Neither of the Companies has been, at any time during the applicable time period set forth in Section 897(c)(1) of the Code, a United States real property holding company within the meaning of Section 897(c)(2) of the Code.

(n)  No net operating loss carryforward, capital loss carryforward or similar tax attribute of the Companies is subject to a limitation under Section 382 or Section 383 of the Code or similar provision of applicable law.

3.09   Compliance with Laws.  The Companies and the operation of their respective businesses are not and have not been in violation of any applicable Law, Order or other requirement of any Governmental or Regulatory Authority, except for violations which would not reasonable be expected to be material to the Companies taken as a whole. Since formation, neither of the Companies has received written notice of any such violation or alleged violation or any citation, fine or penalty imposed against either of the Companies with respect thereto.

3.10   No Breach.  The execution, delivery and performance of this Agreement by Sellers and the Companies and the consummation by Sellers and the Companies of the transactions contemplated hereby will not (i) conflict with, violate or result in the breach of any provision of either Company's Articles of Organization, Operating Agreement or other governing instruments; (ii) violate or conflict with or result in the breach of any of the terms or conditions of, or otherwise give any other contracting party the right to terminate, cancel or accelerate, or constitute (or with notice or lapse of time or both constitute) a default under, any Contract to which either of the Companies is a party or is subject or by which either Company or any asset of either Company is bound, other than as would not reasonable be expected to be material to the Companies taken as a whole; (iii) conflict with or result in a violation or breach of any Permit, Law or Order applicable to Sellers or either of the Companies, other than as would not reasonable be expected to be material to the Companies taken as a whole; or (iv) entitle any party to exercise any right of first refusal, first offer, preemptive right or other option right with respect to the Companies or result in the creation of any Lien (other than Permitted Liens) on the assets, properties or securities of either Company.

3.11   Consents and Approvals.  Schedule 3.11 contains a true, complete and accurate list of each material consent, approval or action of, and each material filing with or material notice to any Governmental or Regulatory Authority or other Person required to be obtained, taken, made or given by the Sellers or either of the Companies in order to effectuate the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby (collectively, "Seller Required Consents").

3.12   Actions and Proceedings.  There are no outstanding Orders against Sellers that relate to the Companies, or against the Companies or any of the Companies' respective securities, assets or properties.  There are no Legal Proceedings pending or, to the Knowledge of Sellers, threatened against Sellers (that relate to the Companies) or either of the Companies.

21

3.13    Contracts and Other Agreements.  Schedule 3.13 contains a true, complete and accurate list (or summaries as to oral contracts) of all of the following Contracts to which either of the Companies is a party or by which any of their assets or properties are bound:

(a)    Contracts for the purchase or sale of services, materials, products or supplies which involve aggregate payments by either of the Companies of more than $75,000 for each such Contract or involve aggregate payments to either of the Companies of more than $75,000 for each such Contract;

(b)    Contracts providing for stock or other equity options or stock or other equity purchases, bonuses, pensions, deferred or incentive compensation, retirement or severance payments, profit-sharing, insurance or other benefit plans or programs for any officer, consultant, director or employee of either Company other than pursuant to the Plans;

(c)    Contracts for construction or for the purchase, acquisition, sale or other disposition of (or right to acquire, sell or otherwise dispose of) real estate, improvements, fixtures, equipment, machinery and other items which under GAAP constitute capital expenditures and involve aggregate payments by either of the Companies in excess of $75,000;

(d)    Contracts under which either Company is lessee of, or holds or operates any personal property owned by any other party, for which the annual rent exceeds $75,000;

(e)    Contracts under which either Company is the lessor of or permits any third party to hold or operate any property, real or personal, for which the annual rental exceeds $75,000;

(f)    Contracts for the borrowing of money or the mortgaging, pledging or otherwise placing a Lien on any portion of either Company's assets;

(g)    Guaranty of any obligation for borrowed money or other guaranty or surety or other Contract wherein either of the Companies has agreed to be contingently or secondarily liable for the obligation of any Person;

(h)    Contracts restricting either of the Companies or, to the Knowledge of Sellers, any of their respective officers, from engaging in any line of business or competing with any Person or entity or in any geographical area, or from using or disclosing any information in its possession, other than, in each case, Contracts whereby the Companies so restrict such officers;

(i)    Contracts with respect to Intellectual Property;

(j)    Contracts providing for joint venture or collaboration agreements or other agreements involving a sharing of profits, revenue, cash flow or expenses of either of the Companies;

22

(k)  Contracts for services with any Company Employee and any such oral agreements which are not terminable at will by either of the Companies;

(l)  Collective bargaining or other Contracts with any labor union;

(m)  Contracts with respect to any completed or pending business acquisition or disposition by either of the Companies since their formation;

(n)  Contracts between either Company, on the one hand, and any Affiliate of either Company, on the other hand; and

(o)  Contracts containing a provision involving a change of control of either Company or requiring the consent of a third party to such change of control.

True and complete copies of all Contracts (and all amendments, written waivers or other modifications thereto) set forth in Schedule 3.13 have been furnished or made available to Purchaser. Each of such Contracts is valid, subsisting, in full force and effect, binding upon the Company that is party thereto, as the case may be, and, to the Knowledge of Sellers, are binding upon the other parties thereto in accordance with their terms (subject in each case to the application of general principles of equity or by the effect of bankruptcy, insolvency, reorganization, moratorium or similar Laws generally affecting creditors' rights). Neither Sellers nor either of the Companies, nor, to the Knowledge of Sellers, any other party to any such Contract, is in material default under the terms thereof, nor, to the Knowledge of Sellers, does any condition exist that with notice or lapse of time or both would constitute a material default thereunder.

3.14  **Bank Accounts and Powers of Attorney.** Schedule 3.14 identifies all bank and brokerage accounts of the Companies, whether or not such accounts are held in the name of the Companies, lists the respective signatories therefore and lists the names of all Persons holding a power of attorney from either Company.

3.15  **Real Property.**

(a)  Schedule 3.15(a) is a true and complete list of all real property owned by either of the Companies (collectively, the "Owned Real Property"). The Companies have not owned and previously disposed of any real properties. The Company designated in Schedule 3.15(a) is the sole owner of good, valid, fee simple and marketable title to the Owned Real Property, including without limitation, all buildings, structures, fixtures and improvements located thereon, free and clear of any Liens other than Permitted Liens and mortgages and other Liens identified on Schedule 3.15(a). Neither of the Companies is obligated under, or a party to, any option, right of first refusal or other contractual right to sell, assign or dispose of any Owned Real Property or any portion thereof.

(b)  A true and complete copy of each real property lease to which either of the Companies is a party (and any amendments or supplements thereto) (each, a "Lease") has been delivered or made available to Purchaser and each such Lease is listed on Schedule 3.15(b).

23

(c)   Except as disclosed in Schedule 3.15(c), with respect to each Lease: (i) such Lease in full force and effect and is legal, binding and enforceable upon the Company that is party thereto, as the case may be, and, to the Knowledge of Sellers, legal, binding and enforceable upon the other parties thereto in accordance with its terms (subject in each case to the application of general principles of equity or by the effect of bankruptcy, insolvency, reorganization, moratorium or similar Laws generally affecting creditors' rights); (ii) to the Knowledge of Sellers, such Company is not in material breach or default under any such Lease, and to the Knowledge of Sellers, no other party to such Lease is in material breach or default, and, to the Knowledge of Sellers, no event has occurred that, with notice or lapse of time, would constitute a material breach or default by the Company or any other party thereto, or give rise to a right of termination, modification or acceleration by the lessor thereunder; (iv) neither Company has received written notice of any material disputes with respect to any such Lease; and (v) neither of the Companies has assigned, transferred, conveyed, mortgaged, deeded in trust or encumbered any interest in the leasehold.

3.16   Tangible Personal Property.  The Companies are in possession of and have marketable title to, or has valid leasehold interests in or valid rights to use, all tangible personal property which (a) is used in and individually or in the aggregate with other such property is material to the business of the Companies, taken as a whole, and (b) is reflected on the Company Financial Statements.  All such tangible personal property is free and clear of all Liens, except for Permitted Liens.  All material items of tangible personal property and all tangible personal property in the aggregate, are in all material respects in good working order and condition, ordinary wear and tear excepted, and are reasonably adequate for the present uses to which it is being or is contemplated by Sellers to be put.

3.17   Intellectual Property.

(a)   Schedule 3.17(a) sets forth a true and complete list of all material:

(i)   patented and registered Intellectual Property, and pending patent applications or applications for registration of Intellectual Property, used, owned or filed by either Company;

(ii)   trade names and trademarks, service marks and copyrights owned or used by either Company;

(iii)   licenses of Intellectual Property to which either Company is a party; and

(iv)   Contracts with respect to Intellectual Property to which either Company is a party.

(b)   With respect to all items listed on Schedule 3.17(a):

(i)   the Companies own, or are licensed to use, all such Intellectual Property;



24

(ii)    (x) all such Intellectual Property owned by either of the Companies is valid, subsisting, and in full force and effect, (y) record ownership of such Intellectual Property owned by either of the Companies is up to date, and (z) registrations and applications for such Intellectual Property owned by either of the Companies and for which registration or applications have been obtained or made have been duly maintained, are subsisting, in full force and effect, and have not been cancelled, expired, or abandoned;

(iii)    the Sellers and Companies have taken reasonable steps to preserve the confidentiality of its trade secrets, its confidential, proprietary manufacturing processes, formulas, recipes and other confidential, proprietary information;

(iv)    the use by the Companies of such Intellectual Property that is owned by the Companies does not, and the use by the Companies of such Intellectual Property that is not owned by the Companies, to Sellers' Knowledge, does not, infringe on or otherwise violate the Intellectual Property rights of any third party, and, to the extent such Intellectual Property is licensed, the license fees that are currently due have been paid in full and its use is in accordance, in all material respects, with the applicable license pursuant to which a Company acquired the right to use such Intellectual Property;

(v)    to the Knowledge of Sellers, no third party is challenging, infringing on or otherwise violating any right of either of the Companies in any such Intellectual Property;

(vi)    neither the Sellers nor either Company has received written notice of any pending, or, to the Knowledge of Sellers, threatened claim, order or proceeding with respect to any such Intellectual Property; and

(vii)    no such Intellectual Property is being used or enforced by the Companies in a manner that would reasonably be expected to result in the abandonment, cancellation or unenforceability thereof.

(c)    Sellers have no ownership interest or license in any Intellectual Property relating to the Business, except that (i) on or prior to the Closing, Sellers anticipate causing the Companies to assign, transfer and distribute to Tripathi all right, title and interest of the Companies in, to and under the Tripathi Technology, (ii) Purchaser hereby consents to such assignment and transfer, and (iii) notwithstanding any provision in this Agreement to the contrary, no representation, warranty or agreement of any kind is provided in this Agreement by Sellers or the Companies with respect to the Tripathi Technology except that Sellers hereby represent and warrant that the Tripathi Technology (I) is not used, held for use or contemplated by Sellers for use in the Business and (II) does not infringe on or otherwise violate the Intellectual Property rights of the Companies or any third party.

3.18    Employee Benefit Plans.

25

(a)   Schedule 3.18(a) contains a true and complete list of all Plans, with a description of any unwritten Plans. Prior to the date of this Agreement, the Sellers have provided to the Purchaser or made available to the Purchaser true and complete copies of (i) each Plan (including amendments since the most recent restatement); (ii) the annual reports (including Form 5500s and attached schedules) required to be filed with the IRS or the Department of Labor with respect to each Plan for the past three years; (iii) the most recent determination letter issued to, or opinion letter or ruling issued with respect to, each Plan that is intended to be qualified under Section 401(a) of the Code and any pending applications for a determination letter for such plans; (iv) copies of confirmations that each Plan that is intended to be qualified under Section 401(a) of the Code satisfied applicable nondiscrimination tests in each of the plan years for the past three years; (v) the most recent summary plan description (and any summaries of material modifications since the most recent summary plan description) for each Plan for which such a summary plan description is required and any summaries or other material communications distributed to participants for each Plan whether or not required to provide a summary plan description; (vi) all personnel, payroll and employment manuals and policies; (vii) each trust agreement, recordkeeping or other third-party agreement, insurance and group annuity Contract relating to any Plan; (viii) all notices that were given by either Company or any of its ERISA Affiliates or any Plan to the IRS, the Department of Labor or any other Governmental or Regulatory Authority relating to a Plan; and (ix) all notices that were given by the IRS, the Department of Labor or any other Governmental or Regulatory Authority to either Company or any of its ERISA Affiliates relating to any Plan.

(b)   Each Plan that is intended to be qualified and exempt from federal income Taxes under Sections 401(a), 401(f) and 403(a) of the Code, respectively, has received a determination letter from the IRS to the effect that such Plan is so qualified and that its related trust (if applicable) is exempt from federal income Taxes under Section 501(a) of the Code. No event has occurred since any such determination letter was issued that could make the letter ineffective or otherwise jeopardize the tax-qualified status of any tax-qualified plan or otherwise cause the imposition of material liability, penalty or tax against either Company or any ERISA Affiliate. Each Plan intended to satisfy the requirements of Section 125 of the Code satisfies such requirements in all material respects.

(c)   Except as set forth in Schedule 3.18(c), no Plan is, has ever been or has ever been the successor or transferee of a "multiemployer plan" (as defined in Section 3(37) of ERISA), a "defined benefit plan" (as defined in Section 3(35) of ERISA), a "multiple employer plan" (as defined in Section 413(c) of the Code) or a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA). Neither Company nor any of their ERISA Affiliates has any actual or potential, secondary or contingent liability to any Person under Title IV of ERISA. Neither Company nor any of their ERISA Affiliates has ever contributed to, been required to contribute to or withdrawn from any "multiemployer plan" (as defined in section 3(37) of ERISA), "multiple employer plan" (as defined in Section 413(c) of the Code) or "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA).

26

(d)   Neither Company nor any of their ERISA Affiliates has ever established, maintained or contributed to, had any obligation to maintain or contribute to or had any liability with respect to any "voluntary employees' beneficiary association" (within the meaning of section 501(c)(9) of the Code), any organization or trust described in Sections 501(c)(17) or 501(c)(20) of the Code or any "welfare benefit fund" described in Section 419(e) of the Code.  Schedule 3.18(d) lists all Plans that are insured.

(e)   All assets of each Plan consist of cash or actively traded securities.

(f)   Except to the extent required by COBRA, neither Company nor any of their ERISA Affiliates has offered or become obligated to provide post-termination health, life insurance or other welfare benefits.

(g)   Each Plan is, has been, and as of the Closing Date will be, operated and administered in accordance with its terms and in material compliance with applicable Law (including ERISA, the Code and applicable state Laws).

(h)   Schedule 3.18(h) lists each Plan that is a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code.  Each such Plan has been, and will be until the Closing, operated in accordance with a "good faith, reasonable interpretation" of Section 409A of the Code, with the intent to avoid the adverse tax consequences described therein.  Neither Company nor any of their ERISA Affiliates has any obligations to any Company Employee with respect to any Tax that may be imposed under Section 409A of the Code.

(i)   Neither Company nor any of their ERISA Affiliates has breached any fiduciary duty with respect to any Plan, and neither Company nor any of their ERISA Affiliates has any material liability or exposure to material liability in connection with any acts taken (or failed to be taken) with respect to investment of the assets or administration of any Plan.  To the Knowledge of Sellers, no fiduciary (within the meaning of Section 3(21) of ERISA) has breached a fiduciary duty with respect to any Plan or otherwise has any liability in connection with any acts taken (or failed to be taken) with respect to the investment of the assets or administration of any Plan.  Neither Company nor any of their ERISA Affiliates has engaged in a "prohibited transaction" (within the meaning of Section 406 of ERISA or Section 4975 of the Code) and, to the Knowledge of Sellers, no "prohibited transaction" (within the meaning of Section 406 of ERISA or Section 4975 of the Code) has occurred with respect to any Plan (without regard to whether an exemption is available).

(j)   All contributions to and payments from the Plans that have been required to be made in accordance with the terms of the Plans and applicable Laws have been timely made.  All filings and payments required to be made before the Closing Date with or to the IRS, the Department of Labor or any Governmental or Regulatory Authority with respect to all Plans will, before the Closing Date, have been made, and all obligations to present and former participants that each Plan will be required to satisfy by the Closing Date will, before the Closing Date, have been satisfied.

(k)   Other than claims for benefits submitted in the ordinary course by participants or beneficiaries, there are no actual or, to the Knowledge of Sellers, threatened, claims (or facts that would be reasonably expected to give rise to a claim) against, or legal or regulatory proceedings (including investigations, audits or voluntary compliance resolution or closing agreement program proceedings) involving, any Plan. Neither Company nor any of their ERISA Affiliates has any liability to the IRS or any other Governmental or Regulatory Authority with respect to any Plan, including any liability imposed under chapter 43 of the Code.

(l)   Except as required under Section 204(g) of ERISA and Section 411(d)(6) of the Code, each Plan may be discontinued or terminated on or after the Closing Date without imposing liability on either Company, any of their ERISA Affiliates, the Purchaser or any of its Affiliates or such Plan.

(m)   Except as set forth in Schedule 3.18(m), neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby, either alone or in combination with any other event, will directly or indirectly (i) result in any payment (including severance, unemployment compensation or golden parachute) becoming due under any Plan, (ii) increase the amount of any benefits (including severance, deferred compensation and equity benefits) that would be payable under any Plan if the transactions contemplated hereby had not occurred, or (iii) result in the acceleration of the time of payment or vesting of any such benefits.  No benefit that is or may become payable by any Plan as a result of, or in connection with, the transactions contemplated by this Agreement shall constitute an "excess parachute payment" (as defined in Section 280G(b)(1) of the Code) that is subject to the imposition of an excise tax under Section 4999 of the Code or that would not be deductible by reason of Section 280G of the Code.

(n)   Neither Company nor any of their ERISA Affiliates has a formal plan, commitment or proposal, whether legally binding or not, or has made a commitment to any individual to create any additional Plan or modify or change any existing Plan in a manner that would affect any Company Employee.  No events have occurred or are expected to occur with respect to any Plan that would cause a material change in the cost of providing the benefits under the Plan.

(o)   There are no claims against either Company for eligibility to participate in any  Plans by any individual who has been classified by the Company as other than a common law employee (such as an independent contractor, leased employee or consultant), and there are no facts that would be reasonably expected to give rise to such a claim if any individual so classified is subsequently reclassified (whether by the Company, a Governmental or Regulatory Authority or otherwise) as an employee of the Company.  No Company Employee is a "leased employee" within the meaning of Section 414(n) of the Code.

3.19   Labor Matters.  Except as set forth in Schedule 3.19, (a) neither of the Companies is a party to or subject to any contract, commitment, agreement, understanding or other arrangement with any labor organization, nor work rules or practices agreed to with



28

any labor organization or employee association, applicable to employees of either of the Companies, nor is either of the Companies a party to or bound by any collective bargaining or similar agreement; (b) there are no agreements with labor unions, work councils or associations representing employees of the business of either of the Companies; (c) there are no current or, to the Knowledge of Sellers, threatened, strikes, slowdowns, picketing, work stoppages, lockouts or other occurrences, events or conditions of a similar character in which any of said employees are participating, and during the last 3 years there has not been any such action; (d) there are no union claims to represent the employees of either of the Companies nor have there been any such claims within the last 3 years; (e) there is, and within the last 3 years has been, no representation of the employees by any labor organization and, to the Knowledge of Sellers, there are no union organizing activities among the employees; (f) neither of the Companies has engaged in any material unfair labor practices as defined in the National Labor Relations Act and the Companies are, and have for the past 3 years been, in compliance in all material respects with all applicable Laws respecting employment and employment practices, terms and conditions of employment, wages, hours of work and occupational safety and health; (g) there is no unfair labor practice charge or complaint against either of the Companies pending or, to the Knowledge of Sellers, threatened before the National Labor Relations Board or any other Governmental or Regulatory Authority; (h) there is no grievance pending or, to the Knowledge of Sellers, threatened against either of the Companies arising out of any collective bargaining agreement or other grievance procedure; (i) there are no charges with respect to or relating to either of the Companies pending or, to the Knowledge of Sellers, threatened before the Equal Employment Opportunity Commission or any other Governmental or Regulatory Authority responsible for the prevention of unlawful employment practices; (j) none of Sellers and neither of the Companies has received written notice of the intent of any Governmental or Regulatory Authority responsible for the enforcement of labor or employment Laws to conduct an investigation with respect to or relating to either of the Companies; and (k) no complaints, lawsuits or other proceedings are pending or, to the Knowledge of Sellers, threatened in any forum by or on behalf of any employee or former employee of either of the Companies, any applicant for employment or classes of the foregoing alleging breach of any express or implied contract, commitment, agreement, understanding or other arrangement for employment, any Law governing employment or the termination thereof or other discriminatory, wrongful or tortious conduct in connection with any employment relationship.

3.20   Insurance.   Schedule 3.20 (a) lists all material insurance policies maintained by or on behalf of the Companies and (b) includes a summary description of any self-insurance arrangements in effect as of the date hereof with respect to the Companies. All such policies are in full force and effect and will not terminate by virtue of the transactions contemplated hereby, all premiums due thereon have been paid by the Companies, and the Companies are otherwise in compliance in all material respects with the terms and provisions of such policies.  Neither of the Companies has received any notice of cancellation or non-renewal of any such policy or arrangement, nor, to the Knowledge of Sellers, is the termination of any such policies or arrangements threatened in writing.  There is no material claim pending under any of such policies or arrangements as to which coverage has been questioned, denied or disputed by the underwriters of such policies or arrangements.  Neither of the Companies has received any notice from any of its insurance

29

carriers that any insurance coverage presently provided for will not be available to either of the Companies in the future on substantially the same terms as now in effect.

      3.21    Environmental Matters.

      (a)  Except as disclosed in Schedule 3.21(a) and/or as would not reasonably be expected to be material to the Companies taken as a whole:

      (i)     the Companies have been and are in compliance with all applicable Environmental Laws, including, but not limited to, possessing all permits, authorizations, licenses, exemptions and other governmental authorizations required for its operations under applicable Environmental Laws, none of which is subject to revocation or termination as a result of the transactions contemplated by this Agreement;

      (ii)    there is no pending or, to the Knowledge of Sellers, threatened Environmental Claim against (x) either Company or (y) to the Knowledge of Sellers, any Person whose liability for Environmental Claims either of the Companies has assumed or retained by contract or operation of law;

      (iii)   the transactions contemplated by this Agreement will not give rise to any liability or obligation for site Cleanup or require any consent of any Person;

      (iv)   with respect to the Owned Real Property and, to the Knowledge of Sellers, the real property subject to a Lease, there have been no Releases or threatened Releases of Hazardous Substances at, on or underneath any of such real property that requires or could reasonably be expected to require Cleanup under applicable Environmental Laws; and

      (v)    neither of the Companies has disposed or arranged for the disposal of Hazardous Substances at any location that is: (w) listed on the Federal National Priorities List ("NPL") or identified on the Comprehensive Environmental Response, Compensation, and Liability Information System ("CERCLIS"), each established pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42, U.S.C. 9601, et seq.; (x) listed on any U.S. domestic list of hazardous waste sites that is analogous to the NPL or CERCLIS; (y) currently undergoing Cleanup actions as a result of such disposal; or (z) to the Knowledge of Sellers, subject to or the source of an Environmental Claim or other request to undertake a Cleanup.

      (vi)   To the Knowledge of Sellers, there are no past or present conditions or circumstances arising out of or relating to the operations of either of the Companies that could reasonably be expected to give rise to any Environmental Claim or Cleanup obligation.

      (vii)  No underground storage tanks, polychlorinated biphenyls, or asbestos-containing material is located at any real property currently owned, leased

30

or operated by either of the Companies, or was located at any real property previously owned, leased or operated by either of the Companies while such property was owned, leased or operated by either of the Companies, and any such storage tanks (whether underground or above ground) have been, or, while such property was owned, leased or operated by either of the Companies, were, at all times maintained, operated, sealed, closed and disposed of in accordance with all applicable Environmental Laws.

(b)   The Companies have provided or made available to Purchaser all material reports and studies, and all material written communications to the Companies from Governmental or Regulatory Authorities or from the parties that prepared such reports and studies, or from the owners of any parcel immediately adjacent to any real property owned by the Companies, in each case, that are in the Companies' possession and pertain to Hazardous Substances, Releases and compliance with or liability under Environmental Laws relating to any real property or facilities currently or formerly owned, operated or leased by either of the Companies.

3.22   Certain Business Practices.  None of Sellers, the Companies or any of their respective Affiliates, nor, to the Knowledge of Sellers, any of their respective directors, officers, agents, employees, representatives or any Person authorized to act on their behalf (in their capacities as such), has, in any material respect, during the past three years: (a) used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity; (b) directly or indirectly paid or delivered any fee, commission or other sum of money or item of property, however characterized, to any finder, agent or other party acting on behalf of or under the auspices of a governmental official or Governmental or Regulatory Authority that, in each case, was illegal under any applicable Law; (c) made any payment, bribe or kick-back payment to any customer or supplier or to any officer, director, partner, employee or agent of any such customer or supplier, in each case that was unlawful under any applicable Law; (d) made any payment to any Person in violation of the United States Foreign Corrupt Practices Act of 1977, as amended; or (e) engaged in any other reciprocal practice, or made any other payment or gave any other consideration to any such customer or supplier or any such officer, director, partner, employee or agent, in each case, that was unlawful under any applicable Law.

3.23   Customers and Suppliers.  Schedule 3.23 sets forth a true, correct and complete list of the 15 largest suppliers to, and customers of, the Companies, taken as a whole, for the fiscal year ended December 31, 2007 (determined on the basis of the total dollar amount of purchases or sales, as the case may be).  There has been no termination or cancellation of the business relationship of either of the Companies with any such customer or supplier nor, to the Knowledge of Sellers, has any such customer or supplier indicated an intent to so terminate, cancel or materially curtail its business relationship with either of the Companies.  The Sellers shall have the right to update Schedule 3.23 on or prior to Closing and no inconsistency between Schedule 3.23 as initially delivered and such update(s) thereto shall be deemed for any purpose to constitute a breach or violation of the representations and warranties set forth in this Section 3.23.

31

3.24    Backlog.  Schedule 3.24 sets forth as of December 31, 2007, a statement of the backlog of firm orders for the sale of products or services relating to the business of the Companies for which revenues have not been recognized by the Companies (the "Backlog Report").  All of the Contracts identified on the Backlog Report ("Backlog Report Contracts") have been incurred in the ordinary course of business.  The Company's current cash flows, including pursuant to its line of credit and other sources of financing, are substantially sufficient to fund the operations of the Company with respect to its performance of such Backlog Report Contracts as currently conducted and as currently contemplated by the Sellers to be conducted; provided, however, that the immediately preceding representation and warranty is provided assuming Purchaser fully complies with its obligation under Section 2.02(e).

3.25    Brokerage.  No broker, finder, agent or similar intermediary has acted on behalf of Sellers or either of the Companies in connection with this Agreement or the transactions contemplated hereby, and there are no brokerage commissions, finders' fees or similar fees or commissions payable in connection herewith based on any agreement, arrangement or understanding with Sellers or either of the Companies.  Sellers shall be solely responsible for any such fees or commissions owed or claimed to be owed as a result of this Agreement or the consummation of the transactions contemplated hereby.

3.26    Disclosure.  The representations and warranties of Sellers and the Companies contained in this Agreement do not contain any untrue statement of a material fact, and do not omit to state any material fact necessary to make such representations and warranties, in light of the circumstances under which they are made, not misleading.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as Previously Disclosed, Purchaser represents and warrants to Sellers and the Companies, as of the date hereof and as of the Closing Date, as set forth below.

4.01    Organization and Qualification.

(a)    Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the Kingdom of Sweden, with full corporate power and authority to own, lease and operate its assets and properties and to carry on its business as now being and as heretofore conducted.  Purchaser is duly qualified and licensed or otherwise authorized to transact business and is in good standing as a foreign corporation in each jurisdiction in which such qualification or license is required by domestic or foreign Law, except for jurisdictions in which the failure to be so qualified or licensed would not, individually or in the aggregate, reasonably be expected to materially impair or delay the ability of Purchaser to perform its obligations hereunder or consummate the transactions contemplated hereby.

(b)    Purchaser has previously provided to Sellers true and complete copies of its Articles of Incorporation, By-laws and any other governing instruments of

32

Purchaser as presently in effect.  Purchaser is not in default in the performance, observation or fulfillment of any of its governing instruments, and no amendments to such governing instruments are currently pending.

      4.02    Authority to Execute and Perform Agreements.  Purchaser has the requisite corporate power and authority and full legal capacity to enter into, execute and deliver this Agreement, to perform fully its obligations hereunder and to consummate the transactions contemplated hereby.  The execution, delivery and performance of this Agreement by Purchaser and the consummation of the transactions contemplated hereby have been duly and validly authorized by the board of directors of Purchaser and all other requisite action.  No other action (corporate or otherwise) on the part of Purchaser is necessary to consummate, execute, deliver or perform this Agreement or the transactions contemplated hereby.  This Agreement has been duly executed and delivered by Purchaser and constitutes a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general applicability relating to or affecting creditors' rights and to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or Law).

      4.03    Compliance with Laws.  Purchaser and the operation of its businesses is not and has not been in violation of any applicable domestic or foreign Law, Order or other requirement of any domestic or foreign Governmental or Regulatory Authority, except for violations that would not, individually or in the aggregate, reasonably be expected to materially impair or delay the ability of Purchaser to consummate the transactions contemplated hereby.

      4.04    No Breach.  The execution, delivery and performance of this Agreement by Purchaser, the performance by Purchaser of its obligations under this Agreement and the consummation by Purchaser of the transactions contemplated hereby will not (i) conflict with, violate or result in the breach of any provision of the organizational documents of Purchaser; or (ii) violate, conflict with or result in the breach of any of the terms or conditions of, result in modification of the effect of, or result in any liability or obligation under, or otherwise give any other contracting party the right to terminate, cancel or accelerate, or constitute (or with notice or lapse of time or both constitute) a default under, any material Contract to which Purchaser is a party or is subject or by which Purchaser or any asset of Purchaser, is bound, other than exceptions to the foregoing that, individually or in the aggregate, would not reasonably be expected to materially impair or delay the ability of Purchaser to consummate the transactions contemplated hereby; (iii) materially conflict with or result in a material violation or breach of any domestic or foreign Permit, Law or Order applicable to Purchaser; or (iv) entitle any party to exercise any right of first refusal, first offer, preemptive right or other option right with respect to Purchaser or result in the creation of any Lien (other than Permitted Liens) on the assets, properties or securities of Purchaser.

      4.05    Brokerage.  No broker, finder, agent or similar intermediary has acted on behalf of Purchaser in connection with this Agreement or the transactions contemplated hereby, and there are no brokerage commissions, finders' fees or similar fees or

commissions payable in connection herewith based on any agreement, arrangement or understanding with Purchaser.  Purchaser shall be solely responsible for any such fees or commissions owed or claimed to be owed as a result of this Agreement or the consummation of the transactions contemplated hereby.

4.06    Governmental Approvals and Filings.  Schedule 4.06 contains a true, complete and accurate list of each consent, approval or action of, filing with or notice to any Governmental or Regulatory Authority or other Person on the part of Purchaser that is required in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby (collectively, "Purchaser Required Consents").

4.07    Public Reports; Financial Statements.  True and complete copies of all forms, reports, schedules, registration statements, proxy statements and other documents filed by Purchaser with the Commission (as such documents have been amended since the time of their filing, and including any such documents filed subsequent to the date of this Agreement, collectively, the "Purchaser Filings") have been made available to Sellers.  Each of the Purchaser Filings, as of its filing date, complied in all material respects with the applicable requirements of applicable domestic and foreign securities Laws, as the case may be, and the applicable rules and regulations rules and regulations promulgated with respect thereto and did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements contained therein not misleading in light of the circumstances in which such statements were made.  The Purchaser Filings constitute all of the reports that were required to be filed by Purchaser under all applicable domestic and foreign securities Laws since January 1, 2002 and Purchaser has otherwise complied with all material requirements of applicable domestic and foreign securities Laws and the applicable rules and regulations with respect thereto.  The audited consolidated financial statements of the Purchaser included in the Purchaser Filings for the fiscal years ended December 31, 2007, December 31, 2006 and December 31, 2005, and any and all unaudited financial statements for any interim periods thereafter (collectively, the "Purchaser Financial Statements") comply as to form in all material respects with all applicable accounting requirements and the published rules and regulations of the Commission with respect thereto, and the Purchaser Financial Statements have been prepared from the books and records of Purchaser and in accordance with all applicable accounting standards applied on a consistent basis during the periods covered, except as may be indicated in the notes thereto, subject to normal year-end audit adjustments in the case of all financial statements that are interim or unaudited financial statements, and fairly present the financial condition of the Purchaser as of their respective dates and the results of operations and cash flows of the Purchaser for the periods covered thereby in accordance with applicable accounting standards in all material respects.

4.08    No Material Changes.  Except (a) as set forth in Schedule 4.08, (b) as required, contemplated or permitted by this Agreement and/or any other agreements, documents and/or instruments executed and/or delivered pursuant hereto and/or the transactions contemplated hereby and thereby (including in connection with the preparation, negotiation, consummation and/or performance hereof and thereof), and/or (c) as consented

34

to in writing by Sellers, since January 1, 2008 there has not been, with respect to Purchaser, any Material Adverse Effect.

       4.09   Investment. Purchaser (a) understands that neither the Membership Interests nor the offer and sale of the Membership Interests hereunder has been registered under the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, or under any state or other securities Laws, and that the Membership Interests are being offered and sold in reliance upon federal and state exemptions for transactions not involving any public offering, (b) is acquiring the Membership Interests solely for such Purchaser's own account for investment purposes, and not with a view to the distribution thereof, (c) is a sophisticated investor with knowledge and experience in business and financial matters, (d) has received certain information concerning the Companies and has had the opportunity to obtain additional information and ask questions as desired in order to evaluate the merits and the risks inherent in holding the Membership Interests, (e) is able to bear the economic risk and lack of liquidity inherent in holding the Membership Interests, and (f) is an Accredited Investor" as defined in Regulation D promulgated under the Securities Act of 1933, as amended.

       4.10   Authorization and Title to Shares. The shares of capital stock of Purchaser required to be issued to Sellers pursuant to Section 2.02 (whether directly or upon conversion of any promissory notes or other convertible securities delivered to Sellers pursuant thereto), when issued to Sellers, will be duly authorized, validly issued, fully paid and nonassessable, and will be approved for listing upon official notice of issuance on the First North (Stockholm Stock Exchange). Upon issuance to the Sellers in accordance with this Agreement, the Sellers will acquire good and valid title to such shares of the Purchaser's capital stock, free and clear of all Liens, other than Liens created by Sellers, if any.

       4.11   Disclosure. The representations and warranties of Purchaser contained in this Agreement do not contain any untrue statement of a material fact, and do not omit to state any material fact necessary to make such representations and warranties, in light of the circumstances under which they are made, not misleading.

**ARTICLE V**

**COVENANTS AND AGREEMENTS OF SELLERS AND THE COMPANIES**

       Each of Sellers and the Companies covenants and agrees with Purchaser that, from and after the date hereof until the Closing, Sellers and the Companies shall comply with all covenants and provisions of this Article V, except to the extent Purchaser may otherwise consent in writing.

       5.01   Regulatory and Other Approvals. From and after the date hereof until the Closing, Sellers and the Companies shall use all commercially reasonable efforts to (a) execute such documents and other papers and take such further actions as may be reasonably required or desirable to carry out the transactions contemplated hereby; (b) take, or cause to be taken, all actions and to do, or cause to be done, all other things necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions

35

contemplated hereby and to cause the fulfillment at the earliest practicable date of all of the conditions to its obligations to consummate the transactions contemplated hereby; and (c) obtain as promptly as possible all authorizations, consents, Orders and approvals of all Governmental or Regulatory Authorities or other Persons that may be or become necessary for the performance of its obligations pursuant to this Agreement. Sellers and the Companies shall cooperate fully with Purchaser in promptly seeking to obtain all such authorizations, consents, Orders and approvals and shall not take any action that will have the effect of delaying, impairing or impeding the receipt of any required approval.

5.02    Due Diligence Review Cooperation.

From the date hereof through March 11, 2008 (the "Due Diligence Review Period"), Purchaser shall have the opportunity to conduct its business, legal, environmental and accounting due diligence review of the Companies (the "Due Diligence Review"). During the Due Diligence Review Period and thereafter until the Closing Date, Purchaser shall be entitled, at its own expense, through its employees and Representatives, to have such access to the assets, properties, business, books, records and operations of the Companies as Purchaser shall reasonably request. Any such access shall be conducted at reasonable times, upon no less than twenty-four (24) hours prior written notice, and without unreasonably interfering with the operations and the conduct of business by the Companies, and Sellers, the Companies shall, subject to the foregoing, cooperate in a commercially reasonable matter with respect thereto. In order that Purchaser may have full opportunity to perform such Due Diligence Review, Sellers, the Companies shall make available to the Representatives of Purchaser during the Due Diligence Review Period all such information and copies of such documents concerning the affairs of the Companies as such Representatives may reasonably request and cause each Company's officers, employees, consultants, agents, accountants and attorneys to cooperate in a commercially reasonable manner with such Representatives in connection with such Due Diligence Review.

5.03    Conduct of Business.

(a)    Except as otherwise contemplated herein (including (i) as provided in Section 2.04(a), (ii) as provided in Section 3.17(c), (iii) all transactions required to fulfill the condition set forth in Section 8.07 with respect to the RI Test Equipment and (iv) as set forth in Schedule 5.03 hereto) or consented to in writing by Purchaser, during the period from the date hereof to the Closing, Sellers and the Companies shall:

(i)    use commercially reasonable efforts to substantially maintain the existence of the Companies, preserve substantially intact their business organizations, keep available the services of present employees and maintain the rights, privileges and franchises currently maintained in the normal conduct of their business, in accordance with past practice, it being understood that termination of employees as reasonably determined by Sellers shall not constitute a violation of this covenant;

(ii)    use commercially reasonable efforts to keep in full force and effect all material insurance policies, including the maintenance of coverage amounts not less than those in effect at the date of this Agreement;

(iii)    use commercially reasonable efforts to maintain all physical properties, equipment and similar assets in the same state of repair, order and condition as they were on the date of this Agreement, reasonable wear and tear excepted;

(iv)    conduct the business of the Companies diligently in the orderly course consistent with past practice;

(v)    pay and discharge the debts of the Companies as they become due;

(vi)    pay the payables of the Companies in the ordinary course of business and in the same manner as previously paid, and collect the receivables of the Companies in the ordinary course and in the same manner as previously collected;

(vii)    maintain sufficient cash on hand to operate the business of the Companies in the ordinary course consistent with past practice; and

(viii)    continue to make capital expenditures pertaining to the business of the Companies in the ordinary course consistent with past practice.

(b)    Except as otherwise contemplated herein (including (i) as provided in Section 2.04(a), (ii) as provided in Section 3.17(c), (iii) all transactions required to fulfill the condition set forth in Section 8.07 with respect to the RI Test Equipment and (iv) as set forth in Schedule 5.03 hereto) or consented to in writing by Purchaser, during the period from the date hereof to the Closing, Sellers and the Companies shall not:

(i)    authorize, issue, repurchase, redeem, transfer or sell any equity securities of the Companies or securities containing equity features, including but not limited to any securities convertible into or exercisable or exchangeable for, or options or warrants with respect to, equity securities of the Companies;

(ii)    adopt a plan of liquidation or authorize or effect any recapitalization, reclassification, dividend or like change in capitalization;

(iii)    amend either Company's Articles of Organization, Operating Agreement or other governing instruments;

(iv)    declare or pay any dividend on, or make any other distribution with respect to, any equity interests, other than as otherwise allowed pursuant to this Agreement in respect to the Companies' 2007 net profits;

37

(v)     acquire (whether by merger, consolidation, recapitalization or otherwise) the shares of capital stock or any other equity interest in, or a substantial portion of the assets of, any Person and/or any division or business thereof, or otherwise acquire any assets (other than inventory in the ordinary course of business consistent with past practice) in any amount, individually or in the aggregate, that is material to the Companies;

(vi)    incur any Indebtedness, except for Indebtedness incurred, paid or discharged in the ordinary course of business consistent with past practice and for any drawdowns on the line of credit of SysTech in the ordinary course of business, or otherwise become responsible for the obligations of, or make any loans or advances of any money or other property to, any other Person (including any Company Employee), in the aggregate in excess of $10,000;

(vii)   waive or release any rights of material value, or cancel, compromise, release or assign any material Indebtedness owed to it or any material claims held by it, other than in the ordinary course consistent with past practice;

(viii)  settle or compromise any material lawsuit, proceeding or action;

(ix)    make any capital expenditures, in the aggregate, in excess of $250,000, other than in the ordinary course consistent with past practice;

(x)     (A) modify, amend, terminate or assign any material Contract or Lease or (B) waive, release, relinquish or assign any of the material rights of either Company under such material Contract or Lease;

(xi)    sell, assign, license, lease, or otherwise dispose of any assets, rights or properties which are material, individually or in the aggregate, to either Company, except for sales of inventory in the ordinary course consistent with past practice;

(xii)   mortgage, pledge or otherwise encumber or subject to a Lien the Membership Interests or any of the Companies' properties or assets other than Permitted Liens;

(xiii)  make any changes in any accounting method, principle or practice other than those required by GAAP;

(xiv)   make, change, or revoke any Tax elections, or except as required by changes in Tax laws or a material change in facts requiring a change take any Tax positions inconsistent with past practice or file any Tax Returns in a manner inconsistent with prior Tax Returns, file any amended Tax Return, enter into any Tax closing agreement, settle or consent to any Tax Claim or assessment, incur any obligation to make any payment of, or in respect of, any Taxes, except in the ordinary course of business, or agree to extend or waive the statutory period of limitations for the assessment or collection of Taxes;

38

(xv)   agree or make a commitment, whether in writing or otherwise, to do any of the foregoing.

(c)   Except as otherwise contemplated herein, during the period from the date hereof to the Closing, Sellers and the Companies shall not (i) increase the compensation, bonuses or fringe benefits of any Company Employee (except for increases in salary or wages, in the ordinary course of business consistent with past practice or the payment of accrued or earned but unpaid bonuses); (ii) grant any severance or termination pay to any Company Employee except pursuant to existing arrangements or in the ordinary course consistent with past practices; (iii) establish, adopt, enter into, amend or terminate any Plan or any plan, agreement, program, policy, trust, fund or other arrangement that would be a Plan if it were in existence as of the date of this Agreement; (iv) enter into or amend any collective bargaining agreement; or (v) hire any employee except for non-management employees hired "at will" in the ordinary course of business consistent with past practice who would not be entitled to annual compensation of $100,000 or more.

5.04   Notification. From the date hereof until the Closing Date, Sellers and the Company shall disclose to Purchaser in writing in reasonable detail any material breaches or violations of the representations and warranties contained in Article III, and any breach or violations of the covenants in this Agreement made by Sellers or the Companies, promptly upon discovery thereof. Such disclosure may, as determined by Sellers, be reflected in updates to the Schedules; provided, however, that, except as otherwise expressly provided in this Agreement (including in Sections 10.09(c) and 11.03(c)(v)) such disclosure and/or updated Schedules shall not be deemed to cure any misrepresentation or breach. Sellers and the Companies shall give prompt notice to Purchaser of any event or circumstance known to any of them (other than general economic conditions) that could prevent or delay the consummation of the transactions contemplated hereby or which would indicate a breach or non-compliance with any of the terms, conditions or agreements of any party to this Agreement other than Purchaser.

## ARTICLE VI

## COVENANTS AND AGREEMENTS OF PURCHASER

Purchaser covenants and agrees with Sellers and the Companies that, from and after the date hereof until the Closing, Purchaser shall comply with all covenants and provisions of this Article VI, except to the extent Sellers and the Companies may otherwise consent in writing.

6.01   Regulatory and Other Approvals. From and after the date hereof until the Closing, Purchaser shall use all reasonable best efforts to (a) execute such documents and other papers and take such further actions as may be reasonably required or desirable to carry out the transactions contemplated hereby; (b) take, or cause to be taken, all actions and to do, or cause to be done, all other things necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated hereby and to cause the fulfillment at the earliest practicable date of all of the conditions to its obligations to

39

consummate the transactions contemplated hereby; and (c) obtain as promptly as possible all authorizations, consents, Orders and approvals of all Governmental or Regulatory Authorities or other Persons that may be or become necessary for the performance of its obligations pursuant to this Agreement. Purchaser shall cooperate fully with Sellers and the Companies in promptly seeking to obtain all such authorizations, consents, Orders and approvals and shall not take any action that will have the effect of delaying, impairing or impeding the receipt of any required approval.

6.02   Notification. From the date hereof until the Closing Date, Purchaser shall disclose to Sellers and the Companies in writing in reasonable detail any material variances from the representations and warranties contained in Article IV, and any other fact or event that would cause or constitute a breach of the covenants in this Agreement made by Purchaser, promptly upon discovery thereof. Such disclosure shall not be deemed to amend or supplement the Schedules delivered on the date hereof or cure any misrepresentation or breach. Purchaser shall give prompt notice to Sellers and the Companies of any event or circumstance known to Purchaser (other than general economic conditions) that could prevent or delay the consummation of the transactions contemplated hereby or which would indicate a breach or non-compliance with any of the terms, conditions or agreements of any party to this Agreement other than Sellers or the Companies.

6.03   Due Diligence Review. Provided that Sellers and the Companies comply with its obligations under Section 5.02, Purchaser shall complete its Due Diligence Review on or prior to the expiration of the Due Diligence Review Period as follows. Purchaser shall promptly (and in all events on or prior to the expiration of the Due Diligence Review Period) notify Sellers and the Companies in writing in reasonable detail of (A) any breach of Seller's obligations under Section 5.02, (B) any matter identified during Purchaser's Due Diligence Review that would reasonably be expected to constitute a breach of Sellers representations and warranties hereunder, and/or (C) any determination by Purchaser that it does not wish to proceed to the Closing (the "Due Diligence Condition Notice").

6.04   Financing. Purchaser shall exercise its best efforts to promptly obtain and secure financing related to the transactions contemplated hereby on commercially reasonable terms reasonably satisfactory to Purchaser, including via a public offering of the equity of Purchaser (the "Financing"). Purchaser shall promptly (but in all events within 3 Business Days) provide written notice to Sellers once it has obtained and secured such Financing or, if Purchaser shall have failed to obtain such Financing, of such failure.

## ARTICLE VII

### ADDITIONAL AGREEMENTS

7.01   Further Assurances; Post-Closing Cooperation.

(a)   From and after the Closing Date:

40

(i)      each of the parties shall execute such documents, further instruments of transfer and assignment and other papers and take such further actions as may be reasonably required or desirable to carry out the provisions hereof and the transactions contemplated hereby; and

(ii)      each party shall afford the other parties, their counsel and their accountants, during normal business hours, reasonable access to the books, records and other data relating to the business of the Companies in its possession with respect to periods prior to the Closing and the right to make copies and extracts therefrom, to the extent that such access may be reasonably required by the requesting party in connection with (A) Tax matters, (B) the determination or enforcement of rights and obligations under this Agreement, (C) compliance with the requirements of any Governmental or Regulatory Authority, (D) the determination or enforcement of the rights and obligations of any Indemnified Party, or (E) any actual or threatened action, suit, proceeding, arbitration against, or investigation by any Governmental or Regulatory Authority of, the requesting party.

(b)   If, in order to properly prepare its Tax Returns, other documents or reports required to be filed with any Governmental or Regulatory Authority or its financial statements or to fulfill its obligations hereunder, it is necessary that a party be furnished with additional information, documents or records relating to the business or condition of the Companies not referred to in paragraph (a) above, and such information, documents or records are in the possession or control of another party to this Agreement, such other party agrees to use its best efforts to furnish or make available such information, documents or records (or copies thereof) at the recipient's request, cost and expense.

(c)   Notwithstanding anything to the contrary contained in this Section 7.01, if the parties are in an adversarial relationship in litigation or arbitration, the furnishing of information, documents or records in accordance with any provision of this Section 7.01 shall be subject to applicable rules relating to discovery.

(d)   Any information obtained by any party in accordance with this Section 7.01 shall be held confidential by the receiving party in accordance with the Confidentiality Agreement.

7.02   Public Announcements; Confidentiality.

(a)   Each party shall consult with the other parties regarding their initial press releases with respect to the execution of this Agreement.  Thereafter, prior to the Closing, no party or any of their respective Affiliates shall issue any press release or other announcement with respect to this Agreement and the transactions contemplated hereby without the prior consent of the other parties (such consent not to be unreasonably withheld), except as such press release or other announcement may be required by Law or the rules of a securities exchange or trading market, in which case the party required to make the release or announcement shall use its reasonable best efforts to provide the other parties with a reasonable opportunity to review and comment on such release or



41

announcement in advance of its issuance. Sellers acknowledge and consent to disclosure prior to the Closing by Purchaser to potential external investors and financing sources of the Agreement and any and all other information relating to the Companies that may be necessary in connection with completing such financing transactions; provided, however, that (i) such investors and financing sources are subject to written contractual obligations of confidentiality with respect to such information that are no less restrictive than those provided for in the Confidentiality Agreement and (ii) prior to any dissemination of any prospectus, private placement memorandum, offering circular or other similar document concerning or substantially related to the transactions contemplated hereby, Sellers shall be provided with copies of such prospectus, private placement memorandum, offering circular or other similar document sufficiently in advance of such dissemination so as to allow Sellers to review and provide Purchaser with comments thereon (none of which comments shall be unreasonably rejected by Purchaser). Any breach or violation by Purchaser of the immediately preceding proviso shall be deemed to constitute a violation of the Confidentiality Agreement.

(b) The disclosure of confidential or proprietary information of one party to any other party shall be governed by the terms and conditions of the Non-Disclosure Agreement between Purchaser and the Sellers dated October 23, 2007 (the "Confidentiality Agreement").

7.03   No Third Party Discussions. From and after the date of this Agreement until the first to occur of the Closing or the termination of this Agreement, none of Sellers or the Companies nor any of their respective Representatives will, directly or indirectly through advisors, agents or other intermediaries, nor shall any such party authorize or permit any of its officers, directors or other Representatives to, (a) solicit, initiate, encourage (including by way of furnishing information) or take any action to facilitate the submission of any inquiries, proposals or offers (whether or not in writing) from any Person (other than Purchaser and its Representatives) relating to, any purchase, transfer or other disposition of all or any part of the Membership Interests, any merger, consolidation, business combination, sale of all or any part of the assets (other than assets sold in the ordinary course in compliance with Section 5.03), recapitalization, liquidation, dissolution or similar transaction involving any of the assets of the Companies (each, a "Third Party Transaction"), (b) agree to or endorse any Third Party Transaction, or (c) enter into or participate in any discussions or negotiations regarding any of the foregoing (other than to indicate that the Companies are currently not interested in a sale and/or merger with the interested party as a result of a pending transaction), or furnish to any other Person any information with respect to the Companies in connection with the foregoing, or otherwise cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any Person (other than Purchaser and its Representatives) to do or seek to do any of the foregoing. Sellers and/or the Companies shall notify Purchaser promptly upon the receipt by any of them of a proposal, offer or contact relating to a potential Third Party Transaction, such notice to include the name of such Person and the material terms and conditions of any proposals or offers.

7.04   Non-Competition.

42

(a)   In order that Purchaser may have and enjoy the full benefit of the Business, Geilen covenants and agrees that for a period of 5 years from the Closing Date he shall not, and Tripathi covenants and agrees that for a period of 30 months from January 1, 2008 he shall not, in his individual capacity or through any entity in which he has an economic interest or through any relative or Affiliate, directly or indirectly (including by means of management, advisory, operating, consulting or similar agreements or arrangements or by any record or beneficial equity interest, either as a principal, trustee, stockholder, partner, joint venture or otherwise, in any Person), engage in the Business, for his own account or for any other Person, in any country in the world.

(b)   Each of Sellers agrees that any remedy at law for any breach by him or his Affiliates of this Section 7.04 would be inadequate, and Purchaser shall be entitled to injunctive or other equitable relief in such case in addition to any other right Purchaser may have, whether at law or in equity without the posting of any bond. If it is ever held that any of the covenants of this Section 7.04 is too broad to permit enforcement of such covenants to their fullest extent, each of Sellers agrees that a court of competent jurisdiction is hereby authorized and directed to enforce such covenants to the maximum extent permitted by law, and each of Sellers hereby consents and agrees that such scope may be judicially modified accordingly in any proceeding brought to enforce such covenants.

(c)   Nothing contained herein shall limit the right of any Seller or his or her Affiliates to (i) maintain any ownership interest of two percent (2%) or less of the outstanding equity securities of any publicly traded entity, or (ii) take any action at the direction or with the written consent of, or in connection with the performance of services for, Purchaser and/or any of its Affiliates.

7.05   Non-Solicitation. During the period commencing on the date of this Agreement and ending on the fifth anniversary of the Closing Date, each Seller agrees that neither he, in his individual capacity or through any entity in which he has an economic interest, nor through any relative or Affiliate will, without the prior written consent of Purchaser, directly or indirectly, induce or attempt to influence any director, manager, officer or employee of Purchaser or either Company during such period to terminate his or her employment with Purchaser or such Company. Each Seller agrees that any remedy at law for any breach by it or its Affiliates of this Section 7.05 would be inadequate, and Purchaser shall be entitled to injunctive or other equitable relief in such case in addition to any other right Purchaser may have, whether at law or in equity. If it is ever held that any of the covenants of this Section 7.05 is too broad to permit enforcement of such covenants to their fullest extent, Sellers agrees that a court of competent jurisdiction is hereby authorized and directed to enforce such covenants to the maximum extent permitted by law, and Sellers hereby consents and agrees that such scope may be judicially modified accordingly in any proceeding brought to enforce such covenants.

7.06   Allocation. For domestic and foreign federal, state and local and all other Tax purposes, the parties agree that they shall allocate the Purchase Price as provided in Schedule 7.06. The Parties will report the transactions effectuated and contemplated by this Agreement in accordance with such Schedule 7.06 on all domestic and foreign federal,



43

state and local Tax returns and reports, and will not take any position that is inconsistent with such Schedule 7.06.

      7.07   Financial Guarantees.  As promptly as practicable, but in all events within 90 days of the Closing, Purchaser shall cause Sellers to be removed and fully released and discharged from those guarantees set forth on Schedule 7.07 (the "Financial Guarantees").  Purchaser shall, from and after the Closing, indemnify the Seller Indemnified Parties in respect of, and save and hold each of them harmless from and against, any demands on such Financial Guarantees, any failure to meet such demands and any other violation or breach thereof and all associated fines, penalties, Taxes, interest, court costs, reasonable fees and expenses of attorneys (at trial and at all appellate levels), accountants and other experts.

      7.08   SysTech International Pvt. Ltd.  Sellers shall not use the name SysTech International Pvt. Ltd. or SysTech in commerce anywhere in the world following the Closing; provided, however, that notwithstanding the foregoing, Sellers shall be permitted to use such names in connection with the ownership, rental, offer and/or sale of real estate.

      7.09   Political Risk Termination.

      (a)  In the event any Backlog Report Contract with respect to a governmental emissions Inspection and Maintenance (I/M) program is terminated early solely as a result of a Political Risk Cancellation (as hereinafter defined) with respect to such program, and for no other reason whatsoever, Sellers shall pay to Purchaser (subject to the limitations set forth in the remainder of this Section) an aggregate amount equal to 50% of the budgeted net profit with respect to the remainder of the term (but not any extensions or renewals thereof) of the terminated Backlog Report Contract minus any amounts paid or credited to the Companies or any Affiliates thereof as a result of such termination.  In the event that either of the Companies or any Affiliates receive any such payment or credit subsequent to the afore-referenced payment from Sellers to Purchaser, then Purchaser shall, within ten (10) days, pay over to Sellers the amount so paid or credited.

      (b)  "Political Risk Cancellation" means a termination of an entire governmental emissions Inspection and Maintenance (I/M) program to which a Backlog Report Contract relates (i.e., neither SysTech nor any other Person will be awarded or will service any Contract with respect to such program and such program is not replaced or substituted for another I/M program) in a jurisdiction that is a "non-attainment" jurisdiction for purposes of the Clean Air Act, but only if such termination arises as a direct and exclusive result of the enactment of state legislation to discontinue such program solely because the state does not choose, in the discretion of the legislature, to continue such program even though it could or should continue such program and such termination is for no other reason, including, in whole or in part, any of the following: (i) enactment of or changes in attainment requirements and/or air quality standards defined by the applicable Governmental or Regulatory Authority and/or other Laws, (ii) achievement by a jurisdiction of any such applicable attainment requirements and/or air

quality standards, (iii) the discontinuance of such program notwithstanding non-compliance with applicable attainment requirements and/or air quality standards and/or other Laws, (iv) poor performance (including any breach or violation of such Contract), (v) termination for convenience by any party thereto (including the Companies) and/or (vi) any other reasons or factors that do not constitute a termination solely for "political purposes."

## ARTICLE VIII

## CONDITIONS TO THE OBLIGATIONS OF PURCHASER

The obligations of Purchaser hereunder shall be subject to satisfaction of each of the conditions set forth below on or before the Closing. Purchaser may at its election waive any one or more of such conditions. Sellers and the Companies agree to use their respective commercially reasonable efforts to see that all of such conditions that impose obligations on any of them or require action on the part of any of them are satisfied.

8.01   Representations and Warranties. Each of the representations and warranties made by Sellers and the Companies set forth herein shall be true and correct in all material respects on and as of the Closing Date as though made on and as of the Closing Date, except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date.

8.02   Performance. Sellers and the Companies shall have duly performed and complied in all material respects with all agreements, covenants and obligations required by this Agreement to be so performed or complied with by them at or before the Closing or, in the case of any material breach, violation or failure to perform such agreements, covenants and/o obligations, cured such breach, violation or failure within 15 days after written notice thereof from Purchaser.

8.03   Litigation. No Legal Proceedings shall have been instituted and be continuing, and no Order shall be subsisting, questioning the validity of this Agreement or seeking to restrain the consummation hereof, or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement and no Legal Proceeding shall be pending before a Governmental or Regulatory Authority seeking to restrain, enjoin or otherwise prevent the consummation of the transactions contemplated hereby.

8.04   Certificates of Sellers and the Companies. Purchaser shall have received certificates of Sellers and the Companies, signed by Sellers and an executive officer of each Company, respectively, stating that such individuals have reexamined the conditions set forth in Sections 8.01 and 8.02 and that the preconditions set forth in Sections 8.01 and 8.02 and have been satisfied.

45

8.05   Certificates of Secretary of Sellers and the Companies.  Purchaser shall have received certificates of Sellers and the Companies, dated the Closing Date, signed by the Sellers and the Secretary of each Company, respectively, in form and substance reasonably satisfactory to Purchaser, and attaching the Articles of Organization and Operating Agreement of each Company confirming the signatures and incumbency of all officers or other agents signing this Agreement on behalf of each Company, as the case may be.

8.06   Assignment of Membership Interests.  Purchaser shall have received from each Seller an Assignment of Membership Interests, with respect to such Seller's respective Membership Interests, in form and substance reasonably acceptable to Purchaser.

8.07   Rhode Island Test Equipment.  Purchaser shall be reasonably satisfied that the title and possession of all materials specified in the RI20007 test equipment bill of materials for 292 Rhode Island test analyzers (the "RI Test Equipment") shall have been relinquished no later than the end of the first calendar quarter of 2008.

8.08   Seller Required Consents.  All Seller Required Consents shall have been made, given or obtained, as the case may be.

8.09   Board Consent.  Purchaser shall have obtained the approval of its board of directors with respect to the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby.

8.10   Financing.  Purchaser shall have obtained and secured the Financing.

8.11   Material Adverse Effect.  Since the date of this Agreement, there shall have not have occurred a Material Adverse Effect on the Companies taken as a whole.

8.12   Employment Agreement.  SysTech and Geilen shall have duly executed and delivered to each other an Employment Agreement which shall be substantially in the form agreed to by the parties on or prior to the expiration of the Due Diligence Review Period, which form shall reflect the terms set forth in the Employment Term Sheet attached as Exhibit A.

8.13   Tennessee Facility.  Purchaser shall have received evidence reasonably satisfactory to Purchaser that the Company's outstanding Indebtedness, if any, under the Tennessee Facility has been paid in full by Sellers or, to the extent such Indebtedness is being repaid by Purchaser at Closing, delivered to Purchaser a payoff letter with respect to such Indebtedness.

8.14   Due Diligence Review.  The Due Diligence Review Period shall have expired without Purchaser providing a Due Diligence Condition Notice to Sellers on or prior to such expiration.

8.15   Good Standing Certificates.  The Sellers shall have delivered to Purchaser a certificate from the Secretary of State (or other applicable governmental entity) of the jurisdiction of organization and each jurisdiction in which either of the Companies is

qualified to do business as to the respective Company's good standing and payment of all taxes in such jurisdiction dated within three days of the Closing Date.

## ARTICLE IX

## CONDITIONS TO THE OBLIGATIONS OF SELLERS AND THE COMPANIES

The obligations of Sellers and the Companies hereunder shall be subject to satisfaction of each of the conditions set forth below on or before the Closing. Sellers and the Companies may at their election waive any one or more of such conditions. Purchaser agrees to use its commercially reasonable efforts to see that all of such conditions that impose obligations on it or require action on its part are satisfied.

9.01    Representations and Warranties. Each of the representations and warranties made by Purchaser set forth herein shall be true and correct, in all material respects, on and as of the Closing Date as though made on and as of the Closing Date, except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date.

9.02    Performance. Purchaser shall have duly performed and complied in all material respects with all agreements, covenants and obligations required by this Agreement to be so performed or complied with by them at or before the Closing or, in the case of any material breach, violation or failure to perform such agreements, covenants and/o obligations, cured such breach, violation or failure within 15 days after written notice thereof from Sellers.

9.03    Litigation. No Legal Proceedings shall have been instituted and be continuing, and no Order shall be subsisting, questioning the validity of this Agreement or seeking to restrain the consummation hereof, or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement and no Legal Proceeding shall be pending before a Governmental or Regulatory Authority seeking to restrain, enjoin or otherwise prevent the consummation of the transactions contemplated hereby.

9.04    Certificate of Purchaser. Sellers shall have received a certificate from Purchaser, signed by the President of Purchaser, stating that such individual has reexamined the conditions set forth in Sections 9.01 and 9.02 and that the preconditions set forth in Sections 9.01 and 9.02 have been satisfied.

9.05    Certificate of Secretary of Purchaser. Sellers shall have received a certificate of Purchaser, dated the Closing Date, signed by the Secretary of Purchaser, in form and substance reasonably satisfactory to Sellers, certifying the resolutions of the board of directors of Purchaser authorizing the execution, delivery and performance of this Agreement and the other agreements contemplated hereby, and approving the transactions contemplated by this Agreement, and confirming the signatures and incumbency of all officers or other agents signing this Agreement on behalf of Purchaser.

47

9.06   Purchaser Required Consents.  All Purchaser Required Consents shall have been made, given or obtained, as the case may be.

9.07   Board Consent.  Purchaser shall have obtained the approval of its board of directors with respect to the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby.

9.08   Financing.  Purchaser shall have obtained and secured the Financing.

9.09   Closing Payment.  Purchaser shall have paid the Closing Payment in accordance with Section 2.02.

9.10   Material Adverse Effect.  Since the date of this Agreement, there shall have not have occurred a Material Adverse Effect on the Purchaser.

9.11   Employment Agreement.  SysTech and Geilen shall have duly executed and delivered to each other an Employment Agreement which shall be substantially in the form agreed to by the parties on or prior to the expiration of the Due Diligence Review Period, which form shall reflect the terms set forth in the Employment Term Sheet attached as Exhibit A.

## ARTICLE X

## TAX MATTERS

10.01   Tax Return Filings.

(a)   Purchaser shall, or shall cause the Companies to, timely prepare and file with the relevant Taxing Authorities all Tax Returns that the Companies are required to file for all taxable periods (or portions thereof) beginning before the Closing Date and ending after the Closing Date. Unless in the reasonable opinion of Purchaser there is not substantial authority for the past practice of the Sellers or the Companies in connection with the filing of any Tax Returns, in preparing and filing such Tax Returns, Purchaser shall not, and shall cause the Companies not to, take any Tax positions inconsistent with past practice or file any Tax Returns in a manner inconsistent with prior Tax Returns, in each case, that would materially adversely impact the Sellers.  If reasonably practical, Purchaser shall furnish Sellers with a copy of such Tax Returns at least 10 days before such Tax Returns are due (taking into account extensions) in order to allow Sellers to review and comment on each such Tax Return prior to filing and shall reasonably consider all comments of the Sellers

(b)   Sellers shall, or shall cause the Companies to, timely prepare and file with the relevant Taxing Authorities (i) all income Tax Returns that the Companies are required to file for all taxable periods ending on or prior to the Closing Date and (ii) all Tax Returns other than income Tax Returns which are due (without regard to any extensions) on or before the Closing Date.  Unless in the reasonable opinion of Sellers there is not substantial authority for the past practice of the Sellers or the Companies in connection with the filing of any Tax Returns, in preparing and filing such Tax Returns,

48

Sellers shall not, and shall cause the Companies not to, take any Tax positions inconsistent with past practice or file any Tax Returns in a manner inconsistent with prior Tax Returns, in each case, that would materially adversely impact the Purchaser. If reasonably practical Sellers shall furnish Purchaser with a copy of such Tax Returns at least 10 days before such Tax Returns are due (taking into account extensions) in order to allow Purchaser to review and comment on each such Tax Return prior to filing and shall reasonably consider all comments of the Purchaser.

(c)     Sellers shall pay all Taxes of the Companies for all Pre-January Tax Periods, except to the extent such Taxes for Pre-January Tax Periods are accrued as a liability on the balance sheet (and specifically allocated to Taxes for Pre-January Tax Periods in the auditors' worksheets) that is part of the Audited 2007 Statements (all Taxes which the Sellers are required to pay pursuant to previous sentence are hereinafter referred to as "Seller Taxes"). Sellers shall also cause the Companies to timely pay all Taxes due with respect to all Tax Returns described in Section 10.01(b) above if such Taxes due are not Seller Taxes.

(d)     All Tax Returns of the Companies due for periods beginning prior to the Closing Date shall be prepared and filed, or caused to be prepared and filed, by Purchaser or Sellers as the case may be, in full compliance with all laws. The Purchaser's or Sellers' comments, or failure to make comments, with respect to Tax Returns which they do not have the obligation to prepare under Section 10.01 (a) or (b) above shall not reduce the responsibility or liability hereunder, or otherwise, with respect to the Tax Returns which such parties have the responsibility to prepare under this Section 10.01.

10.02   Tax Indemnification.

(a)     Subject to Section 10.09 and the other provisions of this Article X, from and after the Closing, Sellers, jointly and severally, shall be liable for, and shall indemnify Purchaser, its Affiliates (including the Companies) and each of their respective officers, directors, employees, partners, members, stockholders, agents, representatives, successors and permitted assigns (the "Purchaser Indemnitees"; except that Purchaser Indemnitees shall in no event be deemed to include the stockholders or other equityholders of any publicly traded entity) against and hold them harmless from (i) all Seller Taxes and (ii) (to the extent not already covered by the immediately preceding clause (i)) all Losses suffered, incurred or sustained by any of them or to which any of them becomes subject, resulting from, arising out of or relating to any breach or violation of any representations, warranties, covenants, agreements or certifications of Sellers or the Companies contained in or with respect to Section 3.08 hereof, Section 5.03(b)(xiv), and this Article X; provided, however, that with respect to Taxes due and payable prior to Closing other than Seller Taxes, the liability of Sellers shall not include the amount of Taxes (calculated for this purpose without regard to interest, penalties and additions to tax and similar items), but Sellers shall indemnify for such interest, penalties and additions to tax as well as other related Losses of the Purchaser Indemnitees.

49

(b)   Subject to Section 10.09 and the other provisions of this Article X, from and after the Closing, Purchaser shall be liable for, and shall indemnify Sellers and their respective Affiliates and each of such Sellers' and Affiliates' respective officers, directors, employees, partners, members, stockholders, agents, representatives, successors and permitted assigns (the "Seller Indemnitees") against and hold them harmless from (i) all Losses suffered, incurred or sustained by any of them or to which any of them becomes subject, resulting from, arising out of or relating to any breach or violation of this Article X by Purchaser, (ii) all Taxes of the Companies which are not Seller Taxes and which are not items for which Sellers are indemnifying Purchaser pursuant to Section 10.02(a) and (iii) the amounts described in Appendix 10.02(b).

(c)   Any indemnity or other payment to be made under this Section 10.02 shall be effected by wire transfer of immediately available funds to an account designated by the payee within 15 days after the Final Determination thereof.

10.03   Cooperation. Sellers, the Companies and Purchaser shall reasonably cooperate, and shall cause their respective Affiliates, officers, employees, agents, auditors and representatives reasonably to cooperate, in preparing and filing all Tax Returns, including maintaining and making available to each other all records necessary in connection with Taxes, and in resolving all disputes and audits with respect to all taxable periods relating to Taxes, including all Tax Claims (as defined below).

10.04   Refunds and Credits. Any refund or credit of Seller Taxes shall be for the account of Sellers; provided, however, (i) that Sellers shall not apply for or otherwise request a refund of any Sellers Taxes without the written consent of Purchaser , which consent shall not be unreasonably withheld, and (ii) that Sellers shall be required to indemnify the Purchaser Indemnitees pursuant to Section 10.02 for any Taxes subsequently determined to be owing by the Companies with respect to any such refund or credit. All other refunds or credits of Taxes shall be for the account of Purchaser provided, however, (i) that Purchasers shall not apply for or otherwise  request a refund with respect to any Pre-Closing Tax Period without the written consent of Sellers, which consent shall not be unreasonably withheld, and (ii) that Purchaser shall be required to indemnify the Seller Indemnitees pursuant to Section 10.02 for any Taxes subsequently determined to be owing by Sellers with respect to any such refund or credit. Each party shall, or shall cause its Affiliates to, forward to any other party entitled under this Section 10.04 to any refund or credit of Taxes any such refund within 30 days after such refund is received or reimburse such other party for any such credit within 30 days after the credit is allowed or applied against another Tax liability; provided, however, that any such amounts shall be net of any Tax cost or benefit to the payor party attributable to the receipt of such refund and/or the payment of such amounts to the payee party.  The control of the prosecution of a claim for refund of Taxes paid pursuant to a deficiency assessed subsequent to the Closing Date as a result of an audit shall be governed by the provisions of Section 10.07.

10.05   Tax Sharing Agreements. Sellers shall cause any and all Tax sharing agreements between (a) Sellers or any of their Affiliates (other than the Companies) on the one hand, and (b) either of the Companies on the other hand, to be terminated on or before

the Closing Date.  After the Closing Date, no party shall have any rights or obligations under any such Tax sharing agreements.

10.06   Transfer Taxes.  All sales, use, transfer, stamp, conveyance, value added or other similar Taxes, duties, excises or governmental charges imposed by any Taxing Authority, and all recording or filing fees, notary fees and other similar costs of Closing with respect to this Agreement or the transactions contemplated hereby (collectively, "Transfer Taxes") will be borne by Sellers; provided, however, Purchaser shall bear (i) all Transfer Taxes arising in connection with the Purchaser's Tax situs; and (ii) up to $5,000 of Florida stamp tax liability relating to the convertible promissory notes issued pursuant to Section 2.02(b)(iii) and (iv).

10.07   Procedures Relating to Indemnification of Tax Claims.

(a)   If a claim shall be made by any Taxing Authority, which, if successful, might result in an indemnity payment to any Purchaser Indemnitee or Seller Indemnitee pursuant to Section 10.02, the Indemnified Party shall provide the Indemnifying Party with an Indemnity Notice of such claim (a "Tax Claim"), in each case, as soon as practical following the time at which the Indemnified Party discovered or reasonably should have discovered such Tax Claim; provided, however, that failure to give an Indemnity Notice of a Tax Claim to the Indemnifying Party within a sufficient period of time to allow the Indemnifying Party to effectively contest such Tax Claim shall affect the liability of such Indemnifying Party to any Indemnified Party only to the extent that the Indemnifying Party's position is actually prejudiced as a result thereof, except that, notwithstanding the foregoing, such Indemnity Notice must in all events be provided to the Indemnifying Party prior to the applicable expiration date specified in Section 10.08 below.

(b)   Sellers shall control all proceedings taken in connection with any Tax Claim relating to Seller Taxes or to income Taxes for any period ending on or prior to Closing, and may make all decisions in connection with such Tax Claim; provided, however, that:(i) if Sellers chose to pay any Taxes in dispute and apply for a refund, Sellers shall advance to the Companies all moneys needed to pay such Taxes (ii) Purchaser and counsel of its own choosing shall have the right to participate in, but not control, all aspects of the prosecution or defense of such Tax Claim at the sole cost and expense of Purchaser, and (iii) Sellers shall not settle any such Tax Claim without the prior written consent of Purchaser (not to be unreasonably withheld or delayed) if such Tax Claim may adversely affect any Taxes of the Companies which are not (A) Seller Taxes or (B) income Taxes for any period ending on or prior to Closing.  Except as described in the previous sentence of this Section 10.07(b), Purchaser shall have complete control of all proceeding taken in connection with any Tax Claim affecting the Companies.

10.08   Exclusive Remedy and Survival.

(a)   For the avoidance of doubt and notwithstanding any other provision in this Agreement to the contrary or otherwise, after the Closing, the indemnities,

51

agreements, and covenants set forth in this Article X shall be the sole and exclusive remedies under this Agreement or at law or in equity or otherwise of Purchaser, its Affiliates and other Purchaser Indemnitees against Sellers and their respective Affiliates, on the one hand, and of Sellers and their respective Affiliates and other Seller Indemnitees against Purchaser and its Affiliates, on the other hand, with respect to or in connection with Taxes, including with respect to any breach or violation of any representations, warranties, covenants, agreements, and certifications contained in or with respect to Section 3.08 (Tax Matters) or Section 5.03(b)(xiv) and Article X.

(b)   All representations, warranties and covenants, agreements and certifications contained in or with respect to Section 3.08 (Tax Matters) or Section 5.03(b)(xiv) (including in any certificate delivered by the parties at Closing in connection herewith or pursuant hereto with respect to the accuracy of the representations and warranties and/or the performance of the covenants and agreements of the parties contained therein) and this Article X (including, without limitation, the right to assert Claims for indemnity payments) shall remain operative and in full force and effect until the date that is 180 days immediately following the expiration of all applicable statute of limitations (including all extensions to any statute of limitations) and shall thereupon terminate, expire and be of no further force or effect. Any indemnity or other payment made pursuant to this Article X shall be treated as an adjustment to the Purchase Price for Tax purposes. The limitations on indemnities contained in Article XI shall not apply to any indemnity obligation under this Article X.

(c)   No Claim for indemnification or payment under this Article X may be made after the expiration of the hereinabove provided survival period applicable to such Claims; provided, however, that the right of the Indemnified Parties to asset a Claim for indemnity under this Article X shall survive the time at which it would otherwise terminate pursuant to this Section 10.08 if an Indemnity Notice with respect thereto shall have been given to the Indemnifying Party against whom such indemnity may be sought prior to such time.

10.09   Limitations.

(a)   each Claim shall be reduced by any indemnity, contribution or other similar payment actually paid to any Indemnified Party by any third party with respect to such Claim and, if any Indemnified Party recovers from third parties all or any part of any indemnification payments previously paid to it by the Indemnifying Party (and even if such recovery occurs after the expiration of the time limit for the survival of such Claim set forth in Section 10.08), the applicable Indemnified Party shall, within ten (10) days, pay over to the Indemnifying Party the amount so recovered;

(b)   each Claim shall be reduced by an amount equal to any Tax benefit currently realized by the Indemnified Party with respect to such Claim;

(c)   no Seller shall be liable with respect to any and/or all Claim(s) resulting from a breach or violation of any representation, warranty, covenant or agreement that would give rise to a right of termination by Purchaser under Section

52

13.01(d) if Purchaser had Knowledge that there had been a breach or violation of the representations and warranties of Section 3.08, or that the covenants and agreements of the Companies or Sellers contained in Section 5.03(b)(xiv) or Article X had been breached or violated prior to the Closing (including Knowledge pursuant to written notice from Sellers of such breach or violation and/or any updates to the Schedules reflecting such breach or violation by Sellers prior to the Closing), if Purchaser nevertheless elects to effectuate the Closing (regardless of whether Purchaser waives such breach in writing or otherwise);

(d)    no Indemnified Party shall seek, or be entitled to damages, liabilities, losses or other amounts, other than Losses, in any claim for indemnification under this Article X, nor shall an Indemnified Party accept payment of any award or judgment for indemnification to the extent that such award or judgment includes exemplary or punitive damages or damages, liabilities, losses or other amounts other than Losses; and

(e)    Sellers shall not have an indemnification liability for any cause of action brought against Purchaser for misrepresentations, omissions or disclosures relating to the Companies in connection with any offer or sale of securities by Purchaser, irrespective of whether such misrepresentations, omissions or disclosures were based upon misrepresentations of Sellers in this Agreement.

10.10    Representations and Warranties.  For purposes of indemnity under this Article X for breach of a representation or warranty, the representations and warranties shall be the representations and warranties of the Indemnifying Party made herein as of the date hereof (unless any such representation or warranty provides that it speaks as of a different date), and shall be deemed to be made again as of the Closing Date (unless any such representation or warranty provides that it speaks as of the date hereof or any other date)

## ARTICLE XI

## SURVIVAL OF REPRESENTATIONS, WARRANTIES,

## COVENANTS AND AGREEMENTS

11.01    Survival.  All representations, warranties and certifications contained in this Agreement and/or in any certificate delivered by the parties at Closing in connection herewith or pursuant hereto (including with respect to the accuracy of the representations and warranties and/or the performance of the covenants and agreements of the parties hereunder) and the right to assert a Claim for indemnity pursuant to this Article XI with respect thereto shall remain operative and in full force and effect until the twelve (12) month anniversary of the Closing Date and shall thereupon terminate, expire and be of no force or effect; provided, however, that (i) all representations, warranties and certifications contained in or with respect to Section 3.21 (Environmental Matters), and the right to assert a Claim for indemnity pursuant to this Article XI with respect thereto, shall terminate, expire and be of no further force or effect on the twenty-four (24) month anniversary of the Closing Date, (ii) the right to assert any Claims based upon or arising out of fraud shall terminate, expire

53

and be of no further force or effect on the date that is 30 days after the expiration of the period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extensions thereof); (iii) any Claims relating to Taxes, including all representations, warranties and certifications contained in or with respect to Section 3.08 (Tax Matters), shall be addressed exclusively as provided in Article X; and (iv) all representations, warranties and certifications contained in or with respect to the following Sections, and the right to assert any Claim for indemnity pursuant to this Article XI with respect thereto, shall survive for 60 days immediately following the expiration of the applicable statute of limitations and shall thereupon terminate, expire and be of no further force or effect: Sections 3.02 (Authority to Execute and Perform Agreements), 3.03 (Capitalization and Title to Membership Interests), 3.25 (Brokerage), 4.01 (Organization and Qualification), 4.02 (Authority to Execute and Perform Agreements), 4.10 (Authorization and Title to Shares), and 4.05 (Brokerage).  All covenants and agreements contained in this Agreement and the right to assert a Claim for indemnity pursuant to this Article XI with respect thereto shall remain operative and in full force and effect until the date that is 60 days immediately following the expiration of the applicable statute of limitations and shall thereupon terminate, expire and be of no further force or effect; provided, however, that all covenants and agreements of the parties contained in Sections 7.02 or 7.03 or in Articles V or VI of this Agreement and the right to assert a Claim for indemnity pursuant to this Article XI or to exercise any other remedy at law or in equity with respect thereto shall terminate, expire and be of no force or effect on the Closing Date.

No Claim for indemnification hereunder for breach of any such representations, warranties, covenants or agreements may be made after the expiration of the hereinabove provided survival period applicable to such claims; provided, however, that the right of the Indemnified Parties to assert a Claim for indemnity under this Article XI in respect of any representation, warranty, covenant or agreement shall survive the time at which it would otherwise terminate pursuant to this Section 11.01 if an Indemnity Notice or Claim Notice with respect thereto shall have been given to the Indemnifying Party against whom such indemnity may be sought prior to such time.

11.02  Exclusivity.  After the Closing, the indemnities set forth in Section 11.03 shall be the sole and exclusive remedies under this Agreement or at law or in equity or otherwise of Purchaser, its Affiliates and other Indemnified Parties against Sellers and their respective Affiliates, on the one hand, and of Sellers and their respective Affiliates and other Indemnified Parties against Purchaser and its Affiliates, on the other hand, with respect to (i) any breach or violation of representations, warranties and/or certifications contained in this Agreement and/or in any certificate delivered by the parties at Closing in connection herewith or pursuant hereto (including with respect to the accuracy of the representations and warranties and/or the performance of the covenants and agreements of the parties hereunder), (ii) the Hickok Claim, and/or (iii) SysTech International Pvt. Ltd.. The preceding limitation shall not apply to Claims relating to Taxes, including with respect to breaches or violations of representations, warranties and certifications contained in or with respect to Section 3.08 (Tax Matters), or the covenants contained in Section 5.03(b)(xiv), which shall in all events be addressed exclusively as provided in Article X, except that Claims with respect to a breach or violation of the parties' respective obligations under Article X itself shall be addressed as provided in this Article XI.

54

11.03  Indemnification.

(a)  Subject to Section 11.03(c) and the other Sections of this Article XI, Sellers, jointly and severally, from and after the Closing, shall indemnify Purchaser, its Affiliates and their respective partners, members, stockholders, representatives, officers, directors, employees, agents, successors and permitted assigns (collectively, the "Purchaser Indemnified Parties"; except that Purchaser Indemnified Parties shall in no event be deemed to include the stockholders or other equityholders of any publicly traded entity ) in respect of, and save and hold each of them harmless from and against, any and all Losses suffered, incurred or sustained by any of them or to which any of them becomes subject, resulting from, arising out of or relating to (i) any breach or violation of representations, warranties and/or certifications of Sellers or the Companies contained in this Agreement and/or in any certificate delivered by Sellers and/or the Companies at Closing in connection herewith or pursuant hereto (including with respect to the accuracy of the representations and warranties and/or the performance of the covenants and agreements of Sellers hereunder), (ii) any breach or non-performance of any covenant or agreement of Sellers or the Companies contained in this Agreement (but not any breach or violation of any representations, warranties and/or certifications of Sellers or the Companies contained in any certificate delivered by Sellers and/or the Companies at Closing in connection herewith or pursuant hereto (including with respect to the performance of the covenants and agreements of Sellers hereunder)), (iii) the Hickok Claim (this Section 11.03(a)(iii) constituting the sole and exclusive remedy hereunder, at law or in equity with respect to the Hickok Claim), and (iv) SysTech International Pvt. Ltd..  For purposes of this Section 11.03(a), to the extent that any representation, warranty, covenant or agreement in this Agreement is qualified by the words "material" or "materially," then the materiality qualifier with respect to a Claim for breach or violation of such representation, warranty, covenant or agreement shall be disregarded solely and only for purposes of calculating the amount of such Claim and whether the Deductible requirement has been met, but such materiality qualifier shall continue to apply for purposes of determining whether the representation, warranty, covenant or agreement has in fact been breached or violated.

(b)  Subject to Section 11.03(c) and the other Sections of this Article XI, Purchaser shall, from and after the Closing, indemnify Sellers, their respective Affiliates and their respective partners, members, stockholders, representatives, officers, directors, employees, agents, successors and permitted assigns (collectively, the "Seller Indemnified Parties") in respect of, and save and hold each of them harmless from and against, any and all Losses suffered, incurred or sustained by any of them or to which any of them becomes subject, resulting from, arising out of or relating to (i) any breach or violation of representations, warranties and/or certifications of Purchaser contained in this Agreement and/or in any certificate delivered by Purchaser at Closing in connection herewith or pursuant hereto (including with respect to the accuracy of the representations and warranties and/or the performance of the covenants and agreements of Purchaser hereunder), or (ii) ) any breach or non-performance of any covenant or agreement of Purchaser contained in this Agreement (but not any breach or violation of any representations, warranties and/or certifications of Purchaser contained in any certificate delivered by Purchaser at Closing in connection herewith or pursuant hereto (including

55

with respect to the performance of the covenants and agreements of Purchaser hereunder)).  For purposes of this Section 11.03(b), to the extent that any representation, warranty, covenant or agreement in this Agreement is qualified by the words "material" or "materially," then the materiality qualifier with respect to a Claim for breach or violation of such representation, warranty, covenant or agreement shall be disregarded solely and only for purposes of calculating the amount of such Claim and whether the Deductible requirement has been met, but such materiality qualifier shall continue to apply for purposes of determining whether the representation, warranty, covenant or agreement has in fact been breached or violated.

      (c)    Notwithstanding anything to the contrary contained in this Agreement:

      (i)    in no event shall Sellers or Purchaser be liable under Section 11.03(a)(i) or Section 11.03(b)(i) of this Agreement, respectively, for an aggregate amount exceeding $9,750,000 (the "Cap"); provided, however, that indemnification with respect to the representations, warranties and certifications contained in or with respect to the following Sections shall not be subject to the Cap: Sections 3.02 (Authority to Execute and Perform Agreements), 3.03 (Capitalization and Title to Membership Interests), 3.25 (Brokerage), 4.01 (Organization and Qualification), 4.02 (Authority to Execute and Perform Agreements), 4.10 (Authorization and Title to Shares), or 4.05 (Brokerage) or Sections 5.03(b)(i), (ii), (iii), (iv), (vi), (ix) and (xii); and

      (ii)    in no event shall Sellers or Purchaser be liable under Section 11.03(a)(i) or Section 11.03(b)(i) of this Agreement, as the case may be, unless and until the aggregate of all amounts for which indemnity would otherwise be due against and would otherwise be payable thereunder exceeds, on a cumulative basis with respect to all such Claims, $530,000 in the aggregate, with respect to the indemnification obligations of Sellers, and $390,000 in the aggregate, with respect to the indemnification obligations of Purchaser (as applicable, the "Deductible"), in which case the amount for which indemnity shall be due and payable shall be equal to the excess over that amount (subject to the Cap); provided, however, that indemnification with respect to the representations, warranties and certifications contained in or with respect to the following Sections shall not be subject to the Deductible: Sections 3.02 (Authority to Execute and Perform Agreements), 3.03 (Capitalization and Title to Membership Interests), 3.25 (Brokerage), 4.01 (Organization and Qualification), 4.02 (Authority to Execute and Perform Agreements), 4.10 (Authorization and Title to Shares), or 4.05 (Brokerage) or Sections 5.03(b)(i), (ii), (iii), (iv), (vi), (ix) and (xii); and

      (iii)    in no event shall Sellers be liable under Section 11.03(a)(iii) for any Losses unless and until the aggregate of all Losses for which indemnity would otherwise be due against and would otherwise be payable thereunder exceeds $70,000 (the "Hickok Deductible"), in which case the amount for which indemnity shall be due and payable shall be equal to the excess of all Losses over that amount.

(iv)     each Claim shall be reduced by any indemnity, contribution or other similar payment actually paid to any Indemnified Party by any third party (including any insurance provider) with respect to such Claim and, if any Indemnified Party recovers from third parties all or any part of any indemnification payments previously paid to it by the Indemnifying Party (and even if such recovery occurs after the expiration of the time limit for the survival of such Claim set forth in Section 11.01), the applicable Indemnified Party shall, within ten (10) days, pay over to the Indemnifying Party the amount so recovered;

(v)     each Claim shall be reduced by an amount equal to any Tax benefit currently realized with respect to such Claim;

(vi)     no Seller shall be liable with respect to any and/or all Claim(s) resulting from a breach or violation of any representation, warranty, covenant or agreement that would give rise to a right of termination by Purchaser under Section 13.01(d) and of which Purchaser had Knowledge prior to the Closing (including pursuant to written notice from Sellers of such breach or violation and/or any updates to the Schedules reflecting such breach or violation delivered by Sellers prior to the Closing), if Purchaser nevertheless elects to effectuate the Closing (regardless of whether Purchaser waives such breach in writing or otherwise);

(vii)     no Indemnified Party shall seek, or be entitled to damages, liabilities, losses or other amounts, other than Losses, in any claim for indemnification under this Article XI, nor shall an Indemnified Party accept payment of any award or judgment for indemnification to the extent that such award or judgment includes exemplary or punitive damages or damages, liabilities, losses or other amounts other than Losses;

(viii)     the Sellers shall be severally, and not jointly, liable for any violation of the provisions of Section 7.04 (Non-Competition) and/or Section 7.05 (Non-Solicitation of Employees), such that neither Seller shall be liable (whether under this Article XI or otherwise) for any breach of either or both of such Sections by the other Seller;

(ix)     each party entitled to indemnification pursuant to this Article XI shall take all reasonable steps to mitigate all Losses after becoming aware of any event which could reasonably be expected to give rise to any Losses that are indemnifiable or recoverable hereunder or in connection herewith; and

(x)     Sellers shall not have an indemnification liability for any cause of action brought against Purchaser for misrepresentations, omissions or disclosures relating to the Companies in connection with any offer or sale of securities by Purchaser, irrespective of whether such misrepresentations, omissions or disclosures were based upon misrepresentations of Sellers in this Agreement.

(d)     Adjustment to Purchase Price.  Any indemnity payment under this Agreement shall be treated as an adjustment to the Purchase Price for Tax purposes,

unless a Final Determination with respect to the Indemnified Party or any or its Affiliates causes any such payment not to be treated as an adjustment to the Purchase Price for United States federal income Tax purposes.

(e)   Representations and Warranties.  For purposes of indemnity under this Article XI for breach of a representation or warranty, the representations and warranties shall be the representations and warranties of the Indemnifying Party made herein as of the date hereof (unless any such representation or warranty provides that it speaks as of a different date), and shall be deemed to be made again as of the Closing Date (unless any such representation or warranty provides that it speaks as of the date hereof or any other date).

(f)   Claims with Respect to SysTech International Pvt. Ltd.  Purchaser shall not bring any Claims against Sellers pursuant to Section 11.03(a)(iv) that are not material to the Companies.

11.04   Method of Asserting Claims.  All claims for indemnification by any Indemnified Party under Section 11.03 will be asserted and resolved as follows:

(a)   In the event any claim or demand in respect of which an Indemnifying Party might seek indemnity under Section 11.03(a) or 11.03(b) is asserted against or sought to be collected from such Indemnified Party by a Person other than Sellers, Purchaser or any of their respective Affiliates (a "Third Party Claim"), the Indemnified Party shall deliver a Claim Notice with reasonable promptness to the Indemnifying Party; provided, however, that the failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder except to the extent (and only to the extent) that such failure shall have caused the Losses for which the Indemnifying Party is obligated to be greater than such Losses would have been had the Indemnified Party given the Indemnifying Party prompt notice hereunder; but provided further, however, that in all events such Claim Notice shall be delivered prior to the expiration of the survival period for such Third Party Claim as set forth in Section 11.01.  The Indemnifying Party will notify the Indemnified Party as soon as practicable within the Dispute Period whether the Indemnifying Party disputes its liability to the Indemnified Party under Section 11.03(a) or 11.03(b) and/or whether the Indemnifying Party desires, at its sole cost and expense, to defend the Indemnified Party against such Third Party Claim.

(i)   If the Indemnifying Party notifies the Indemnified Party within the Dispute Period that the Indemnifying Party desires to defend the Indemnified Party with respect to the Third Party Claim pursuant to this Section 11.04(a), then such party will be deemed to have assumed the defense of such Third Party Claim and it will be conclusively established for purposes of this Agreement that the Third Party Claim is within the scope of and subject to indemnification.  The parties agree that, notwithstanding the assumption of the defense of any Third Party Claim by an Indemnifying Party, all reasonable fees and expenses of its or the Indemnified Party's counsel or any other reasonable expenses with respect to the defense of such Third Party Claim, in each case, incurred by or on behalf of the

58

Indemnifying Party in connection with the defense of such Third Party Claim shall (x) be reimbursed to such Indemnifying Party by the Indemnified Parties promptly upon invoice, as and when the same are incurred, unless and until the then current balance of the Deductible or the Hickok Deductible, as applicable, has been exceeded (and thereafter, any additional such fees and expenses shall be at the sole cost and expense of the Indemnifying Party, subject in all events, to the Cap), and (y) be deemed to constitute indemnifiable Losses for purposes of calculation of the resulting balance of the Deductible or the Hickok Deductible, as applicable. If the Indemnifying Party assumes defense of a Third Party Claim as hereinabove provided, then the Indemnifying Party will have full control of such defense and all proceedings with respect thereto, including any settlement thereof, which defense and proceedings will be conducted by counsel selected by the Indemnifying Party who shall be reasonably acceptable to the Indemnified Party and will be vigorously and diligently prosecuted by the Indemnifying Party to a final conclusion; provided, however, that (A) the Indemnifying Party shall obtain the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld, delayed or conditioned) before entering into any settlement of a claim or ceasing to defend such Third Party Claim if such Third Party Claim is not exclusively for monetary damages; (B) the Indemnified Party may, at the sole cost and expense of the Indemnified Party, at any time prior to the Indemnifying Party's delivery of the notice referred to in the first sentence of this clause (i), file any motion, answer or other pleadings or take any other action that the Indemnified Party reasonably believes to be necessary or appropriate to protect its interests and not prejudicial to the Indemnifying Party (it being understood and agreed that, if an Indemnified Party takes any such action that is prejudicial and causes a final adjudication that is adverse to the Indemnifying Party, the Indemnifying Party will be relieved of its obligations hereunder with respect to the portion of such Third Party Claim prejudiced by the Indemnified Party's action); (C) the Indemnified Party may participate (but not control), at its own expense, in the defense of such Third Party Claim; and (D) if requested by the Indemnifying Party, the Indemnified Party will reasonably cooperate with the Indemnifying Party and its counsel in contesting any Third Party Claim that the Indemnifying Party elects to contest, or, if appropriate and related to the Third Party Claim in question, in making any counterclaim against the Person asserting the Third Party Claim, or any cross-complaint against any Person (other than the Indemnified Party or any of its Affiliates). The parties agree that the defense, settlement and/or adjudication of the Hickok Claim shall be conducted by Sellers as the Indemnifying Party pursuant to this sub-section (i).

(ii)    If the Indemnifying Party fails to notify the Indemnified Party within the Dispute Period that the Indemnifying Party desires to defend the Third Party Claim pursuant to this Section 11.04(a) but such Indemnifying Party does not notify the Indemnified Party within the Dispute Period that the Indemnifying Party disputes that the Third Party Claim is within the scope of and subject to indemnification, or if the Indemnifying Party notifies the Indemnified Party within the Dispute Period that the Indemnifying Party desires to defend the Third Party Claim pursuant to this Section 11.04(a) but fails to prosecute vigorously and diligently the Third Party Claim, or if the Indemnifying Party fails to give any notice

59

whatsoever within the Dispute Period, then (A) it will be conclusively established for purposes of this Agreement that the Third Party Claim is within the scope of and subject to indemnification, (B) the Indemnified Party will have the right to defend the Third Party Claim by all appropriate proceedings and will have full control of such defense and proceedings, which defense and proceedings will be vigorously and diligently prosecuted in good faith by the Indemnified Party to a final conclusion by counsel selected by the Indemnified Party who shall be reasonably acceptable to the Indemnifying Party, and (C) the Indemnifying Party shall be required to reimburse the Indemnified Party for the reasonable costs and expenses of defending such Third Party Claim (subject in all events to the Deductible and the Cap and the other provisions of Section 11.03(c)) within 10 Business Days after the date of receipt of any bill; provided, however, that (I) the Indemnified Party shall obtain the prior written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, delayed or conditioned) before entering into any settlement of any such Third Party Claim if such Third Party Claim is not exclusively for monetary damages or ceasing to defend such Third Party Claim, (II) if requested by the Indemnified Party, the Indemnifying Party will cooperate reasonably with the Indemnified Party and its counsel in contesting any Third Party Claim which the Indemnified Party is contesting, or, if appropriate and related to the Third Party Claim in question, in making any counterclaim against the Person asserting the Third Party Claim, or any cross-complaint against any Person (other than the Indemnifying Party or any of its Affiliates), and (III) the Indemnifying Party may participate in, but not control, any defense or settlement controlled by the Indemnified Party pursuant to this sub-section (ii), and the Indemnifying Party will bear its own costs and expenses with respect to such participation.

(iii)     If the Indemnifying Party notifies the Indemnified Party within the Dispute Period that the Indemnifying Party disputes that the Third Party Claim is within the scope of and subject to indemnification, then (A) the Claim for indemnification against the Indemnifying Party with respect to such Third Party Claim shall be suspended (and no amounts shall be due and payable from the Indemnifying Party hereunder) until the final adjudication and/or settlement of such Third Party Claim and (B) the Indemnified Party will have the right to defend the Third Party Claim by all appropriate proceedings and will have full control of such defense and proceedings, which defense and proceedings will be vigorously and diligently prosecuted in good faith by the Indemnified Party to a final conclusion by counsel selected by the Indemnified Party; provided, however, that (I) the Indemnified Party shall obtain the prior written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, delayed or conditioned) before entering into any settlement of any such Third Party Claim if such Third Party Claim is not exclusively for monetary damages or before ceasing to defend such Third Party Claim, (II) if requested by the Indemnified Party, the Indemnifying Party will, at the sole cost and expense of the Indemnified Party, cooperate reasonably with the Indemnified Party and its counsel in contesting any Third Party Claim which the Indemnified Party is contesting, or, if appropriate and related to the Third Party Claim in question, in making any counterclaim against the Person asserting the Third Party Claim, or any cross-complaint against any Person (other than the Indemnifying

60

Party or any of its Affiliates), and (III) the Indemnifying Party may participate in, but not control, any defense or settlement controlled by the Indemnified Party pursuant to this sub-section (iii), and the Indemnifying Party will bear its own costs and expenses with respect to such participation. Upon the final adjudication and/or settlement of such Third Party Claim, the Indemnifying Party and the Indemnified Parties shall negotiate in good faith to resolve any remaining disputes with respect to such Third Party Claim; provided, however, that if such disputes can not be resolved within thirty (30) days, either party may submit the disputes to a court of competent jurisdiction for adjudication. In the event that such disputes are definitively adjudicated in favor of the Indemnified Party, the Indemnifying Party shall, together with any and all other indemnifiable Losses, be required to reimburse the Indemnified Party for the reasonable costs and expenses of defending such Third Party Claim (subject in all events to the Deductible and the Cap and the other provisions of Section 11.03(c)).

(b) In the event any Indemnified Party should have a Claim under Section 11.03(a) or 11.03(b) against any Indemnifying Party that does not involve a Third Party Claim, the Indemnified Party shall deliver an Indemnity Notice with reasonable promptness to the Indemnifying Party, but in all events prior to the expiration of the survival period for such Claim as set forth in Section 11.01. The Indemnifying Party shall notify the Indemnified Party within the Dispute Period following its receipt of such Indemnity Notice if the Indemnifying Party disputes its liability to the Indemnified Party under this Article XI. If the Indemnifying Party does not so notify the Indemnified Party, the Claim specified by the Indemnified Party in such Indemnity Notice shall be conclusively deemed to be a liability of the Indemnifying Party under this Article XI, and the Indemnifying Party shall pay to the Indemnified Party the amount of Losses indicated in such Indemnity Notice on demand, or, in the case of any Indemnity Notice in which the amount of the Claim (or any portion of the Claim) is estimated, on such later date when the amount of such Claim (or such portion of the Claim) becomes finally determined, in each case, subject in all events to the Deductible or the Hickok Deductible, as applicable, and the Cap and the other provisions of Section 11.03(c).

11.05  Manner of Payment.  Any indemnification of a Purchaser Indemnified Party pursuant to Section 11.03(a) shall be effected by wire transfer of immediately available funds to an account designated by such Purchaser Indemnified Party within 15 days after the determination thereof. Any indemnification of a Seller Indemnified Party pursuant to Section 11.03(b) shall be effected by wire transfer of immediately available funds to an account designated by such Seller Indemnified Party within 15 days after the determination thereof.

11.06  Escrow.

(a)  With respect to any Claim made by any Purchaser Indemnified Parties for indemnification from Sellers under this Article XI or Article X, if Sellers notify the Purchaser Indemnified Parties within the applicable Dispute Period that the Sellers dispute their liability to the Purchaser Indemnified Parties with respect to such Claim, then Purchaser shall be permitted to place into escrow any and all Earn-Out

61

Payments that thereafter become due (and no other portions of the Purchase Price whatsoever), but solely as and when such Earn-Out Payments become due (that is, no Earn-Out Payments may be placed into escrow prior to the actual due date thereof), and solely to the extent that the aggregate amount so placed in escrow is reasonable in relation to such Claim (with respect to each Claim, the "Escrowed Payment"); provided, however, that the maximum amount which may be placed in escrow at any time, in the aggregate with respect to all Claims, shall in no event exceed $500,000.  Each and all of such Escrowed Payments shall be placed in an interest-bearing escrow account with an escrow agent, and pursuant to the terms and conditions of an escrow agreement (the "Escrow Agreement"), to be agreed on by the parties at or prior to the expiration of the Due Diligence Review Period.  Except for Escrowed Payments properly escrowed in accordance with the immediately preceding sentence and the Escrow Agreement, Purchaser may not delay, setoff or withhold any payments under this Agreement (including the Additional Purchase Price Payments and any other portion of the Purchase Price).

            (b)   With respect to each Claim to which an Escrowed Payment relates that is either (i) agreed to by the parties as constituting the liability of Sellers under this Article XI or Article X, as applicable, or (ii) finally adjudicated (on a non-appealable basis ) by court of competent jurisdiction, in whole or in part, in favor of Purchaser, then Purchaser and the Sellers shall jointly instruct the escrow agent in writing, pursuant to and in accordance with the terms of the Escrow Agreement, to promptly release to Purchaser from the Escrowed Payment with respect to such Claim the amount that has been so agreed to by the parties or the net amount so resolved in favor of Purchaser, if any, with respect to such Claim, together with any and all interest thereon, with the balance of such Escrowed Payment relating to such Claim, if any, to be concurrently released to Sellers together with any and all interest thereon.  With respect to each Claim to which an Escrowed Payment relates that is either (A) agreed to by the parties as not constituting the liability of Sellers under this Article XI or Article X, as applicable, or (B) finally adjudicated (on a non-appealable basis ) by court of competent jurisdiction, in whole or in part, in favor of Sellers, then Purchaser and the Sellers shall jointly instruct the escrow agent in writing, pursuant to and in accordance with the terms of the Escrow Agreement, to promptly release to Sellers the entire balance of the Escrowed Payment with respect to such Claim, together with any and all interest thereon, net of any amount which has been awarded by such court in such final adjudication in favor of Purchaser, if any, together with any and all interest thereon (which awarded amount and interest, if any, the escrow agent shall be directed to release to Purchaser concurrently with the release to Sellers).  All released portions of the Escrowed Payments to Purchaser (but not any interest earned thereon) shall be deemed to be reductions of the Purchase Price.  All released portions of the Escrowed Payments to Sellers (together with any interest earned thereon), shall be deemed to be Earn-Out Payments made in accordance with this Agreement and to constitute part of the Purchase Price for all Tax purposes.



## ARTICLE XII

## EMPLOYEE MATTERS

12.01 <u>Employee Matters</u>. Any individual who is a Company Employee and whose employment so continues following the Closing shall hereinafter be referred to as a "Continuing Employee." Purchaser shall provide to the Continuing Employees employee benefits, substantially the same, in the aggregate, as those, if any, provided to similarly situated employees of Purchaser. From and after the Closing, Continuing Employees shall receive full credit for all purposes under any employee benefit plan maintained by Purchaser (a "Purchaser Plan"), including without limitation for purposes of determining eligibility and vesting levels, but not for the actual accrual of benefits, for their service prior to the Closing with either of the Companies, full credit for deductibles and co-payments, annual limits and lifetime limits under the welfare plans of Purchaser, in all cases to the extent such Continuing Employees would have received such credit under a corresponding Plan, and all preexisting conditions, limitations and waiting periods to which any such Continuing Employees are subject shall be waived under the welfare plans of Purchaser. Key executives of SysTech who are Continuing Employees, agreed to by Purchaser and Sellers, shall be eligible to participate in the Purchaser's stock option program on comparable terms to other United States employees of the Purchaser. Nothing in this Article XII or elsewhere in this Agreement shall require Purchaser to provide any particular form of employee benefit or to establish or maintain any particular type or form of employee benefit plan or preclude Purchaser from amending or terminating in its discretion any Purchaser Plan or, following the Closing, terminate the employment of any Continuing Employee.

## ARTICLE XIII

## TERMINATION

13.01 <u>Termination</u>. Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time before the Closing, and the transactions contemplated hereby may be abandoned:

(a) by mutual written agreement of Sellers, the Company and Purchaser;

(b) by either Sellers and the Companies, on the one hand, or Purchaser, on the other hand, in the event that any Order or Law becomes effective restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement, upon notification of the non-terminating party by the terminating party;

(c) by either Sellers and the Companies, on the one hand, or Purchaser, on the other hand, if the transactions contemplated hereby have not been consummated by April 30, 2008, upon notification of the non-terminating party by the terminating party; provided, however, that neither Purchaser nor Sellers and the Companies shall be entitled to terminate this Agreement pursuant to this Section 13.01(c) if such party's

63

breach of this Agreement has prevented the consummation of the transactions contemplated hereby;

(d)  by Purchaser, if there has been a material violation or breach by Sellers or the Companies of any covenant, agreement, representation or warranty contained in this Agreement, in each case, such that the conditions set forth in Section 8.01 or 8.02, as applicable, would not be satisfied as of the Closing Date and where such violation, breach or failure has not been waived by Purchaser;

(e)  by Sellers and the Companies, if there has been a material violation or breach by Purchaser of any covenant, agreement, representation or warranty contained in this Agreement, in each case, such that the conditions set forth in Section 9.01 or 9.02, as applicable, would not be satisfied as of the Closing Date and where such violation, breach or failure has not been waived by Sellers and the Companies; or

(f)  by Sellers and the Companies, if Purchaser shall have failed to obtain the approval of its board of directors with respect to the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby.

13.02  Effect of Termination.  The parties acknowledge and agree that, notwithstanding any other provision in this Agreement to the contrary or otherwise, prior to the Closing Date, each party's sole and exclusive remedy under this Agreement or at law or in equity or otherwise against any and all Persons for any breach of any representation, warranty, covenant, agreement, undertaking or obligation contained in this Agreement or any other Transaction Document or directly or indirectly in connection with the transactions contemplated hereunder shall be either (i) termination under Section 13.01(d) or (e), as applicable, and, if and only to the extent applicable, payment of the amounts set forth in this Section 13.02, or (ii) specific performance under Section 14.06.  In the event of termination by a party, or all parties, pursuant to Section 13.01, written notice thereof shall forthwith be given to the other parties and, except as set forth in this Section 13.02, all further obligations of the parties shall terminate, no party shall have any right against the other party hereto or its respective Indemnified Parties, except that:

(a)  If this Agreement is terminated either (A) by a party under Section 13.01(d) or (e), as applicable, because of an intentional and willful breach, violation or failure to perform hereunder (whether under any representation, warranty, covenant, agreement or obligation hereunder) by the other party, or (B) by Sellers and/or the Companies pursuant to Section 13.01(f) (i.e., for failure to obtain the approval of Purchaser's board of directors with respect to the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby), then the non-terminating party shall pay to the other party(ies), as liquidated damages and as such other party(ies)' sole and exclusive remedy, a termination fee equal to Two Hundred and Fifty Thousand Dollars ($250,000.00), by wire transfer of immediately available funds to an account(s) specified to such breaching party by the other party(ies), within ten (10) days of the effective date of such termination.  The parties acknowledge and agree that it would be impracticable or extremely difficult for any Party to determine the actual

damages resulting from any such breach or failure to perform hereunder and, therefore, the parties have agreed upon the foregoing remedy as liquidated damages which shall not be deemed to be in the nature of a penalty.

(b)   If this Agreement is terminated by a party under Section 13.01(d) or (e), as applicable, because of any breach, violation or failure to perform by the other party hereunder (whether under any representation, warranty, covenant, agreement or obligation hereunder), other than a breach covered by Section 13.02(a) above, then neither party shall have any right whatsoever to recover any Losses, damages or other amounts from the other party, whether pursuant to this Agreement, at law, in equity or otherwise, as a result of such termination or otherwise in connection with this Agreement and/or the transactions contemplated hereby, except for any obligations of the parties which survive such termination, as identified on Section 13.02(c) below.

(c)   If this Agreement is validly terminated pursuant to Section 13.01, the provisions of this Agreement shall thereafter become null and void, and there shall be no liability or obligation on the part of Sellers, the Companies or Purchaser (or any of their respective Indemnified Parties) under the Agreement or any other Transaction Document, except that (i) the provisions with respect to expenses in Section 14.02 (Expenses) and confidentiality in Section 7.02 (Public Announcements; Confidentiality) shall continue to apply following any such termination, and (ii) each party will return all documents, work papers and other material (and all copies thereof) of the other party, whether so obtained before or after the execution hereof, to the party furnishing the same.

## ARTICLE XIV

## MISCELLANEOUS

14.01   Notices.  Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed given when actually delivered and received in person, by overnight courier, by facsimile transmission (with receipt confirmed by telephone or by automatic transmission report) or by registered or certified mail (postage prepaid, return receipt requested), as follows:

(a)   if to Purchaser (and after the Closing, to the Company), to:

Opus Produx AB (publ)
Bäckstensgatan 11 C
SE-431 49 Gothenburg
Sweden
Attention: Magnus Greko, CEO
Fax:  +4631288655

with a copy to:

Marek Zdrojewski

65

Glimstedts Advokatbyrå
Kungsgatan 42, Box 2259
403 14 Gothenburg
Sweden

and:

Squire, Sanders & Dempsey L.L.P.
4900 Key Tower
127 Public Square
Cleveland, OH 44114-1304
Attention: David A. Zagore, Esq.
Fax: (216) 479-8780

(b)  if to Sellers (and before the Closing, to the Companies), to:

Pradeep Tripathi
100 S. Point Drive, Suite 1005
Miami Beach, Florida  33139
Fax:

and

Lothar Geilen
1834 NW 124th Way
Coral Springs, Florida 33071
Fax:

with copy to:

Bilzin Sumberg Baena Price & Axelrod LLP
200 S. Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Attention: Richard M. Goldstein, Esq.
Fax: (305) 351-2220

Any party may by notice given in accordance with this Section 14.01 to the other parties designate another address or person for receipt of notices hereunder.

14.02  Expenses.  Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated hereby are consummated, each party shall pay its own costs and expenses incurred in connection with the negotiation, execution and closing of this Agreement and the transactions contemplated hereby, including without limitation, all fees and expenses of agents, representatives, brokers, investment bankers, financial advisors, counsel and accountants; except that the Companies shall bear up to $10,000 of the fees, costs and expenses of Sellers' counsel accrued in 2007.

66

14.03   Captions.  The captions of this Agreement are for convenience only and shall not affect the interpretation or construction of this Agreement.

14.04   Governing Law.  This Agreement and the legal relations between and among the parties hereto shall be governed by and interpreted and construed in accordance with the Laws of the State of New York, without regard to the principles of conflicts of laws.

14.05   Consent to Jurisdiction; No Jury Trial.  Except as otherwise specifically provided in this Agreement, each of the parties hereby irrevocably submits to the jurisdiction of the United States District Court for the Southern District of New York (or, if such court shall not accept such jurisdiction, any state court sitting in New York City) in any action, suit or proceeding brought against it by the other party under this Agreement. THE PARTIES HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY OF THEM AGAINST THE OTHER IN ANY MATTERS ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT.

14.06   Specific Performance.  The parties agree that if any of the provisions of this Agreement were not performed by any party hereto in accordance with their specific terms or were otherwise breached by any party hereto, except for those provisions with respect to which indemnification under Articles X or XI is the sole and exclusive remedy as provided therein, irreparable damage would occur, no adequate remedy at Law would exist and damages would be difficult to determine, and that, except as provided in Articles X and XI, and except in the event that a Party elects to terminate this Agreement pursuant to Section 13.01(d) or (e), as applicable (in which case, the remedies set forth in Section 13.02 shall govern), each non-breaching party would be entitled to specific performance to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which they may be entitled at Law or in equity.

14.07   Entire Agreement.  This Agreement and the documents referred to herein (including the Schedules and Exhibits), the Confidentiality Agreement, and the Termination Fee Agreement entered into among the parties concurrently herewith, shall constitute the entire agreement among the parties with respect to the subject matter hereof, thereby superseding all prior agreements among any of the parties.  Neither this Agreement nor the Confidentiality Agreement or the Termination Fee Agreement may be amended except in a writing signed by all the parties.  Each party hereby acknowledges and agrees that, except for the representations and warranties of the other parties expressly set forth in this Agreement, none of such other parties has made any representation or warranty, express or implied, and all such other representations and warranties are hereby expressly disclaimed.  Each party hereby further acknowledges and agrees that, except for the representations and warranties expressly set forth in this Agreement, such party has not relied, with respect to the transactions contemplated by this Agreement, on any statement, information or documents communicated, furnished or otherwise made available to such acknowledging party and/or its advisors, auditors and other Representatives.

67

14.08   No Waiver.  No waiver of any breach or default hereunder shall be considered valid unless in writing and signed by the party giving such waiver; no failure or delay by any party exercising any right, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege.

14.09   No Third Party Beneficiaries.  The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person.

14.10   Successors and Assigns.  Neither this Agreement nor any right, interest or obligation hereunder is assignable without the prior written consent of the other parties hereto and any attempt to do so will be null and void, except for assignments and transfers by operation of Law (subject, however, to satisfaction of the Purchaser's obligations to pay all remaining Earn Out Payments to Sellers on an accelerated basis pursuant to and as provided in Section 6 of Appendix 2.02(c)); provided, however, that notwithstanding any provision to the contrary, Purchaser may assign its rights hereunder to a an Affiliate of Purchaser that is 100% owned and controlled by Purchaser without such consent as long as such assignment (a) does not limit, release or otherwise affect Purchaser's obligations hereunder and with respect to which Purchaser shall in all events remain primarily liable, and (b) is effectuated by way of written assignment and assumption agreement (in form and substance reasonably satisfactory to Sellers) which gives effect to the immediately preceding item (a) and pursuant to which such Affiliate agrees to assume all obligations of Purchaser hereunder and be primarily liable with respect thereto to the same extent as Purchaser.  Subject to the preceding sentence, this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

14.11   Severability.  Each provision of this Agreement shall be interpreted in such manner as to validate and give effect thereto to the fullest lawful extent, but if any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable under applicable Law, such provision shall be ineffective only to the extent so determined and such invalidity or unenforceability shall not affect the remainder of such provision or the remaining provisions of this Agreement.

14.12   Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement shall become effective when one or more such counterparts have been executed by each of the parties hereto and delivered to the other parties hereto, it being understood that all parties need not sign the same counterpart. Delivery by facsimile or e-mail transmission in PDF format to counsel for the other party of a counterpart executed by a party shall be deemed to meet the requirements of the previous sentence and to constitute good and effective delivery for all purposes.

68

14.13   Construction.  The parties acknowledge that they have been represented by counsel and that no inference against the party who drafted this Agreement shall be made when construing the provisions of this Agreement.

14.14   Interest.  Amounts not paid when due hereunder shall bear interest from the date originally due and payable until paid at an annualized interest rate equal to the Prime Rate of Key Bank as of the end of each calendar quarter, as in effect from time to time and as listed in *The Wall Street Journal*, compounded quarterly.

14.15   Attorneys' Fees.  In the event of any litigation, arbitration or other dispute resolution proceeding to enforce the provisions of this Agreement, the prevailing party shall be entitled to recover its reasonable legal fees, expenses and costs from the losing party, whether at trial and at all appellate levels.

14.16   Interpretation.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  In this Agreement, unless a clear contrary intention appears:

(a)   references in this Agreement to Sections, Exhibits, Schedules, Articles, Appendices or Recitals refer to the sections, exhibits, schedules, articles, appendices or recitals, respectively, of this Agreement;

(b)   all Exhibits, Schedules, and Appendices annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein and any and all capitalized terms used in any Schedule, Exhibit or Appendix but not otherwise defined therein shall have the meaning as defined in this Agreement.

(c)   accounting terms used but not otherwise defined in this Agreement shall have the meaning given them by or under GAAP;

(d)   references to Dollars means United States Dollars.

(e)   the words "include," "includes" and "including" when used herein shall be deemed in each case (unless already stated) to be followed by the words "without limitation";

(f)   when a reference is made in this Agreement to a certain number of days, such reference shall be deemed to refer to "calendar" days unless the reference expressly indicates that the reference is being made with respect to business days;

(g)   the phrases "the date of this Agreement," "the date hereof," and terms of similar import, unless the context otherwise requires, shall be deemed to refer to the date first set forth in the introductory paragraph to this Agreement;

(h)   the masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires;

69

(i)   words such as "herein," "hereinafter," "hereof," "hereby" and "hereunder" and the words of like import refer to this Agreement as a whole and not to any particular Section or other provision hereof;

(j)   references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto;

(k)   when calculating the period of time before which, within which or following which any act is to be done or action taken pursuant to this Agreement, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day;

(l)   with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; and

(m)   reference to any Person includes such Person's permitted successors and assigns, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

*[Remainder of Page Intentionally Left Blank]*



70

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the date first above written.

OPUS PRODOX AB (publ)

By: _____
Name: Göran Nordlund   Magnus Greko
Title: Chairman   CEO

SYSTECH INTERNATIONAL, LLC

By: _____
Name: LOTHAR GEILEN
Title: MEMBER

TRILEN LLC

By: _____
Name: LOTHAR GEILEN
Title: MEMBER

_____
PRADEEP TRIPATHI

_____
LOTHAR GEILEN

By executing this Agreement, the undersigned, the legal spouses of Pradeep Tripathi and Lothar Geilen, hereby join in the transfer of the Membership Interests solely to effect the release, extinguishment and waiver of any rights, including rights of dower, common law property, marital property or any other rights whatsoever, that either or each of them may have in and to the Membership Interests, and for no other purpose whatsoever.

_____
POOJA TRIPATHI
Print Name Above

_____
LUISA GEILEN
Print Name Above

**APPENDIX 2.02(d)**

**Additional Purchase Payments**

The additional Purchase Price Payments provided for in this Appendix shall not be subject to escrow, offset, withholding or condition (including in order to offset or otherwise fund any Claim pursuant to the Agreement) with respect to the happening or non-happening of any event or circumstances not specifically described in this Appendix.

1.    Wisconsin Additional Purchase Price Payment.

    1.1    Purchaser and Sellers acknowledge that the Companies will respond to a request for proposal for a contract with the State of Wisconsin (the "Wisconsin Contract"). If the Wisconsin Contract is awarded to SysTech by December 31, 2008 and the budgeted revenues with respect to the Wisconsin Contract (excluding extensions) are at least $20,000,000, Purchaser shall pay to Sellers, on or before March 31, 2009 the amount of Four Million Dollars ($4,000,000.00). Such Additional Purchase Price Payment shall be paid on the basis of 75% to Tripathi and 25% to Geilen. Such Additional Purchase Price Payment (i) is not subject to and shall not be charged against the $25,000,000 maximum Earn-Out Payments and (ii) shall be treated by Purchaser and Seller as additional Purchase Price. No Earn-Out Payment or other payments shall be due or payable to Sellers relating to the Wisconsin Contract.

    1.2    In the sole discretion of Purchaser, such payment may be made either in cash or Purchaser's ordinary shares (the "Stock") so long as such Stock is actively traded on a Swedish stock exchange at the time of payment and Purchaser reasonably does not anticipate that such Stock will discontinue to be so traded. Should the Purchaser elect to make the payment in Stock the per share value of the Stock shall be the volume weighted average closing share price of the Stock on such exchange for the two (2) week period commencing four (4) weeks prior to the date of the Purchaser's extra general assembly at which it determines whether to make the payment in cash or stock (the "Calculation Period"). Further, if the payment is to be made in cash, it will be made in United States dollars, and if it is to be made in $4,000,000 worth of Stock the currency exchange rate of US Dollars to Swedish Krona (SEK) shall be the average exchange rate during the Calculation Period.

    1.3    Purchaser covenants to use reasonable business efforts to diligently pursue the award to the Wisconsin contract, to provide that the contract will have projected revenues of at least $20,000,000 and to obtain such award by December 31, 2008.

2.    Remote OBD Additional Purchase Price Payment.

    2.1    The Sellers and Purchaser acknowledge that the Companies are in the process of promoting sales of Remote OBD link units and testing networks for various inspection programs. Purchaser and Sellers agreed that the first 205,000 units sold shall be treated as New Business for purposes of calculating the Earn-Out Payments. For sold units in excess of 205,000, such units (the "Excess Units") shall not be deemed New Business and no Earn-Out Payments shall be made with regard thereto. Instead Sellers, on the basis of 75% to Tripathi and 25% to Geilen, shall be entitled to separate additional payments, treated as additional Purchase Price not subject to offset or conditioned on the happening or non-happening of any other event or circumstances,

equal to seven and one-half percent (7.5%) of the actual revenues received for the Excess Units. Such payments shall be made during the entire Earn-Out Period, shall be deemed accrued and payable upon the delivery of the Remote OBD link units and testing networks and shall be paid at the same time as the Earn-Out Payments are to be paid.

2.2    Purchaser shall cause SysTech to use reasonable business efforts to market and sell the Remote OBD units

**EXECUTION COPY**

**AMENDMENT NO. 1**

**TO**

**SALE AND PURCHASE AGREEMENT**

**THIS AMENDMENT NO. 1 TO SALE AND PURCHASE AGREEMENT** (this "Amendment") is hereby made and entered into, effective as of April 8, 2008 (the "Amendment Date"), by and among **OPUS PRODOX AB (publ)**, a company organized under the laws of the Kingdom of Sweden ("Purchaser"), **PRADEEP TRIPATHI** ("Tripathi") and **LOTHAR GEILEN** ("Geilen")(Tripathi and Geilen are collectively referred to herein as "Sellers" and each is referred to herein as a "Seller"), and **SYSTECH INTERNATIONAL, LLC**, a Florida limited liability company ("SysTech") and **TRILEN LLC**, a Florida limited liability company ("TriLen") (SysTech and TriLen are collectively referred to herein as the "Companies" and each is referred to herein as a "Company"), in order to amend that certain Sale and Purchase Agreement, dated as of March 2, 2008 (the "Agreement"), by and among Purchaser, Tripathi, Geilen, SysTech and TriLen. Capitalized terms used herein without being defined herein (whether by cross-reference or parenthetically) shall have the respective meanings ascribed thereto in the Agreement.

**RECITALS**

**WHEREAS**, Purchaser having not obtained the Financing as contemplated by the Agreement, Purchaser, Sellers and the Companies desire to amend the Agreement upon the terms and subject to the conditions set forth in this Amendment.

**NOW, THEREFORE**, in consideration of the foregoing recitals, the sum of Ten Dollars ($10.00), and the mutual representations, warranties, covenants, and promises set forth in this Agreement, and intending hereby to be legally bound subject to the terms and conditions set forth in this Amendment, Purchaser, Sellers, and the Companies hereby amend the Agreement, effective as of the Amendment Date, as follows:

**ARTICLE I**

**AMENDMENT TO PURCHASE PRICE AND PAYMENT**

1.01    Recitals.   The foregoing recitals are true and correct and shall constitute an integral and substantive part of this Amendment, and this Amendment shall be construed in consideration thereof.

1.02    References to Agreement.   All references in the Agreement to the "Agreement" are hereby amended to refer to the Agreement, collectively with this Amendment, which is hereby incorporated therein and made a part thereof.

1.03    Amendment to Purchase Price and Payment.   Section 2.02 of the Agreement is hereby amended as follows:

(a)   the text of Section 2.02(b) is hereby deleted in its entirety and replaced with the following:

"(b)   In consideration for the sale and transfer of the Membership Interests to Purchaser by Sellers, at the Closing, Purchaser shall pay and deliver to the Sellers a closing payment (the "Closing Payment") consisting of (i) 20,000,000 ordinary shares in Purchaser (the "Shares") to be issued to Tripathi and Geilen through a directed share issue, decided by the Purchaser's board on April 7, 2008.  At the Closing (a) Purchaser shall provide Tripathi with a promissory note of Purchaser in an amount of Twenty-One Million SEK (21,000,000), and Tripathi undertakes to immediately subscribe for 7,000,000 Shares, through payment, at a price of SEK 3.00 per share. Tripathi shall be entitled to pay for the subscription of the shares by way of set off against the promissory note, and (b) Purchaser shall provide Geilen with a promissory note of Purchaser in an amount of Thirty-Nine Million SEK (39,000,000), and Geilen undertakes to immediately subscribe for 13,000,000 Shares, through payment, at a price of SEK 3.00 per share.  Geilen shall be entitled to pay for the subscription of the shares by way of set off against the promissory note; and (ii) Twenty-Seven Million Seven Hundred Forty-Nine Thousand Four Hundred Sixty-Eight Dollars ($27,749,468).   In the event that, at any time from and after the Amendment Date through and including the Closing Date, (I) the outstanding shares of Purchaser's capital stock are changed into a different number or kind of shares, securities or other consideration by reason of any reorganization, reclassification, recapitalization, stock split, merger, consolidation, share exchange, combination, or any similar transaction, and/or (II) any dividend payable in stock or other securities shall be declared thereon with a record date from and after the Amendment Date but on or prior to the Closing Date, then the Shares shall be equitably adjusted to provide the Sellers the same economic effect as contemplated by this Agreement prior to such reclassification, reorganization, recapitalization, stock split, merger, consolidation, share exchange, combination, transaction or dividend, and any and all securities or other consideration that may be issued, paid or delivered in respect of, in exchange for, or in substitution for the Shares, shall be deemed to constitute Shares for all purposes hereunder.  For all purposes under this Agreement, the Shares shall be issued to and owned by Sellers effective as of the Closing Date.  The Closing Payment shall be paid and delivered as follows:

(i)   to Tripathi and/or to one or more trusts designated by Tripathi, a promissory note, in substantially the form attached as Exhibit G, of the Purchaser at an amount of Twenty-One Million SEK (21,000,000);

(ii)  to Geilen and/or to one or more trusts designated by Geilen, a promissory note, in substantially the form attached as Exhibit H, of the Purchaser at an amount of Thirty-Nine Million SEK (39,000,000);

(iii)      a secured promissory note, in substantially the form attached as Exhibit B, of Purchaser in the original principal amount of Five Million One Hundred Eighty-Seven Thousand One Hundred One Dollars ($5,187,101) payable to Tripathi or to a trust designated by Tripathi in writing not less than Two Business Days prior to the Closing Date;

(iv)      a secured promissory note, in substantially the form attached as Exhibit C, of Purchaser in the original principal amount of Two Million Five Hundred Twenty-Nine Thousand Thirty-Four Dollars ($2,529,034) payable to Geilen or to a trust designated by Geilen in writing not less than Two Business Days prior to the Closing Date (such note, collectively with the note required to be issued to Tripathi pursuant to the preceding Section 2.02(b)(iii), the "Notes," and each of such Notes, individually, a "Note");

(v)      to Tripathi and/or to one or more trusts designated by Tripathi, by wire transfer of immediately available funds to such account(s) as is/are designated by Tripathi in writing not less than Two Business Days prior to the Closing Date, the difference between (A) Nineteen Million Four Hundred Twenty Five Thousand Dollars ($19,425,000) and (B) Seventy-Five Percent (75%) of the amount paid by Purchaser pursuant to subsection (vii) below, if any;

(vi)      to Geilen and/or to one or more trusts designated by Geilen, by wire transfer of immediately available funds to such account(s) as is/are designated by Geilen in writing not less than Two Business Days prior to the Closing Date, the difference between (A) Six Hundred Eight Thousand Three Hundred Thirty-Three Dollars ($608,333) and (B) Twenty-Five Percent (25%) of the amount paid by Purchaser pursuant to subsection (vii) below, if any; and

(vii)      to Tennessee Bank & Trust, all Indebtedness of the Company outstanding as of the Closing Date, if any, under that certain loan made on or about August 2007 by Tennessee Bank & Trust to SysTech in the original aggregate principal amount of Five Hundred Thousand Dollars ($500,000) (the "Tennessee Facility"), in accordance with the payoff letter described in Section 8.13, unless Sellers shall have delivered to Purchaser evidence that all such Indebtedness has been paid in full by Sellers prior to Closing."

(b)   the following is hereby added as Section 2.02(f) of the Agreement:

"(f)      Lock-Up Agreement.  The Shares shall be subject to such restrictions on transfer as shall be set forth in a Lock-Up Agreement to be entered into on the Closing Date by and among Sellers and Purchaser in

3

substantially the form attached hereto as <u>Exhibit D</u> (the "<u>Lock-Up Agreement</u>")."

(c)   the following is hereby added as Section 2.02(g) of the Agreement:

"(g)   <u>Security Interests</u>.   Notwithstanding anything in this Agreement to the contrary or otherwise, Purchaser's obligation to make any and all payments under each of the Notes shall be absolute and unconditional and shall not be subject to escrow, offset, withholding or condition of any kind (including in order to offset or otherwise fund any Claim).  In addition, in order to secure payment of all amounts due under the Notes, at the Closing concurrently with the issuance of the Notes, Purchaser shall grant to each Seller a security interest in the collateral described in Pledge Agreements and/or Security Agreements to be executed, delivered and entered into at the Closing in substantially the forms annexed hereto as composite <u>Exhibit E</u> (collectively, the "<u>Security Agreements</u>").   Each security interest granted under this Section is subordinate to:

(i)   the security interests granted to Nordea Bank AB (publ) ("Nordea") pursuant to: (A) that certain Bridge Facility Agreement, in a maximum principal amount of Thirty Million SEK (30,000,000) (the "<u>Bridge Loan</u>"), (B) the Senior Facilities Agreement, in a maximum principal amount of Fifty-Five Million SEK (55,000,000) to be entered into as of the Closing Date by and between, *inter alia*, Purchaser and Nordea in order to finance the acquisition of the Membership Interests pursuant to this Agreement, (C) the Working Capital Facilities in maximum principal amount of Twenty-Eight Million Seven Hundred Thousand SEK (28,700,000) to be entered into as of the Closing Date by and between, *inter alia*, Purchaser and Nordea in order to finance the working capital needs of the of the Companies following the Closing, and (D) up to Five Million Dollars ($5,000,000) to refinance any mortgage indebtedness of the Companies existing immediately prior to the Closing; and

(ii)   any security interests relating to the Indebtedness disclosed on Schedule 3.05.

The security interests granted pursuant to the Security Agreements shall not otherwise be subordinate to any other Indebtedness or other liability whatsoever of Purchaser or any of its Affiliates (including, after the Closing, the Companies) resulting from any action taken by the Purchaser or its Affiliates.   Furthermore, the subordination of Sellers' security interests granted in the Security Agreements to the Nordea debt facilities identified in Section 2.02(g)(i) above shall be governed by a Subordination Agreement to be entered into by Sellers with Purchaser and Nordea in substantially the form attached hereto as <u>Exhibit I</u> (the "<u>Subordination Agreement</u>").   Sellers

4

shall not be required to enter into any subordination agreement, intercreditor agreement or other similar agreement of any kind that is inconsistent with or expands upon the limitations imposed upon Sellers under the Subordination Agreement in order to effectuate the Closing.  For the avoidance of doubt, any such requirement shall constitute a breach that permits Sellers to terminate this Agreement pursuant to Section 13.01(e)."

1.04    Amendment to Exhibits.  Exhibit B and Exhibit C to the Agreement are hereby amended, restated and replaced in their entirety with Amended Exhibit B and Amended Exhibit C, respectively, attached hereto.  Exhibit D, Exhibit E, Exhibit G, Exhibit H and Exhibit I to this Amendment are hereby incorporated as Exhibit D, Exhibit E, Exhibit G, Exhibit H and Exhibit I, respectively, to the Agreement.

1.05    Amendment to Appendix 2.02(c).  Section 5 of Appendix 2.02(c) to the Agreement is hereby amended by deleting the third sentence of such Section in its entirety and replacing such sentence with the following:

"Each Earn-out Payment shall (i) be paid Seventy-Five Percent (75%) to Tripathi and/or to one or more trusts designated by Tripathi, and Twenty-Five Percent (25%) to Geilen and/or to one or more trusts designated by Geilen, in each case, by wire transfer of immediately available funds to such account(s) as is/are designated by such Seller, and (ii) be treated by Purchaser and Sellers as additional Purchase Price."

1.06    Amendment to Closing.  Section 2.03 is hereby amended by deleting the words "Squire, Sanders & Dempsey L.L.P. in Miami, Florida" and replacing such words with the words "Glimstedts Advokatbyrå in Gothenburg, Sweden."

1.07    Amendment to Notification.  Section 5.04 is hereby amended by deleting the parenthetical cross-reference to Section 11.03(c)(v) and replacing it with a cross-reference to Section 11.03(c)(vi).

1.08    Financing.  Section 6.04 is hereby amended by deleting the text of such Section in its entirety and replacing such text with the following:

"6.04    Financing.    From the date of the Amendment until the Closing, Purchaser shall exercise its best efforts to promptly obtain and secure financing related to the transactions contemplated hereby on commercially reasonable terms reasonably satisfactory to Purchaser, including via a public offering of the equity of Purchaser (the "Financing"). Purchaser shall promptly (but in all events within 3 Business Days) provide written notice to Sellers once it has obtained and secured such Financing or, if Purchaser shall have failed to obtain such Financing, of such failure. Failure to obtain Financing shall constitute a breach that permits Sellers to terminate the Agreement pursuant to Section 13.01(e)."

1.09    Further Assurances; Post-Closing Cooperation.  Section 7.01(a)(i) is hereby amended by adding prior to the semicolon at the end thereof the words ", including such documents, further instruments of transfer and assignment and other papers necessary to evidence the transfer and disposition of SysTech International Pvt. Ltd.".

1.10    Non-Competition.  Section 7.04 is hereby amended by adding at the end of said Section a new subsection (d) reading as follows:

"(d) Notwithstanding any other provision in this Agreement, the Notes, the Security Agreements or any agreement or document to which Sellers are parties with Purchaser's lenders, in the event that a payment default under the Notes is not cured within ninety (90) days following maturity (i.e., eighteen (18) months following the Closing), the provisions of this Section 7.04 shall immediately become null and void and of no further effect as to Tripathi."

1.11    Amendments to Conditions to the Obligations of Purchaser.  Article VIII of the Agreement is hereby amended as follows:

(a)   The following Sections are hereby deleted from the Agreement and replaced with the words "[Intentionally Omitted.]": Sections 8.09 (Board Consent), 8.10 (Financing), 8.14 (Due Diligence Review), and 8.15 (Good Standing Certificates).

(b)   Section 8.01 is hereby amended by deleting the text of such Section in its entirety and replacing such text with the following:

"8.01    Representations and Warranties.  Each of the representations and warranties made by Sellers and the Companies set forth in this Agreement shall be true and correct in all material respects on and as of the Closing Date as though made on and as of the Closing Date, except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date.  Solely for purposes of determining whether such condition precedent has been satisfied (and not for purposes of indemnification), in the event that any representation and/or warranty of Sellers and/or the Companies is not true and correct in all material respects as described above, such condition precedent shall nevertheless be deemed fully satisfied if:

(i)  prior to the Amendment Date, Purchaser had Knowledge that such representation and warranty was not true in all material respects and Knowledge of the material facts or circumstances resulting in such breach of representations and/or warranties not being true and correct; or

(ii) the failure of such representation and/or warranty to be true and correct in all material respects is not reasonably expected to result in

6

indemnifiable Losses to the Purchaser Indemnified Parties exceeding Three Million Dollars ($3,000,000), individually or in the aggregate, with all other such failures referred to in this Section 8.01(ii) and with all breaches or violations of agreements, covenants and/or obligations of Sellers and/or the Companies of which Purchaser did not have Knowledge on or prior to the Amendment Date that remain uncured after fifteen (15) days' written notice thereof."

(c)   Section 8.02 is hereby amended by deleting the text of such Section in its entirety and replacing such text with the following:

"8.02   Performance.   Sellers and the Companies shall have duly performed and complied in all material respects with all agreements, covenants and obligations required by this Agreement to be so performed or complied with by them at or before the Closing or, in the case of any material breach or violation of such agreements, covenants and/or obligations, cured such breach or violation within fifteen (15) days after written notice thereof from Purchaser.  Solely for purposes of the preceding sentence (and not for purposes of indemnification), in the event that Sellers and/or the Companies shall have failed to duly perform and comply in all material respects with any agreement, covenant and/or obligation required by this Agreement at or before the Closing or shall have failed to cure such breach or violation as hereinabove provided, Sellers and/or the Companies, as applicable, shall nevertheless be deemed to have fully performed and complied and this condition shall be deemed fully satisfied with respect to such agreement, covenant and/or obligation if (i) at any time on or prior to the Amendment Date Purchaser had Knowledge of such breach or violation, or (ii) if Purchaser did not have such Knowledge, such breach or violation shall not reasonably be expected to result, individually or in the aggregate with all other such breaches or violations of which Purchaser did not have such Knowledge and with all breaches or violations of representations and/or warranties of the Sellers and/or the Companies of which Purchaser did not have Knowledge on or prior to the Amendment Date, in indemnifiable Losses to the Purchaser Indemnified Parties exceeding Three Million Dollars ($3,000,000)."

(d)   Section 8.07 is hereby amended by deleting the text of such Section in its entirety and replacing such text with the following:

"8.07   Rhode Island Test Equipment.   Purchaser shall be reasonably satisfied that the purchase by the Companies of substantially all materials specified in the RI20007 test equipment bill of materials for 292 Rhode Island test analyzers (the "RI Test Equipment") has been completed and that at least 260 of 292 pieces of the RI Test Equipments will have been delivered

to the customer and expensed on the books of the Company no later than the Closing."

(e)    Section 8.08 is hereby amended by deleting the text of such Section in its entirety and replacing such text with the following:

"Section 8.08  Seller Required Consents.  Sellers shall have given the notices required to the States of Rhode Island and Oregon that are reflected on Schedule 3.11."

(f)    Section 8.12 is hereby amended by deleting the words "on or prior to the expiration of the Due Diligence Review Period" from such Section.

1.12    Amendments to Conditions to the Obligations of Sellers and the Companies.  Article IX of the Agreement is hereby amended as follows:

(a)    The following Sections are hereby deleted from the Agreement and replaced with the words "[Intentionally Omitted.]": Sections 9.06 (Purchaser Required Consents), 9.07 (Board Consent), and 9.08 (Financing).

(b)    Section 9.01 is hereby amended by deleting the text of such Section in its entirety and replacing such text with the following:

"9.01    Representations and Warranties.  Each of the representations and warranties made by Purchasers set forth in this Agreement shall be true and correct in all material respects on and as of the Closing Date as though made on and as of the Closing Date, except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date.  Solely for purposes of determining whether such condition precedent has been satisfied (and not for purposes of indemnification), in the event that any representation and/or warranty of Purchaser is not true and correct in all material respects as described above, such condition precedent shall nevertheless be deemed fully satisfied if:

(i)    prior to the Amendment Date, Sellers or the Companies had Knowledge that such representation and warranty was not true in all material respects and Knowledge of the material facts or circumstances resulting in such breach of representations and/or warranties not being true and correct; or

(ii) the failure of such representation and/or warranty to be true and correct in all material respects is not reasonably expected to result in indemnifiable Losses to the Seller Indemnified Parties exceeding Three Million Dollars ($3,000,000), individually or in the aggregate, with all

8

other such failures referred to in this Section 9.01(ii) and with all breaches or violations of agreements, covenants and/or obligations of Sellers and/or the Companies of which Purchaser did not have Knowledge on or prior to the Amendment Date that remain uncured after fifteen (15) days' written notice thereof."

(c)   Section 9.02 is hereby amended by deleting the text of such Section in its entirety and replacing such text with the following:

"9.02   Performance.   Purchaser shall have duly performed and complied in all material respects with all agreements, covenants and obligations required by this Agreement to be so performed or complied with by Purchaser at or before the Closing or, in the case of any material breach or violation of such agreements, covenants and/or obligations, cured such breach or violation within fifteen (15) days after written notice thereof from Sellers.  Solely for purposes of the preceding sentence (and not for purposes of indemnification), in the event that Purchaser shall have failed to duly perform and comply in all material respects with any agreement, covenant and/or obligation required by this Agreement at or before the Closing or shall have failed to cure such breach or violation as hereinabove provided, Purchaser shall nevertheless be deemed to have fully performed and complied and this condition shall be deemed fully satisfied with respect to such agreement, covenant and/or obligation if (i) at any time on or prior to the Amendment Date, Sellers had Knowledge of such breach or violation, or (ii) if Sellers did not have such Knowledge, such breach or violation shall not reasonably be expected to result, individually or in the aggregate with all other such breaches or violations of which Sellers did not have such Knowledge and with all breaches or violations of representations and/or warranties of Purchaser of which Sellers did not have Knowledge on or prior to the Amendment Date, in indemnifiable Losses to the Seller Indemnified Parties exceeding Three Million Dollars ($3,000,000)."

(d)   Section 9.11 is hereby amended by deleting the words "on or prior to the expiration of the Due Diligence Review Period" from such Section.

(e)   Article IX is hereby amended by adding a new Section 9.12 reading as follows:

"9.12   Sellers' Representations, Warranties and Performance.  Sellers shall have met the Purchaser's conditions set forth in Section  8.01(ii) or Section 8.02 because the indemnifiable Losses from the failure to meet such conditions, individually or in the aggregate, is not reasonably expected to exceed Three Million Dollars ($3,000,000)."

9

1.13   Amendment to Transfer Taxes.  Section 10.06 is hereby amended by deleting the words "convertible promissory notes" and replacing such words with the word "Notes".

1.14   Amendment to Indemnification.   Section 11.03(a)(iii) is hereby amended by deleting the text of such clause in its entirety and replacing such text with the following words: "(iii) the Hickok Claim and any third-party claim relating to the Hickok Claim (this Section 11.03(a)(iii) constituting the sole and exclusive remedy hereunder, at law or in equity with respect to the Hickok Claim and any such third-party claim); and"

1.15   Amendments to Limitations on Indemnification.  Section 11.03(c)(vi) is hereby amended by deleting the text of such Section in its entirety and replacing such text with the following:

"(vi)  no Seller shall be liable with respect to any breach or violation of any representation, warranty, covenant or agreement set forth in this Agreement (other than Section 3.08, Section 5.03(b)(xiv) or Article X) if Purchaser had Knowledge that such representation and warranty was not true in all material respects and Knowledge of the material facts or circumstances resulting in such breach of representations and/or warranties not being true and correct prior to the Amendment Date;"

1.16   Amendment to Escrow.  Section 11.06(a) is hereby amended by deleting the words "at or prior to the expiration of the Due Diligence Review Period" from such Section.

1.17   Amendment to Employee Matters.  Section 12.01 is hereby amended by adding, at the end of such Section, the following language:

"Notwithstanding anything in this Section 12.01 to the contrary, Purchaser agrees that (i) the employment of Geilen from and after the Closing shall be pursuant to and governed by the terms and conditions of the Employment Agreement contemplated to be entered into by Sections 8.12 and 9.11, and (ii) Purchaser shall cause the Companies to continue to provide to Tripathi, at the Companies' sole cost and expense, for a period expiring on the last calendar day of the third (3rd) month immediately following the month of the Closing, continuation of all health insurance benefits (in the same manner as provided to Tripathi immediately prior to Closing), and thereafter, continuation of such health insurance benefits pursuant to 29 U.S.C. §1161 et seq. (commonly known as COBRA)."

1.18   Amendments to Termination.  Article XIII of the Agreement is hereby amended as follows:

(a)  Section 13.01(c) hereby amended by deleting the text of such Section (including all sub-sections) in its entirety and replacing such text with the following:

"(c)     by either Sellers and the Companies, on the one hand, or Purchaser, on the other hand, if the transactions contemplated hereby have not been consummated by May 9, 2008, upon notification of the non-terminating party by the terminating party; provided, however, that, except for a termination by Sellers due to the condition set forth in Section 9.12, neither Purchaser nor Sellers and the Companies shall be entitled to terminate this Agreement pursuant to this Section 13.01(c) if such party's breach of this Agreement has prevented the consummation of the transactions contemplated hereby;"

(b)  Section 13.01(f) is hereby deleted.

(c)  Section 13.02 is hereby amended by deleting the text of such Section (including all sub-sections) in its entirety and replacing such text with the following:

"13.02  Effect of Termination.  The parties acknowledge and agree that, notwithstanding any other provision in this Agreement to the contrary or otherwise, each party's sole and exclusive remedy under this Agreement or at law or in equity or otherwise against any and all Persons resulting from a termination of this Agreement for any breach of any representation, warranty, covenant, agreement, undertaking or obligation contained in this Agreement or any other Transaction Document under Section 13.01(d) or (e), as applicable, shall be payment of the amount set forth in this Section 13.02, or (ii) specific performance under Section 14.06.  In the event this Agreement shall be duly terminated by a party, or all parties, pursuant to Section 13.01, written notice thereof shall forthwith be given to the other parties and, except as set forth in this Section 13.02, all further obligations of the parties shall terminate.

(a)     If this Agreement is duly terminated by a party under Section 13.01(d) or (e), as applicable, (regardless of whether the underlying breach or violation by the other party giving rise to such termination is intentional, unintentional, willful, negligent or otherwise), then the non-terminating party shall pay to the other party(ies), as liquidated damages and as such other party(ies)' sole and exclusive remedy with respect to such termination (including all underlying breaches or violations), whether under this Agreement, at law, in equity or otherwise, a termination fee equal to One Million Dollars ($1,000,000), by wire transfer of immediately available funds to an account(s) specified to such breaching party by the other party(ies), within ten (10) days of the effective date of such termination.  The parties acknowledge and agree that it would be impracticable or extremely difficult for any party to determine the actual damages resulting from any such breach or failure to perform hereunder and, therefore, the parties have agreed upon the foregoing remedy as liquidated damages which shall not be deemed to be in the nature of a penalty.  If a breach occurs that one party believes entitles it to terminate this Agreement pursuant to Section 13.01(d) or (e)

11

and the parties do not agree on whether the indemnifiable Losses from the breach are reasonably expected to exceed Three Million Dollars ($3,000,000), then each party shall have the right to demand mediation in New York City, NY in order to resolve any disagreement among the parties. The mediation will be performed by a mutually acceptable mediator in a forum agreed by the parties.

   (b)  If this Agreement is validly terminated pursuant to Section 13.01, the provisions of this Agreement shall thereafter become null and void, and there shall be no liability or obligation on the part of Sellers, the Companies or Purchaser (or any of their respective Indemnified Parties) under the Agreement or any other Transaction Document, except that (i) the provisions with respect to expenses in Section 14.02 (Expenses) and confidentiality in Section 7.02 (Public Announcements; Confidentiality) shall continue to apply following any such termination, and (ii) each party will return all documents, work papers and other material (and all copies thereof) of the other party, whether so obtained before or after the execution hereof, to the party furnishing the same."

  1.19 <u>Amendments to Expenses</u>. The provisions of Section 14.02 of the Agreement are hereby amended to reflect that, in addition to any and all other fees, costs and expenses required to be borne by Purchaser pursuant such Section, Purchaser shall bear all fees, costs and expenses of Sellers' counsel, both in the United States and Sweden, incurred in connection with the preparation, negotiation and execution of this Amendment (including all Exhibits hereto) up to a maximum amount of Forty Thousand Dollars ($40,000).

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF SELLERS AND THE COMPANIES

  Each Seller and the Company, jointly and severally, represent and warrant to Purchaser as of the Amendment Date and as of the Closing Date, as set forth below.

  2.01 <u>Authority to Execute and Perform Amendment</u>.

  (a) Each Seller has the individual power and authority and full legal capacity to, and is competent to, enter into, execute and deliver this Amendment, to perform fully his obligations hereunder and to consummate the transactions contemplated hereby.

  (b) Each Company has the requisite corporate power and authority and full legal capacity to enter into, execute and deliver this Amendment, to perform fully its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Amendment by the Companies and the consummation of the transactions contemplated hereby have been duly and validly

authorized by Sellers as the sole members of the Companies and by all requisite limited liability company actions or proceedings required to be taken by each Company.

(c) This Amendment has been duly executed and delivered by Sellers and each Company and constitutes a valid and binding obligation of Sellers and the Companies, enforceable against Sellers and the Companies in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or similar laws of general application now or hereafter in effect affecting the rights and remedies of creditors and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

2.02    Investment.   Each Seller (a) understands that neither the Shares nor the offer and sale of the Shares hereunder has been registered under the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, or under any state or other securities Laws, and that the Shares are being offered and sold in reliance upon federal and state exemptions for transactions not involving any public offering, (b) is acquiring the Shares solely for such Seller's own account for investment purposes, and not with a view to the distribution thereof, (c) is a sophisticated investor with knowledge and experience in business and financial matters, (d) has received certain information concerning Purchaser and has had the opportunity to obtain additional information and ask questions as desired in order to evaluate the merits and the risks inherent in holding the Shares, (e) is able to bear the economic risk and lack of liquidity inherent in holding the Shares, and (f) is an "Accredited Investor" as defined in Regulation D promulgated under the Securities Act of 1933, as amended.

### ARTICLE III

### REPRESENTATIONS, WARRANTIES AND COVENANTS OF PURCHASER

Purchaser represents, warrants and covenants to Sellers and the Companies, as of the Amendment Date and as of the Closing Date, as set forth below.

3.01    Authority to Execute and Perform Amendment and Agreement. Purchaser has the requisite corporate power and authority and full legal capacity to enter into, execute and deliver this Amendment and the Agreement (as amended by this Amendment), to perform fully its obligations hereunder and to consummate the transactions contemplated hereby and thereby.   The execution, delivery and performance of this Amendment and the Agreement (as amended by this Amendment) by Purchaser and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by the board of directors (and/or applicable governing body) of Purchaser and all other requisite action.   No other action (corporate or otherwise) on the part of Purchaser or its board of directors or other governing body is necessary to consummate, execute, deliver or perform this Amendment or the Agreement (as amended by this Amendment) or the transactions contemplated hereby and thereby.   This Amendment and the Agreement (as amended by this Amendment) each has been duly executed and delivered by Purchaser and constitutes a valid and binding obligation of Purchaser, enforceable against

Purchaser in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general applicability relating to or affecting creditors' rights and to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or Law).

3.02    Rights Offering.    Following the Closing Purchaser shall use its best efforts to consummate one or more public offerings and issuances of the ordinary shares, and/or rights with respect to such shares, of Purchaser with an aggregate offering value resulting in net proceeds (after payment of commissions and offering expenses) adequate to satisfy all of its obligations under the Bridge Loan and the Notes (the "Rights Issue").  If, notwithstanding such exercise of best efforts, Purchaser is unable to consummate such rights offering prior to June 13, 2008, Purchaser shall continue to use its best efforts to consummate such rights offering as promptly as possible thereafter.

3.03    Lock-Up Agreements.    Purchaser shall cause AB Kommandoran, HWJ Holding ApS, and Force C Investment sprl, (the "Opus Lock-Up Parties") and the persons (other than Geilen) listed in Section 3.04, on behalf of themselves and their Affiliates, to enter into lock-up agreements prior to the Closing in substantially the form of Exhibit F, prohibiting such parties from selling any shares of capital stock Purchaser prior to full satisfaction of all obligations under the Notes.  Each of the Opus Lock-Up Parties are investment vehicles controlled by one or more of the individuals named in Section 3.04 of this Amendment.

3.04    Compensation.    Except for increases in compensation in the ordinary course of business, which increases in the aggregate, may be no more than Thirty Percent (30%) of the respective individuals' total compensation as of the date hereof (and in the case of Geilen, as of the date his Employment Agreement commences), following the Closing and prior to the satisfaction of all obligations under the Notes, Purchaser shall not increase the total compensation of Magnus Greko, Jörgen Hentschel, Henrik Wagner Jörgensen, Göran Nordlund or Geilen.

3.05    Operation of SysTech Business.    Following the Closing and prior to the satisfaction of all obligations under the Notes, SysTech shall not (and Opus and its Affiliates shall not in the United States) participate in any new program relating to the Business (except for the Wisconsin program) involving start-up and implementation costs exceeding Five Hundred Thousand Dollars ($500,000), unless approved in writing by Tripathi in his sole discretion.  Examples of new programs that would require Tripathi approval are programs similar to Rhode Island, Nashville, Missouri, Ohio, Maryland and Ontario.  Examples of programs that would not require Tripathi approval (i.e. assuming start-up and implementation costs of less than Five Hundred Thousand Dollars ($500,000)) are programs similar to Salt Lake County and Memphis.

## ARTICLE IV

## MISCELLANEOUS

4.01   <u>No Further Amendments; Ratification</u>.   Except as specifically modified by this Amendment, the Agreement shall remain in full force and effect and is hereby ratified and affirmed, and this Amendment is hereby made a part thereof; provided, however, that, in the event of any conflict between the provisions of the Agreement and the provisions of this Amendment, the provisions of this Amendment shall control.

4.02   <u>Captions</u>.   The captions of this Amendment are for convenience only and shall not affect the interpretation or construction of this Amendment.

4.03   <u>Governing Law</u>.   This Amendment and the legal relations between and among the parties hereto shall be governed by and interpreted and construed in accordance with the Laws of the State of New York, without regard to the principles of conflicts of laws.

4.04   <u>Counterparts</u>.   This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.   This Amendment shall become effective when one or more such counterparts have been executed by each of the parties hereto and delivered to the other parties hereto, it being understood that all parties need not sign the same counterpart. Delivery by facsimile or e-mail transmission in PDF format to counsel for the other party of a counterpart executed by a party shall be deemed to meet the requirements of the previous sentence and to constitute good and effective delivery for all purposes.

4.05   <u>Construction</u>.   The parties acknowledge that they have been represented by counsel and that no inference against the party who drafted this Amendment shall be made when construing the provisions of this Amendment.

*[Remainder of Page Intentionally Left Blank.]*

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Amendment as of the date first above written.

OPUS PRODOX AB (publ)

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

TRILEN LLC                                        SYSTECH INTERNATIONAL, LLC

By: _____        By: _____
Name: LOTHAR GEILEN                         Name: LOTHAR GEILEN
Title: MEMBER                                       Title: MEMBER

_____        _____
PRADEEP TRIPATHI                                LOTHAR GEILEN

By executing this Amendment, the undersigned, the legal spouses of Pradeep Tripathi and Lothar Geilen, hereby join in the transfer of the Membership Interests solely to effect the release, extinguishment and waiver of any rights, including rights of dower, common law property, marital property or any other rights whatsoever, that either or each of them may have in and to the Membership Interests, and for no other purpose whatsoever.

_____        _____
POOJA TRIPATHI                                    MARIA LUISA GEILEN
Print Name Above                                   Print Name Above

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Amendment as of the date first above written.

OPUS PRODOX AB (publ)

By: _____
Name: Magnus Greko
Title: CEO

By: _____
Name: Göran Nordlund
Title: Chairman of the board
      OPUS Prodox AB

TRILEN LLC                           SYSTECH INTERNATIONAL, LLC

By: _____          By: _____
Name: _____          Name: _____
Title: _____          Title: _____


_____              _____
PRADEEP TRIPATHI                     LOTHAR GEILEN

By executing this Amendment, the undersigned, the legal spouses of Pradeep Tripathi and Lothar Geilen, hereby join in the transfer of the Membership Interests solely to effect the release, extinguishment and waiver of any rights, including rights of dower, common law property, marital property or any other rights whatsoever, that either or each of them may have in and to the Membership Interests, and for no other purpose whatsoever.


_____              _____

Print Name Above                     Print Name Above